*Hyundai Electric & Energy Systems Co. Ltd. v. United States and ABB Enterprise Software Inc.*
*AND SPX Transformer Solutions, Inc.*
**Court No. 20-00108, Slip Op. 20-160 (CIT November 9, 2020)**

**FINAL RESULTS OF REDETERMINATION PURSUANT TO COURT REMAND**

## I.    SUMMARY

The Department of Commerce (Commerce) prepared these final results of redetermination

in accordance with the opinion and remand order of the U.S. Court of International Trade (CIT or

the Court) issued on November 9, 2020, in *Hyundai Electric & Energy Systems Co. Ltd. v. United*

*States and ABB Enterprise Software Inc. AND SPX Transformer Solutions, Inc. Court No. 20-*

*00108, Slip Op. 20-160* (*Remand Order*).    These final remand results concern the final results in

the antidumping duty administrative review of large power transformers (LPTs) from the Republic

of Korea (Korea), and the period of review (POR) August 1, 2017, through July 31, 2018.[1]

In the underlying review, Commerce assigned Hyundai Electric & Energy Systems Co.

Ltd. (Hyundai) a final dumping margin of 60.81 percent based on total facts available with an

adverse inference.[2]  On October 30, 2020, the Court granted Hyundai's motion to supplement the

record with two documents that Hyundai presented at verification[3] which, at Commerce's request,[4]

---

[1]  *See Large Power Transformers from the Republic of Korea:    Final Results of Antidumping Duty Administrative Review; 2017-2018*, 85 FR 21827 (April 20, 2020) (*Final Results*), and accompanying Issues and Decision Memorandum (IDM).
[2]  *See Final Results*, 85 FR at 21829.
[3]  *See Hyundai Elec. & Energy Sys. Co. v. United States*, Slip Op. 20-153, 2020 Ct. Int'l Trade LEXIS 166 (CIT Oct. 30, 2020) (Order Granting Motion); *see generally* Confidential Pl.'s Mot. to Supp. the Record (Hyundai's Motion), ECF No. 28.
[4]  *See* Commerce's Letter, dated November 23, 2020.

Hyundai filed on the record.[5]  Hyundai alleges that these documents speak to the place of the

production of one of Hyundai's LPTs, and that Commerce's determination in the *Final Results* that

Hyundai's U.S. sales database was incomplete, was incorrect.  This was one of three factors that

Commerce found sufficiently warranted the application of total adverse facts available (AFA).[6]

Thus, in the *Remand Order*, at Commerce's request, the Court remanded the *Final Results*, with

respect to Hyundai, to allow Commerce to consider the documents and modify its determination,

as necessary.  In accordance with the *Remand Order*, Commerce considered its findings in light of

the documents subject to the Court's opinion in its October 30, 2020 order.

## II.    DISCUSSION

### A.  Statutory and Regulatory Background

Commerce conducts an administrative review in accordance with 19 CFR 351.221, under

which Commerce sends to appropriate interested parties questionnaires requesting necessary

factual information to conduct the review.  Commerce's regulation, 19 CFR 351.102(21), defines

factual information.  For instance, pursuant to 19 CFR 351.102(21)(i), Commerce considers

factual information as evidence, including statements of fact, documents, and data submitted either

in response to initial and supplemental questionnaires, or, to rebut, clarify, or correct such evidence

submitted by any other interested party.  Further, and pursuant to section 776 of the Tariff Act of

1930, as amended (the Act), when a party provides less than full and complete facts needed to

make a determination, Commerce must fill in the gaps with facts otherwise available.

Section 776(a) of the Act provides that Commerce, subject to section 782(d) of the Act,

will apply "facts otherwise available" if necessary information is not available on the record or an

---

[5]  *See* Hyundai's Letter, "Large Power Transformers from Korea:   Submission of Record Documents," dated
November 25, 2020 (Hyundai's Record Documents).
[6]  *See Final Results* IDM at 5-37.

interested party: (1) withholds information that has been requested by Commerce; (2) fails to provide such information within the deadlines established, or in the form or manner requested by Commerce, subject to subsections (c)(1) and (e) of section 782 of the Act; (3) significantly impedes a proceeding; or (4) provides such information, but the information cannot be verified.

Additionally, section 776(b) of the Act provides that if Commerce finds that an interested party failed to cooperate by not acting to the best of its ability to comply with a request for information, Commerce may use an inference adverse to the interests of that party in selecting the facts otherwise available. A respondent fails to cooperate to the best of its ability when it fails "to do the maximum it is able to do."[7] In determining whether a party has failed to do the maximum it is able to do, Commerce first "make{s} an objective showing that a reasonable and responsible {respondent} would have known that the requested information was required to be kept and maintained under the applicable statutes, rules, and regulations."[8] Further, motivation or intent is not taken into consideration when applying the "best of its ability" standard.[9]

Depending on the severity of a party's failure to respond to a request for information and failure to cooperate to the best of its ability, Commerce may select either partial or total AFA. Generally, the "use of partial facts available is not appropriate when the missing information is core to the antidumping analysis and leaves little room for the substitution of partial facts without undue difficulty."[10] Where there are "pervasive and persistent deficiencies that cut across all aspects of the data," all of the reported information may be unreliable, making a total AFA application appropriate.[11]

---

[7] *See Nippon Steel* 337 F.3d at 1382.
[8] *Id.*
[9] *Id.* 337 F.3d at 1383.
[10] *See Mukand, Ltd. v. United States*, 767 F.3d 1300, 1308 (Fed. Cir. 2014).
[11] *See Zhejiang DunAn Hetian Metal Co. v. United States*, 652 F.3d 1333, 1348 (Fed. Cir. 2011) (citing *Steel Auth. of India, Ltd. v. United States*, 25 CIT 482, 487–88, 149 F. Supp. 2d 921, 928–29 (2011)).

Commerce is not required to determine, or make any adjustments to, a weighted-average dumping margin based on assumptions about information an interested party would have provided if the interested party had complied with Commerce's request for information.[12]  In addition, the Statement of Administrative Action accompanying the Uruguay Round Agreements Act (SAA) explains that Commerce may employ an adverse inference "to ensure that the party does not obtain a more favorable result by failing to cooperate than if it had cooperated fully."[13]  Further, affirmative evidence of bad faith on the part of a respondent is not required before Commerce may select information based upon the application of an adverse inference.[14]  It is Commerce's practice to consider, in employing adverse inferences, the extent to which a party may benefit from its own lack of cooperation.[15]

Further, section 776(b)(2) of the Act states that Commerce, when employing an adverse inference, may rely upon information derived from the petition, the final determination from the less-than-fair-value (LTFV) investigation, a previous administrative review, or other information placed on the record.[16]  In selecting a rate based on AFA, Commerce selects a rate that is sufficiently adverse to ensure that the uncooperative party does not obtain a more favorable result by failing to cooperate than if it had fully cooperated.[17]

When using facts otherwise available, section 776(c) of the Act provides that, in general, where Commerce relies on secondary information (such as a rate from the petition) rather than

---

[12] *See* section 776(b)(1)(B) of the Act.
[13] *See* H.R. Doc. 103-316, vol. 1 (1994) at 870; *Certain Polyester Staple Fiber from Korea: Final Results of the 2005-2006 Antidumping Duty Administrative Review*, 72 FR 69663, 69664 (December 10, 2007).
[14] *See, e.g.*, *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1382-83 (Fed. Cir. 2003); *Notice of Final Determination of Sales at Less Than Fair Value: Circular Seamless Stainless Steel Hollow Products from Japan*, 65 FR 42985 (July 12, 2000); *Antidumping Duties; Countervailing Duties, Final Rule*, 62 FR 27296, 27340.
[15] *See, e.g.*, *Steel Threaded Rod from Thailand: Preliminary Determination of Sales at Less Than Fair Value and Affirmative Preliminary Determination of Critical Circumstances*, 78 FR 79670 (December 31, 2013), and accompanying IDM at 4, unchanged in *Steel Threaded Rod from Thailand: Final Determination of Sales at Less Than Fair Value and Affirmative Final Determination of Critical Circumstances*, 79 FR 14476 (March 14, 2014).
[16] *See also* 19 CFR 351.308(c).
[17] *See* SAA at 870.

information obtained in the course of an investigation, it must corroborate, to the extent practicable, information from independent sources that are reasonably at its disposal. Secondary information is defined as information derived from the petition that gave rise to the investigation or review, the final determination from the LTFV investigation concerning the subject merchandise, or any previous review under section 751 of the Act concerning the subject merchandise.[18] The SAA clarifies that "corroborate" means that Commerce will satisfy itself that the secondary information to be used has probative value.[19] To corroborate secondary information, Commerce will, to the extent practicable, examine the reliability and relevance of the information to be used.[20]

Finally, under section 776(d) of the Act, Commerce may use any dumping margin from any segment of a proceeding under an antidumping order when applying an adverse inference, including the highest of such margins.[21] The Act also makes clear that when selecting an AFA margin, Commerce is not required to estimate what the dumping margin would have been if the interested party failing to cooperate had cooperated or to demonstrate that the dumping margin reflects an "alleged commercial reality" of the interested party.[22]

## B. Factual Background

On October 4, 2018, in accordance with 19 CFR 351.221(c)(1)(i), Commerce published a notice of initiation of the administrative review of the antidumping duty order on LPTs from

---

[18] *Id.*
[19] *Id.; see also* 19 CFR 351.308(d).
[20] *See, e.g., Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, from Japan, and Tapered Roller Bearings, Four Inches or Less in Outside Diameter, and Components Thereof, from Japan; Preliminary Results of Antidumping Duty Administrative Reviews and Partial Termination of Administrative Reviews*, 61 FR 57391, 57392 (November 6, 1996), unchanged in *Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, from Japan, and Tapered Roller Bearings, Four Inches or Less in Outside Diameter, and Components Thereof, from Japan; Final Results of Antidumping Duty Administrative Reviews and Termination in Part*, 62 FR 11825 (March 13, 1997).
[21] *See* section 776(d)(1)-(2) of the Act.
[22] *See* sections 776(d)(3)(A) and (B) of the Act.

Korea.[23]    Commerce subsequently selected Hyosung and Hyundai as mandatory respondents for individual review.[24]

On October 9, 2019, in the *Preliminary Results*, Commerce determined that Hyundai failed to cooperate and act to the best of its ability to provide Commerce with necessary requested information by failing to provide information regarding service-related revenues for U.S. transactions, failing a completeness check at verification, and failing to provide complete information with respect to merchandise under consideration, and, therefore, impeded the review by preventing Commerce from calculating an accurate dumping margin.[25]

On April 14, 2020, Commerce issued the *Final Results*, determining a final dumping margin of 60.81 percent for Hyundai based on the application of total AFA.[26]    Commerce's decision to apply total AFA to Hyundai was based on three findings:    (1) Hyundai failed to cooperate by not acting to the best of its ability to comply with a request for sales documentation, including documentation related to service-related revenues and expenses; (2) Hyundai impeded the proceeding by providing shifting and opaque explanations for its classification of certain parts and components as not within the scope of the order (out-of-scope merchandise); and, (3) Hyundai failed to demonstrate that it reported all required sales in its U.S. sales database and therefore Commerce found that its reporting of all U.S. sales of subject merchandise during the POR was incomplete.[27]    Hyundai challenged Commerce's determination to rely on total AFA and the rationale that Commerce relied upon as support.

---

[23]  *See Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 83 FR 50077 (October 4, 2018).
[24]  *See* Memorandum, "Antidumping Duty (AD) Administrative Review of Large Power Transformers (LPTs) from the Republic of Korea (Korea):    Respondent Selection Memorandum," dated December 13, 2018.
[25]  *See Large Power Transformers from the Republic of Korea:    Preliminary Results of Antidumping Duty Administrative Review; 2017–2016*, 84 FR 5559 (October 17, 2019) (*Preliminary Results*), and accompanying Preliminary Decision Memorandum.
[26]  *See Final Results*, 85 FR at 21828.
[27]  *See Final Results* IDM at 5-37.

On October 30, 2020, as noted above, the Court granted Hyundai's motion to supplement the record with two documents that Hyundai contends show where the LPT in question was produced, and therefore establish the completeness of Hyundai's sales reporting.[28]   The Court noted that Commerce relied, in part, on total AFA because Hyundai failed to report all of its U.S. sales of subject merchandise during the POR after Commerce discovered that one LPT had been omitted from Hyundai's U.S. sales database, even though the associated documentation showed that it was produced in Korea and delivered during the POR.[29]   Hyundai alleged that it transferred the production of the LPT from Korea to Hyundai Power Transformers USA (HPT) in the United States, and therefore HPT, not Hyundai, produced and sold this LPT; as such, there was no basis for Hyundai to include this sale in its U.S. sales database, and its U.S. sales database is reliable.[30] Hyundai provided two documents, a test report and a nameplate document, both related to the sale of the LPT at issue, which Commerce officials requested, reviewed, and discussed at verification – as support for the location of the production of the LPT.[31]   However, Commerce did not include the documents as verification exhibits and did not discuss these documents in its *Final Results*. Thus, the Court remanded the *Final Results* with respect to Hyundai so that Commerce could consider the documents and modify its final results of review, as necessary.[32]   In accordance with the granted motion, therefore, Commerce requested that the Court remand the final results so that Commerce could consider these documents and address whether they affect Commerce's reliance on total AFA; Commerce subsequently requested that Hyundai file the documents to the record of this remand proceeding for examination and comment.[33]   Hyundai, as well as ABB Enterprise

[28]  *See, generally*, Order Granting Motion.
[29]  *See Final Results* IDM at 6.
[30]  *See* Order Granting Motion at 3.
[31]  *See* Hyundai's Record Documents.
[32]  *See* Remand Order at 4.
[33]  *See* Remand Order at 4; *see also* Commerce's Letter, dated November 23, 2020.

Software Inc. and SPX Transformer Solutions, Inc. (collectively, the petitioners) provided comments on the documents.[34]   We have considered the record evidence, and discuss these issues below in the "Analysis" section.

Among the objectives of verification is to confirm the accuracy and completeness of factual information submitted by a respondent over the course of an investigation or administrative review.[35]   Most important to the integrity of responses is to ensure that the respondent has reported all of the required sales transactions.    Accordingly, Commerce reviews the reconciliation of the reported quantity and value of sales at verification.    During this review, Commerce conducts on-going completeness tests to confirm both the accuracy and thoroughness of the information submitted by the respondent and its affiliates.

In conducting completeness checks, Commerce officials typically select a number of sales transactions from a respondent's books and records to comprehensively review.    These requests may concern transactions of alleged out-of-scope merchandise or transactions that are entirely unrelated to selling or production of subject merchandise.    As part of the completeness checks, Commerce officials may ask the respondent to identify whether or not the transaction was included in the questionnaire response as subject merchandise and the rationale for its inclusion or exclusion.    Commerce also asks the respondent to provide the original sales documents, such as invoices, and documentation to support the respondent's exclusion of the information from the response if the sale or other information is not part of the response.    During these tests, verifiers trace sales and expense information into company books and records, and follow up with company

---

[34]  See Hyundai's Letter, "Large Power Transformers from Korea:    Comments on Hyundai Documents," dated December 21, 2020 (Hyundai's Comments); and Petitioners' Letter, "Large Power Transformers from the Republic of Korea – Petitioners' Response to Hyundai's Submission of Record Documents," dated December 21, 2020(Petitioners' Comments).
[35]  *See* 19 CFR 351.307(d).

officials as necessary, particularly when there is a potential discrepancy between the quantity and value of sales as reported to Commerce, as is evident in company books and records.

During the on-going completeness tests at verification, a respondent will normally need some time to compile the appropriate source documents and to generate any explanatory worksheets and explanations for the completeness tests.    However, in the verification agenda, Commerce notes:

> It is the responsibility of the respondent to be fully prepared for this verification. If your client is not prepared to support or explain a response item at the appropriate time, the verifiers will move on to another topic.    If, due to time constraints, it is not possible to return to that item, we may consider the item unverified, which may result in our basing the results of this administrative review on the facts available, possibly including information that is adverse to the interests of your client.[36]

Thus, when verifiers find the respondent is not prepared to support or explain a response in a timely manner, verifiers will move on to the next agenda item to complete the verification of responses in the time Commerce allotted.

Further, Commerce informs respondents that at verification, new information will be accepted only when:    "(1) the need for that information was not evident previously; (2) the information makes minor corrections to information already on the record; or (3) the information corroborates, supports, or clarifies information already on the record."[37]    As a result, Commerce accepts new factual information at a verification only in limited circumstances.

In its verification of Hyundai, Commerce was unable to confirm the accuracy and completeness of factual information submitted by Hyundai.    Commerce determined that Hyundai

---

[36] *See* Commerce's Letter, "2017-2018 Administrative Review of Large Power Transformers from the Republic of Korea:    Constructed Export Price Sales Verification," dated August 21, 2019 at 2.
[37] *Id.*

failed to report a complete U.S. sales database after it failed Commerce's completeness test at verification.[38]    As part of the completeness test for Hyundai's U.S. sales database, Commerce officials selected a sale that was booked during the POR, and noted that it was delivered during the POR, and in addition, Commerce found that "documentation indicated that this sale was made on behalf of {Hyundai Power Transformers (HPT)} in Alabama, while {Hyundai Corporation USA (Hyundai USA)} had invoiced, and the customer had paid to Hyundai USA, customs duties."[39] Consequently, Commerce officials asked several follow-up questions during the completeness test, including where documents were stored.    This line of inquiry led to the discovery of a working file kept at Hyundai USA, which compiles documents related to the sale, including correspondence between Hyundai, Hyundai USA, HPT, and the final customer.[40]    Commerce requested the complete working file for the sale in question, as well as for two other U.S. sales, and reviewed the working file.[41]

As with any completeness test during a verification, and as the Court noted,[42]  Commerce officials requested to review other documents to thoroughly vet the discrepancy in Hyundai's U.S. sales database.    However, outside the context of a verification, Commerce officials do not have the immediate ability to test the integrity of a company's books and records.    Here, Commerce accepted the working file related to the sale in question as an exhibit instead of other documents that Commerce reviewed at the time.

Pursuant to the Court's order, Commerce has considered the test report and nameplate document and, as necessary, reconsidered our reliance on total AFA to determine Hyundai's

---

[38]  *See Final Results* IDM at 6.
[39]  *Id.*
[40]  *See* Memorandum, "Constructed Export Price Verification of the Sales Response of Hyundai Electric & Energy Systems Co., Ltd. in the Antidumping Review of Large Power Transformers from the Republic of Korea," dated October 9, 2019 (Hyundai CEP Verification Report) at 10-11.
[41]  *Id.*
[42]  *See Remand Order* at 2; *see also* Hyundai's Record Documents.

margin.    For reasons provided below, we continue to find that Hyundai failed to establish that the LPT was produced in Alabama by HPT, and thus, should not have been included in its U.S. sales database.    Specifically, we find that the documents Hyundai used to support its contention do not indicate the production location of the [            ] of the LPT.    Further, these documents do not fulfill the evidentiary requests of Commerce officials' verification "completeness" test. Accordingly, for this redetermination, we continue to apply an adverse inference in selecting from the facts available for Hyundai, based on Hyundai's failure:    in the above-referenced completeness test; to provide supporting documentation concerning its service-related revenues; and to report as home market sales the sales of certain parts.

### C.  Verification Documents

### 1.  Nameplates

Commerce has examined the nameplates in the test report and those submitted separately.[43] We find that contrary to Hyundai's contentions, the name plate document does not indicate where the [            ] of the LPT is produced.[44]    Further, the nameplate information on page 17 of the test report is inconsistent, and thus, not clearly indicative of the production location.    Specifically, the nameplate information within the test report identifies the manufacturer as [        ], while a separate test report for the same customer for another LPT leaves this field blank.[45]    The presence of the manufacturer field in one test report and its absence in another highlights concerns about internal consistency between the nameplate information located within test reports and the nameplate document itself.    Further, the internal inconsistency demonstrates that the mere presence of [        ] in the manufacturer information field is not an indication of the manufacture

---

[43]  *See* Hyundai's Record Documents at Attachments 1 and 2.
[44]  *See* Hyundai's Comments at 3.
[45]  *See* Hyundai's Letter, "Large Power Transformers from the Republic of Korea:    HEES's Section A Questionnaire Response," dated February 19, 2019 at Exhibit A-14, page 180.

location of [                  ] of the LPT.   Because of this inconsistency and the failure of the nameplate to designate the production location as Alabama, secondary to the other record evidence of Hyundai's completeness test failure at verification, for purposes of this   redetermination, we continue to conclude that the weight of the evidence indicates the LPT in question was produced in Korea.   Therefore, we continue to determine that Hyundai should have included this sale in the database of U.S. sales during the POR that was provided to Commerce during the conduct of the administrative review, and that Hyundai's reporting of U.S. sales was therefore incomplete.

## 2.  Test Report

Commerce has examined the test report.[46]   The test report indicates that the assembled LPT was *tested* at the Alabama plant.   However, because it contains no information indicating the manufacturing location of the [              ] of the LPT, it does not establish that the [            ] was produced in the United States.   While the nameplate information located within the test report identifies [     ] as the manufacturer, as noted above, this information is not consistent and not illustrative of manufacture location.   Therefore, the test report identifies only the testing location not the production location of the [              ] of the LPT in question.   Because of the absence of this information, among the other record evidence of Hyundai's completeness test failure at verification, for purposes of this redetermination, we continue to conclude that the weight of the evidence indicates the LPT in question was produced in Korea, as described below, and therefore, Hyundai should have included this sale in the database of U.S. sales during the POR that was provided to Commerce during the conduct of the administrative review.

## 3.  Party Comments

Below, we address arguments raised by Hyundai concerning the supplemental

---

[46] *See* Hyundai's Record Documents at Attachment 1.

12

documents.[47]

***Hyundai's Comments:***

- The serial number listed in the test report and on the nameplate document differ from serial numbers used by Hyundai in Korea, and this establishes that the LPT at issue was not produced in Korea.[48]

- Commerce verified that Hyundai uses a consistent serial number for LPTs.[49]

- The nameplate identifies the manufacturer.[50]

- There is a "strong relationship" between testing and the production location, and the name plate and the initial pages of the test reports identify HPT in Alabama as the manufacturer.[51]

- Certain parts and components of the LPT itself, provided by outside contractors, were shipped to HPT, and contractors routinely ship parts and components to the manufacturer of the LPT.[52]

***Petitioners' Comments:***

- While the test report is on HPT letterhead, it does not actually say anything about the manufacturer of the main body or LPT, nor where the main body or LPT were produced.[53]

- HPT may have performed testing in the United States after the active parts of the LPT were imported and assembled and does not constitute substantial evidence that the active parts of the LPT were produced by HPT in the United States.[54]

---

[47] *See* Hyundai's Comments.
[48] *Id*. at 2.
[49] *Id*. at 3.
[50] *Id*.
[51] *Id*. at 4-5.
[52] *Id*. at 5-6.
[53] *See* Petitioners' Comments at 2.
[54] *Id*.

- Hyundai could not provide the specific documentation that Commerce actually requested at verification, *i.e.*, the contractually required communication between the customer and Hyundai or the bill of lading for the [          ].

- There are also no production records.[55]

- The test report [

    ]. Thus, the most up-to-date records indicate that the production of the [

    ] was completed in Korea.[56]

### 4. Analysis of Verification Documents

Despite Commerce's inability to follow up on these assertions, as it would have been able to do had Hyundai presented them at verification, Hyundai's arguments do not establish that the [          ] of the LPT was made at HPT in Alabama, and not in Korea.    Therefore, Hyundai should have included this sale in its database of U.S. sales during the POR.    Hyundai argues that the serial number listed in the test report and the serial number listed on the nameplate document differ from serial numbers used by Hyundai in Korea;[57]  that it uses a consistent serial number for LPTs; and that Commerce has verified this.[58]    We have examined the serial numbers reported for Hyundai's U.S. and Korean sales of LPTs.    However, as we explain below, when weighed against other substantial record evidence, for purposes of this redetermination, we find that the placement of a serial number on the LPT nameplate does not establish that the [          ] was produced in Alabama.    Second, Hyundai argues that the nameplate identifies the manufacturer.[59]    However, there are two nameplates documents on the record, one separately submitted[60]  and one that is part

---

[55] *Id.* at 3.
[56] *Id.*
[57] *See* Hyundai's Comments at 2.
[58] *Id.* at 3.
[59] *Id.*
[60] *See* Hyundai Record Documents at Attachment 2.

of the test report, and these two documents are virtually identical.[61]   Hyundai claims that the

separately submitted nameplate identifies the general manufacturer of the LPT as HPT.

However, the test report also includes a form with nameplate information which merely identifies

"[    ]" as the manufacturer.[62]   All of these documents, whether considered separately or taken

together, do not establish where the [          ] was produced, either in Alabama or in Korea.

Not only is there an inconsistency between the one name plate (the separately submitted one) that

identifies HPT on it and the nameplate information in the test report that identifies the

manufacturer as [    ], but Hyundai has also identified no record evidence establishing that [    ]

indicates HPT.   Further, nameplate information in another test report for an LPT sold to the same

customer leaves the manufacturer field blank.   Even if the LPT was assembled in Alabama, the

documents do not establish that the [          ] was produced in Alabama.   In any event, as we

explain below, when weighed against other record evidence, the generic identifier [    ] in the

nameplate information in the test report is inconsistent with the submitted nameplate information

on the record for another LPT for the same customer as well as other record evidence.   Further,

this identifier does not establish that the [          ] was produced in Alabama.

     Third, Hyundai states that there is a "strong relationship" between the testing location and

the production location, and that the nameplate and the initial pages of the test reports identify

HPT in Alabama as the manufacturer.[63]   We find that this statement is not supported by record

information.   The test report indicates that the LPT was tested at HPT in Alabama.   However,

there is no information in the test report that establishes that the [          ] was produced in

Alabama.   The manufacturer box in the nameplate information in the test report merely lists

[    ].   Thus, we find that the only information that can be inferred from the test report is that it

---

[61] *Id.* at Attachment 1, Test Report, pages 3-4.
[62] *Id.* at Attachment 1, Test Report, page 17.
[63] *Id.* at 4-5.

was tested at the Alabama plant.   There is no record evidence of the "strong relationship" that Hyundai contends exists between the testing site and the place of production.   Further, Hyundai merely describes this as a "strong relationship," rather than referring to any direct evidence thereof.   In so doing, Hyundai implicitly recognizes that the test report does not provide direct evidence of production occurring in the same location as testing.   Hyundai also implicitly recognizes that there are exceptions (*i.e.*, exceptions to the "strong relationship" between testing and the production location).   In the context of Hyundai's inability to establish the completeness of its U.S. sales reporting at verification, the LPT at issue could be the single exception, or there may be others.   This is not a case where there are thousands of sales, which would diminish the effect of an omission or other misreporting of one sale in the calculation of the potential margin. To the contrary, given the small number of sales at issue in this review, and the impact the omission or other misreporting of one sale could have on the dumping margin, the complete and accurate reporting of every sale is critical for Commerce to accurately determine the extent to which dumping, if any, is occurring.   Moreover, as we explain below, when weighed against other record evidence, the fact that the LPT may have been tested at the Alabama plant, does not establish that the [          ] was produced in Alabama.   That Hyundai did not include this in its U.S. sales database establishes that Hyundai's reporting was incomplete and inaccurate.

   Finally, we have considered Hyundai's argument that certain parts and components of the LPT itself, provided by outside contractors, were shipped to HPT, and that because contractors routinely ship parts and components to the manufacturer of the LPT, this fact establishes that HPT, in Alabama, is the manufacturer.[64]   We find that Hyundai's argument is not supported by record information.   The fact that certain parts and components were shipped to the Alabama plant is not

---

[64] *Id*. at 5-6.

evidence that the [                ] was produced in Alabama, and not in Korea.    Rather, it lends

support to the notion that the LPT may have been assembled at the Alabama plant.    However, as

noted, none of the record evidence demonstrates that the [

                              ] of the LPT subject to the sale at issue, was produced in Alabama,

and not in Korea.

### 5.  Other Record Evidence

While the nameplates and test report may indicate that the LPT at issue may have been

assembled and tested at the Alabama plant, we continue to find, for this redetermination, that

Hyundai's verification failures do not support a finding that the [                ] was produced at HPT

in Alabama.

### *The Sales Contract*

The sales contract for the LPT at issue required the LPT to be made in Korea.    In the

event that Hyundai wished to shift production to the United States, the sales contract requires

Hyundai to notify the customer in writing and to get explicit approval from the customer for such a

shift.[65]   When asked at verification for documentation demonstrating that such a request was

made by Hyundai and approved by the customer regarding this sale, Hyundai was unable to

produce them.[66]   Hyundai provided no explanation for the inability to produce these documents at

verification.

### *Documents of Payment of Customs Duties*

At verification, Commerce collected documents demonstrating that customs duties were

---

[65] *See* Hyundai CEP Verification Report at 9-11.
[66] *Id.*

paid for the LPT at issue.[67]   These customs duties were charged to the customer and the customer

paid Hyundai USA for them.[68]   Hyundai has asserted that the inclusion of customs duties was a

clerical error.[69]   However, this is unsupported by the administrative record, given that record

documents show the customs duties were paid and passed on to the customer who, in turn, paid

Hyundai USA.   Hyundai has identified no record evidence of a refund for a "clerical error."

***Transport Documents for the [        ] from Alabama to the Customer***

At verification, Commerce made three separate requests to Hyundai to provide shipping

documentation to demonstrate that the [      ] was shipped from the Alabama plant to the

customer.[70]   Hyundai was unable to provide any shipping information regarding the [      ].

Hyundai was able to provide shipping invoices only for certain parts and components.[71]

### 6.  Summary

In sum, record evidence does not support Hyundai's assertions that the [       ] of the

LPT in question was produced in Alabama.   It is imperative to remember that even if the test

report were, as Hyundai contends, a reliable indicator of where the LPT was produced, Hyundai

could not provide the specific documentation that Commerce requested at verification.

Specifically, Hyundai was unable to provide evidence of the contractually required communication

between Hyundai and the customer representing the notification of, and the approval by the

customer, for the shift in production from Korea to the United States.   Hyundai was also unable to

provide evidence of the communication with its customer, also required by contract, notifying that

production of the LPT had begun, whether in Korea or in Alabama.[72]   Hyundai provided no

---

[67] *Id.*
[68] *Id.*
[69] *See Final Results* IDM at 7.
[70] *See* Hyundai CEP Verification Report at 9-11.
[71] *Id.*
[72] *Id.*

evidence of such communication at verification at Commerce's request, and therefore, there is none on the record. At verification, Hyundai was unable to explain: (1) the absence of the documents required by the sales contract for shifting production to the United States and beginning testing; and (2) the documentation showing that Hyundai was charged customs duties, subsequently charged the customer for those customs duties and that the customer paid those customs duties, in light of Hyundai's contention that there was a clerical error. Hyundai was also unable to produce any shipping documents from the Alabama plant to the customer for the [

]. Such documents would have been created if the [        ] had been produced in Alabama and shipped to the customer from there. Moreover, Hyundai did not provide any production documentation that demonstrated the [        ] was produced in Alabama, as described above.[73] Taken as a whole, the lack of basic supporting documentation and the payment of customs duties by the customer supports a finding that Hyundai failed to properly report this sale as a U.S. sale as required by Commerce and it establishes Hyundai's failure at verification of Commerce's completeness test.[74] Any inference that may be drawn from the testing in Alabama or a nameplate serial number is completely overshadowed by these failures.

For the reasons explained above, for this redetermination, we continued to find that Hyundai failed at verification to demonstrate it had reported a complete U.S. sales database. This failure leaves Commerce with unreliable data that cannot be used to calculate an accurate margin. The new information provided by Hyundai in this remand redetermination does not undermine Commerce's *Final Results*. Thus, Commerce continued to find that the record evidence warrants the application of AFA to Hyundai.

### 7. Total Adverse Facts Available

---

[73] *Id.*
[74] *Id.*

*Facts Available*

Commerce's application of facts available to Hyundai is supported by the weight of the evidence on the record.   In addition to Hyundai's completeness test failure at verification that rendered unreliable Hyundai's U.S. sales database, Hyundai failed in other areas when it failed to report service-related revenues and provide sales documentation associated with U.S. sales, and Hyundai failed to consistently report the sales of certain parts in the home market.[75]   These deficiencies affect both export price and normal value, thus affecting all aspects of the margin calculation.   Therefore, the statute gives Commerce the authority to resort to facts available for the defective and missing information.[76]

*Adverse Inference in Selection of Facts Available*

Hyundai had the opportunity to provide complete and accurate information with respect to its reporting of its U.S. sales, home market sales, and all relevant sales documentation and expenses.   Indeed, as the record demonstrates, Hyundai possessed the information regarding its sales and the documentation.   However, Hyundai either failed to provide such information, or inconsistently reported it to Commerce and was thus unable to establish that its U.S. sales reporting was complete.   Therefore, Commerce finds that Hyundai did not act to the best of its ability and impeded Commerce's conduct of the review; therefore, in accordance with section 776(b) of the Act, the use of adverse inference is warranted in selecting from the available facts.

The Court has found that the use of total AFA is appropriate when the respondent's conduct undermines the credibility and reliability of the data overall.[77]   Because of the fundamental nature and the severity of Hyundai's failures at verification, Hyundai's failure to provide sales documentation related to its service-related revenues and expenses, and Hyundai's

---

[75] *See Final Results* IDM at 4-37.
[76] *See* section 776(a)(1) of the Act.
[77] *See Papierfabrik August Koehler SE v. United States*, 7 F. Supp. 1304 (2014).

inconsistent reporting of the sales of certain parts in the home market, for purposes of this redetermination, Commerce accordingly has determined it appropriate to continue to apply total AFA. The effect of Hyundai's inaccurate and incomplete reporting results in Commerce's inability to calculate an accurate dumping margin. Further, Commerce could not verify that Hyundai had reported accurate information, nor could Commerce confirm, at verification, that Hyundai had not omitted relevant data, such as other U.S. sales, from its U.S. sales database. Because Hyundai submitted incomplete, inconsistent, and unreliable information, Commerce cannot reasonably calculate an accurate dumping margin based on the factual information on the record of this proceeding. Therefore, under these circumstances Commerce continued to rely, for purposes of this redetermination, on total AFA to determine a dumping margin for Hyundai.

## III.  Discussion of Comments

Commerce released its Draft Remand Redetermination on February 12, 2021, and invited comments from interested parties.[78] The petitioners and Hyundai submitted comments. We continue to find, after reviewing all comments on the issue, that Hyundai failed at verification to demonstrate it had reported a complete U.S. sales database, and that the application of total AFA is warranted. Our discussion of interested party comments is below.

### A.  Issue 1:  Documents Placed on the Record

*Petitioners' Comments*

- Commerce's analysis with respect to the documents placed on the record is correct.[79]

---

[78] *See* Draft Results of Remand Redetermination:  *Hyundai Electric & Energy Systems Co. Ltd. v. United States and ABB Enterprise Software Inc. AND SPX Transformer Solutions, Inc.* Court No. 20-00108, Slip Op. 20-160, dated November 9, 2020 (Draft Remand Redetermination).
[79] *See* Petitioners' Comments at 1-2.

- Commerce has taken all comments into consideration, and has reached a conclusion that is supported by substantial evidence.[80]

***Hyundai's Comments***

- Commerce's findings in the Draft Remand Redetermination are not supported by substantial evidence, and a reasonable assessment of the record evidence would lead to the conclusion that the LPT in question was produced in Alabama.[81]  The definition of "substantial evidence" indicates that Commerce must consider the record as a whole, including evidence that supports and detracts from the substantiality of the evidence.[82]

- Commerce has not given appropriate weight to the nameplate and test report documents,[83] and the conclusions reached by Commerce with respect to the test report are not supported by evidence on the record.[84]

- Commerce must give weight to the serial number as evidence showing that the [          ] was not produced in Korea.[85]

- Commerce does not give weight to the "strong relationship" between the testing site and place of production in its analysis.[86]

- The shipment of components to Alabama indicates that the LPT itself was produced in Alabama.[87]  A [                              ] document demonstrates that the LPT in question was shipped from Alabama to the customer.[88]

---

[80] *Id.* at 2.
[81] *See* Hyundai Comments at 4, 18-20.
[82] *Id.* at 4.
[83] *Id.* at 5.
[84] *Id.* at 8.
[85] *Id.* at 8-9.
[86] *See* Hyundai's Comments at 9-10.
[87] *Id.* at 10-11.
[88] *Id.*

- Furthermore, other information on the record supports the conclusion that the LPT in question was manufactured in Alabama, such as the production and sales of LPTs from Korea to the United States that Commerce examined and which also comports to Customs data.[89]

- In contrast, the evidence cited by Commerce in support of Commerce's conclusions does not indicate that the LPT in question was produced in Korea.[90]

- There is no evidence on the record that customs duties were paid for the LPT in question.[91]

- The lack of customer approval documentation does not demonstrate that the LPT in question was produced in Korea.[92]

- Finally, other documents Hyundai provided support that the LPT in question was produced in Alabama, such as milestone payments, wire transfers, and the revised purchase contract between Hyundai USA and HPT.[93]

- Commerce gave no indication during verification that this issue was unverified.[94]

***Commerce's Position:***

Throughout its comments, Hyundai alleges that Commerce failed to consider all of the record evidence, and as such, Commerce cannot find that record evidence would lead to the conclusion that the LPT in question was produced in Alabama. However, Commerce reached its conclusion in the *Final Results* and in this *Remand Redetermination* based on the weight of the evidence on the record.

---

[89] *Id*. at 11-14.
[90] *Id*. at 14.
[91] *Id*. at 15-16
[92] *Id*. at 16-17.
[93] *See* Hyundai Comments at 17-18.
[94] *Id*. at 18.

Regarding the nameplates and test reports, the record contains the following:

- The full test report for the LPT in question[95] which includes a diagram of the nameplate for LPT in question with the name "[       ]" at the top,[96] and "[

      ]" at the bottom of the nameplate.[97]

- Also included in the test report at page 17[98] is a form with nameplate information which merely identifies "[     ]" as the manufacturer.

- Another diagram of the nameplate for the LPT in question, which includes the same information as the nameplate diagram included in the test report.[99]

Hyundai asserts that Commerce's conclusion regarding the nameplate is incorrect.[100] Specifically, while Commerce contends that there are two nameplate documents on the record (*i.e.*, one separately submitted)[101] and one that is part of the test report,[102] Hyundai argues there is only one.[103] The test report itself[104] also contains a page with nameplate information.[105] Within the test report's nameplate information,[106] the general manufacturer is identified as "[     ]," and thus, as Commerce found above, it does not definitively identify the production location.

Hyundai continues that even if the nameplate information within the test report[107] were the nameplate itself, the document identifies the "Company" as "Hyundai Power Transformers USA," which demonstrates that the LPT was produced in Alabama.[108] However, while the "Company"

---

[95] *See* Hyundai's Record Documents at Attachment 1, Test Report.
[96] *Id.* at Attachment 1, Test Report, page 3.
[97] *Id.* at Attachment 1, Test Report, page 4.
[98] *Id.* at Attachment 1, Test Report, page 17.
[99] *Id.* at Attachment 2.
[100] *See* Hyundia's Comments at 5.
[101] *See* Hyundai's Record Documents at Attachment 2.
[102] *Id.* at Attachment 1, Test Report, pages 3-4.
[103] *See* Hyundai's Comments at 6.
[104] *See* Hyundai's Record Documents at Attachment 1.
[105] *Id.* at Attachment 1, Test Report, page 17.
[106] *Id.*
[107] *Id.*
[108] *See* Hyundai's Comments at 7.

listed on page 17 of the test report is "Hyundai Power Transformers USA," the general

manufacturer listed on page 17 of the test report is "[     ]."[109]  Hyundai has not identified any

record evidence to demonstrate that "[     ]" is in fact HPT in Alabama.

Hyundai argues that the serial number listed in the test report and the serial number listed

on the nameplate document differ from serial numbers used by Hyundai in Korea; that it uses a

consistent serial number for LPTs; and that Commerce has verified this.    We have examined the

serial numbers reported for Hyundai's U.S. and Korean sales of LPTs.    However, as we explain

above, when weighed against other substantial record evidence, we find that the placement of a

serial number on the LPT nameplate does not establish that the [          ] was produced in

Alabama.

Hyundai further alleges that Commerce does not give weight to the "strong relationship"

between the testing site and place of production in its analysis.[110]    Yet, Hyundai even admits in its

comments that testing *typically* (*e.g.*, on occasion, but not always) occurs at the place of

production.[111]    The record evidence (*e.g.*, the test report) demonstrates the LPT in question was

tested in Alabama.    However, a test report is indicative only of where an LPT is *tested*, not where

it is *produced*.    Thus, Commerce cannot conclude that the LPT was produced in Alabama only

because it was tested in Alabama based on conjecture.

Hyundai asserts that shipment of components demonstrates that the LPT itself was

produced in Alabama.[112]  Hyundai also points to the [                    ] document that

it purports demonstrates that the LPT in question was shipped from Alabama to the customer.[113]

We disagree with Hyundai's interpretation of the record evidence.    Neither the shipment of

---

[109] *See* Hyundai's Record Documents at Attachment 1, Test Report, page 17.
[110] *See* Hyundai's Comments at 9-10.
[111] *Id.*
[112] *Id.* at 10-11.
[113] *Id.* at 14.

components or the [                    ] document support the conclusion that the LPT in question was produced in Alabama; only that the "components" were shipped from Alabama. Further, a central issue at the U.S. verification revolved around the shipment of the [

].[114]    Commerce noted that the [        ] was not included in the [

] to the job site.[115]    After several requests, rather than providing a [          ], Hyundai instead provided the [                    ] document, a document that had not been included with any other sale of an LPT.[116]    Further, Hyundai was unable to explain why it did not include the [        ] in the [              ], nor did it explain how a [

] document would suffice to replace a [            ].[117]    Regardless, shipping documentation does not demonstrate where an LPT is produced; only from where it was shipped.

Hyundai also argues that because Commerce verified Hyundai's U.S. sales and cost reporting in Korea, and reconciled this reporting to the company's books and records (which was also reflected in the data from U.S. Customs and Border Protection), this negates the possibility that the company could have produced and shipped a [        ] to HPT in Alabama.[118] However, as Commerce wrote in its verification reports, verification reports "do not draw conclusions as to whether the reported information was successfully verified, and further does not make findings or conclusions regarding how the facts obtained at verification will ultimately be treated in Commerce's determinations."[119]    Indeed, Commerce conducts verification to confirm both the accuracy and thoroughness of the information submitted by a respondent, but Commerce

---

[114] *See* Commerce's Letter, "2017-2018 Administrative Review of Large Power Transformers from the Republic of Korea:    Constructed Export Price Sales Verification," dated August 21, 2019 at 9-11.
[115] *Id*. at 10.
[116] *Id*.
[117] *Id*.
[118] *See* Hyundai Comments at 11-13.
[119] *See* Commerce's Letter, "2017-2018 Administrative Review of Large Power Transformers from the Republic of Korea:    Constructed Export Price Sales Verification," dated August 21, 2019 at 1; *see also* Commerce's Letter, "2017-2018 Administrative Review of Large Power Transformers from the Republic of Korea:    Korea Sales Verification," dated August 21, 2019 at 1.

cannot conclude that the reported information was verified successfully.    In this case, the LPT in question was [            ] within the POR, but was recorded as sold outside of the POR in Hyundai USA's books and records.[120]    Commerce discovered this during its completeness tests during verification.[121]    Thus, while Commerce reviewed Hyundai's production and sales information during the verifications, Commerce's review of this information does not contradict Commerce's findings with respect to the LPT in question.

Hyundai states that there is no evidence on the record that customs duties were paid for the LPT in question.    This statement is directly contradicted by the record evidence.    First, as noted above, Hyundai charged the customer for customs duties in the amount of $[        ], as listed on the invoice.[122]    Next, the customer paid Hyundai that amount for the customs duties.[123]    Again, Hyundai has identified no record evidence of a refund for this alleged "clerical error."

Further, Hyundai states that the lack of customer approval documentation does not demonstrate that the LPT in question was produced in Korea.[124]    In addition to the record evidence that Hyundai was contractually required to notify the customer if Hyundai were to shift the production location of the LPT in question, if the customer had approved the shift in production, it certainly would not have paid the amount of $[        ] in customs duties charged by Hyundai.    Therefore, either the customer was unaware of the change to the place of production, or Hyundai produced the LPT in question in Korea.    The weight of the record evidence indicates the latter.

---

[120] *Id.* at 9-11.
[121] *Id.*
[122] *See* Hyundai's Letter, "Large Power Transformers from the Republic of Korea:    HEES's Verification Exhibits for Constructed Export Price Sales Verification," dated September 6, 2019 at Exhibit USSVE-8, page 5.
[123] *Id.*
[124] *See* Hyundai's Comments at 16-17.

Hyundai also argues that it provided other documents to support that the LPT in question was produced in Alabama, such as milestone payments, wire transfers, and the revised purchase contract between Hyundai USA and HPT.[125]   However, given the other record evidence discussed, in addition to the fact that these documents pre-date the [

], the most up-to-date records indicate that the production of the [          ] was completed in Korea.[126]

Lastly, Hyundai states that Commerce gave no indication during verification that this issue was unverified.[127]   As Commerce explained above, when verifiers find the respondent is not prepared to support or explain a response in a timely manner, verifiers will move on to the next agenda item to complete the verification of responses in the time Commerce allotted.   As Hyundai states in its comments, "a full day of verification was devoted to the issue of determining whether the LPT was produced in Alabama."[128]   In this case, Commerce requested documentation and explanations with respect to the LPT in question.   In response, Hyundai provided, or was unable to provide, documentation and explanations; therefore, Commerce moved on to other sections of the verification agenda.   Hyundai was fully aware of the verification agenda, and Commerce afforded Hyundai numerous opportunities at verification to remedy the issues surrounding the LPT in question.

As we note below, we continue to find that total AFA is warranted for Hyundai, specifically for the failure at verification to demonstrate it had reported a complete U.S. sales database, in addition to the other reasons for total AFA as detailed in the *Final Results*.

---

[125] *See* Hyundai Comments at 17-18.
[126] *See* Hyundai's Letter, "Large Power Transformers from the Republic of Korea:   HEES's Verification Exhibits for Constructed Export Price Sales Verification," dated September 6, 2019 at Exhibit USSVE-8, page 36.
[127] *See* Hyundai Comments at 18.
[128] *Id.*

**B. Issue 2: Application of Total AFA**

*Petitioners' Comments*

- Commerce's made the appropriate determination in the Draft Remand Redetermination to apply total AFA for Hyundai.[129]

*Hyundai's Comments*

- Commerce should conclude that the unit in question is manufactured in Alabama, and that the application of total AFA is not justified on the basis of a conclusion that the [

  ] was produced in Korea.[130]

*Commerce's Position*

    We agree with the petitioners that the use of total AFA is warranted in this remand. Section 776(a) of the Act provides that Commerce, subject to section 782(d) of the Act, will apply "facts otherwise available" if necessary information is not available on the record or an interested party: (1) withholds information that has been requested by Commerce; (2) fails to provide such information within the deadlines established, or in the form or manner requested by Commerce, subject to subsections (c)(1) and (e) of section 782 of the Act; (3) significantly impedes a proceeding; or (4) provides such information, but the information cannot be verified. Additionally, section 776(b) of the Act provides that if Commerce finds that an interested party failed to cooperate by not acting to the best of its ability to comply with a request for information, Commerce may use an inference adverse to the interests of that party in selecting from the facts otherwise available.

---

[129] *See* Petitioners' Comments at 2.
[130] *See* Hyundai Comments at 21.

Hyundai states that Commerce should conclude that HPT produced the LPT in Alabama and that the application of total AFA is not justified on that basis.[131]    As detailed above, Commerce found that the record does not support Hyundai's contention that the LPT was produced in Alabama, and therefore, as AFA, Commerce concludes that the LPT in question was produced in Korea, and should have been reported in the U.S. sales database.    Additionally, given that there were [  ] reported U.S. sales,[132] the failure to include one sale in the U.S. database accounts for a significant percentage of total sales, particularly a sale with a total sales value of $[       ].[133]    As noted above, the Court has found that the use of total AFA is appropriate when the respondent's conduct undermines the credibility and reliability of the data overall.[134]    Under such conditions as in this case, *i.e.*, in a situation in which a respondent's data fails the completeness test conducted at verification, we cannot assume that the submitted data are sufficiently complete to use as a reliable basis in the calculation of dumping margins.[135]    The accuracy and completeness of the submitted U.S. sales database is essential to our calculation of an accurate margin, and our inability to determine that accuracy and completeness due to Hyundai's deficient and incomplete reporting renders it unusable.    The application of partial AFA is thus inappropriate, as we cannot be certain of the accuracy of the data as a whole.

Additionally, as described above and in the *Final Results* IDM, Commerce's decision to apply total AFA to Hyundai was based on three findings, not solely on Hyundai's failure to demonstrate that it reported all required sales in its U.S. sales database (and therefore that its

---

[131]  *Id.*
[132]  *See* Hyundai's Letter, "Large Power Transformers from the Republic of Korea:    HEES's Section A Questionnaire Response," dated February 19, 2019 at Exhibit A-1.
[133]  *See* Hyundai's Letter, "Large Power Transformers from the Republic of Korea:    HEES's Verification Exhibits for Constructed Export Price Sales Verification," dated September 6, 2019 at Exhibit USSVE-8, page 1.
[134]  *See Papierfabrik August Koehler SE v. United States*, 7 F. Supp. 1304 (2014).
[135]  Because verification is a spot-check of a respondent's submitted data and not an opportunity for the respondent to submit new factual information, when a respondent is unable to establish that its U.S. sales reporting is complete, Commerce verifiers make note of their verification findings but do not seek to identify whether, and how many, additional U.S. sales have not been reported.

reporting of all U.S. sales of subject merchandise during the POR was complete).[136]    In addition to this failure, Commerce also found that:    (1) Hyundai failed to cooperate by not acting to the best of its ability to comply with a request for sales documentation, which include service-related revenues and expenses; and (2) Hyundai impeded the proceeding by providing shifting and opaque explanations for its classification of certain parts and components as out-of-scope.[137]    For these reasons, we continue to find that the application of total AFA is warranted.

## IV.    Final Results of Redetermination

In accordance with the *Remand Order*, Commerce has reconsidered the record evidence. Based on our analysis, Commerce bases its decision to use to total facts available with an adverse inference on:    (1) Hyundai failed to cooperate by not acting to the best of its ability to comply with a request for sales documentation, which include service-related revenues and expenses; (2) Hyundai impeded the proceeding by providing shifting and opaque explanations for its classification of certain parts and components as out-of-scope; and (3) Hyundai failed to demonstrate that it reported all required sales in its U.S. sales database and therefore that its reporting of all U.S. sales of subject merchandise during the POR was complete.

---

[136] *See Final Results* IDM at 5-37.
[137] *Id*.

For purposes of these final results of redetermination, Commerce is applying the total AFA rate of 60.81 percent to Hyundai for the POR, August 1, 2017, through July 31, 2018.    As we explained in the *Final Results*, this rate is the dumping margin alleged in the petition of this proceeding.[138]

3/25/2021

X _____

Signed by: CHRISTIAN MARSH

_____
Christian Marsh
Acting Assistant Secretary
    for Enforcement and Compliance

---

[138] *See* Petitioners' Letter, "Petition for the Imposition of Antidumping Duties on Large Power Transformers from Korea," dated July 14, 2011.