**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE THE HONORABLE MARK A. BARNETT, CHIEF JUDGE**

HYUNDAI ELECTRIC & ENERGY
SYSTEMS, CO., LTD.,

                  Plaintiff,

v.

 UNITED STATES,

              Defendant,

and

ABB ENTERPRISE SOFTWARE INC. AND
SPX TRANSFORMER SOLUTIONS, INC.

           Defendant-Intervenors.

Court No. 20-00108

# NON-CONFIDENTIAL

**Business Proprietary Information has been deleted from the Table of Contents and on Pages 3, 10, 12-17, 24-25, 27-40 and 42.**

**MEMORANDUM OF POINTS AND AUTHORITIES**
**IN SUPPORT OF PLAINTIFF'S RULE 56.2 MOTION**
**FOR JUDGMENT UPON THE AGENCY RECORD**

David E. Bond
William J. Moran
Ron Kendler

WHITE & CASE LLP
701 Thirteenth Street, NW
Washington, DC 20005
(202) 626-3600

August 23, 2021

**PUBLIC VERSION**

**TABLE OF CONTENTS**

I.     STATEMENT PURSUANT TO USCIT R. 56.2(c)..........................................................1

     A.     Administrative Determination Sought to Be Reviewed.............................................1

     B.     Questions Presented and Summary of Argument ......................................................1

          1.     Was the Department's determination that Hyundai failed to submit service-related revenue documentation supported by substantial evidence and otherwise in accordance with law? ..........................................1

          2.     Was the Department's determination that Hyundai incorrectly reported a [            ] as non-subject merchandise supported by substantial evidence and otherwise in accordance with law? ......................3

          3.     Was the Department's determination that Hyundai failed to report an LPT allegedly produced in Korea supported by substantial evidence? .......3

          4.     Was the Department's application of an adverse inference with respect to these issues supported by substantial evidence and otherwise in accordance with law?..................................................................................4

          5.     Was the Department's application of total AFA supported by substantial evidence and otherwise in accordance with law? ......................4

II.     STATEMENT OF FACTS ....................................................................................................4

     A.     Overview ...................................................................................................................4

     B.     SRR Documentation ................................................................................................6

          1.     The Department's Initial Instructions ........................................................6

          2.     The Department's Lack of Instruction Regarding Hyundai's Affiliation and Verification.........................................................................9

          3.     The Department's Determination .............................................................11

     C.     Reporting of a [               ] ................................................................12

     D.     Reporting of a Single Alleged US Sale...................................................................15

     E.     The Department's Remand Redetermination..........................................................18

III.     STANDARD OF REVIEW ................................................................................................19

IV.     ARGUMENT .....................................................................................................................20

**PUBLIC VERSION**

A.  Legal Basis for and Court's Review of AFA..........................................................20

    1.  Facts Available..............................................................................................20

    2.  Adverse Inferences.......................................................................................22

    3.  Partial versus Total AFA ..............................................................................22

B.  The Department's Application of FA with Respect to Hyundai's SRR
    Documentation is Unsupported by Substantial Evidence and Contrary to
    Law ........................................................................................................................23

    1.  Hyundai Fully Responded to the Department's Request, Consistent
        with the Relevant Reporting Requirements ..............................................23

    2.  The Department Did Not Notify Hyundai of a Deficiency.......................25

C.  The Department's Application of FA with Respect to Hyundai's Reporting
    of the [                            ] is Unsupported by Substantial Evidence
    and Contrary to Law ..............................................................................................27

    1.  Hyundai reported [      ] consistent with the scope of the order, and
        consistently throughout the review ...........................................................28

    2.  There was no gap in the record .................................................................30

    3.  The Department Failed to Notify Hyundai of a Deficiency ....................30

D.  The Department's Application of FA with Respect to the LPT Allegedly
    Produced in Korea is Unsupported by Substantial Evidence.................................31

    1.  Sales and cost reconciliations and CBP data ...........................................31

    2.  Sales documents provided at verification ................................................33

    3.  Serial number differences between the United States and Korea.............34

    4.  Other information in the Test Report and Nameplate...............................34

    5.  "Other Record Evidence" Cited by the Department Does Not Indicate
        that the LPT was Produced in Korea ........................................................36

    6.  The Department Gave No Weight to Evidence Contradicting Its
        Conclusion ................................................................................................38

E.  The Department's Application of an Adverse Inference to Hyundai Was
    Unsupported by Substantial Evidence and Otherwise Not in Accordance
    with Law ................................................................................................................39

**PUBLIC VERSION**

F.      There Was No Basis for the Application of Total AFA ........................................41

V.      CONCLUSION AND RELIEF SOUGHT ........................................................................44

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*ABB Inc. v. United States*,
355 F. Supp. 3d 1206 (Ct. Int'l Trade 2018) ............................................................9, 10, 24

*ABB Inc. v. United States*,
437 F. Supp. 3d 1289 (Ct. Int'l Trade 2018), *pending appeal*................................................42

*Allegheny Ludlum Corp. v. United States*,
24 C.I.T. 452, 112 F. Supp. 2d 1141 (2000) ...........................................................................39

*Atlantic Sugar, Ltd. v. United States*,
744 F.2d 1556 (Fed. Cir. 1984)................................................................................................20

*China Steel Corp. v. United States*,
393 F. Supp. 3d 1322 (Ct. Int'l Trade 2019) ...........................................................................23

*Consol. Edison Co. v. NLRB*,
305 U.S. 197 (1938).................................................................................................................19

*Diamond Sawblades Mfrs. Coal. v. United States*,
301 F. Supp. 3d 1326 (Ct. Int'l Trade 2018) .....................................................................20, 39

*Fujian Mach. & Equip. Imp. & Exp. Corp. v. United States*,
27 C.I.T. 1059, 276 F. Supp. 2d 1371 (2003) .........................................................................42

*Huaiyin Foreign Trade Corp. v. United States*,
322 F.3d 1369 (Fed. Cir. 2003)..........................................................................................19, 29

*Huvis Corp. v. United States*,
570 F.3d 1347 (Fed. Cir. 2009)................................................................................................19

*Hyundai Elec. & Energy Sys. v. United States*,
477 F. Supp. 3d 1324 (Ct. Int'l Trade 2020) .....................................................................18, 35

*Hyundai Heavy Indus., Co. v. United States*,
332 F. Supp. 3d 1331 (Ct. Int'l Trade 2018) .....................................................................30, 40

*Hyundai Heavy Indus. Co. v. United States*,
393 F. Supp. 3d 1293, 1313-17 (Ct...........................................................................................25

*Hyundai Heavy Indus. Co. v. United States*,
485 F. Supp. 3d 1380 (Ct. Int'l Trade 2020) .............................................................39, 40, 42

*Hyundai Steel Co. v. United States*,
   282 F. Supp. 3d 1332 (Ct. Int'l Trade 2018) ......................................21, 22, 25, 26

*Jacobi Carbons AB v. United States*,
   313 F. Supp. 3d 1344 (Ct. Int'l Trade 2018) ........................................................27

*Jiangsu Changbao Steel Tube Co. v. United States*,
   884 F. Supp. 2d 1295 (Ct. Int'l Trade 2012) ........................................................22

*Jiaxing Brother Fastener Co. v. United States*,
   380 F. Supp. 3d 1343 (Ct. Int'l Trade 2019) ..................................................20, 38

*Jinan Yipin Corp. v. United States*,
   35 C.I.T. 1254, 800 F. Supp. 2d 1226 (2011) ......................................................27

*Lucent Techs., Inc. v. Gateway, Inc.*,
   580 F.3d 1301 (Fed. Cir. 2009)........................................................................20, 39

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983).................................................................................................20

*Mukand, Ltd. v. United States*,
   CIT No. 11-00401, Slip Op. 13-41,
   *aff'd* 767 F.3d 1300 (Fed. Cir. 2014) .............................................................22, 41

*Nippon Steel Corp. v. United States*,
   337 F.3d 1373 (Fed. Cir. 2003)........................................................................22, 40

*NSK Corp. v. United States*,
   33 C.I.T. 1185, 637 F. Supp. 2d 1311 (2009) ......................................................20

*NSK Ltd. v. United States*,
   481 F.3d 1355 (Fed. Cir. 2007)............................................................................26

*Pro-Team Coil Nail Enter. v. United States*,
   419 F. Supp. 3d 1319 (Ct. Int'l Trade 2019) ..................................................22, 40

*Ta Chen Stainless Steel Pipe v. United States*,
   23 C.I.T. 804 (1999) .....................................................................................21, 26, 27

*Taian Ziyang Food Co. v. United States*,
   35 C.I.T. 863, 783 F. Supp. 2d 1292 (2011) ........................................................27

*Universal Camera Corp. v. NLRB*,
   340 U.S. 474 (1951)...............................................................................................20

*Zhaoqing New Zhongya Aluminum Co. v. United States*,
   929 F. Supp. 2d 1324 (Ct. Int'l Trade 2013) ........................................................20

## STATUTES AND REGULATIONS

19 U.S.C. § 1516a(b)(1)(B)(i)..................................................................................19

19 U.S.C. § 1677(33)(E) ...........................................................................................6

19 U.S.C. § 1677a(a)..................................................................................................7

19 U.S.C. § 1677a(b) .................................................................................................7

19 U.S.C. § 1677e(a).........................................................................................20, 21

19 U.S.C. § 1677e(a)(2)............................................................................21, 23, 30

19 U.S.C. § 1677e(a)(2)(A).....................................................................................21

19 U.S.C. § 1677e(b)(1)(A).....................................................................................22

19 U.S.C. § 1677m(d)......................................................................................20, 21, 26

19 U.S.C. § 1677m(e)...............................................................................................20

## ADMINISTRATIVE DETERMINATIONS

*Certain Cut-to-Length Carbon-Quality Steel Plate Products from the Republic of Korea:*
    *Preliminary Results of Antidumping Duty Administrative Review; 2016-2017*, 8
    3 Fed. Reg. 10670 (Mar. 12, 2018),
    and accompanying Issues & Decision Memorandum.............................................8

*Certain Oil Country Tubular Goods from India: Preliminary Determination of Sales at Less*
    *Than Fair Value, Preliminary Affirmative Determination of Critical Circumstances, in Part,*
    *and Postponement of Final Determination,*
    79 Fed. Reg. 10493 (Feb. 25, 2014),
    and accompanying Issues & Decision Memorandum.............................................8

*Large Power Transformers from the Republic of Korea: Preliminary Results of Antidumping*
    *Duty Administrative Review; 2017-2018,*
    84 Fed. Reg. 55559 (Oct. 17, 2019),
    and accompanying Issues & Decision Memorandum.........................................5, 11, 14, 17

*Large Power Transformers from the Republic of Korea: Final Results of Antidumping Duty*
    *Administrative Review; 2017-2018,*
    85 Fed. Reg. 21827 (Apr. 20, 2020),
    and accompanying Issues & Decision Memorandum.................................... passim

**PUBLIC VERSION**

## I.   STATEMENT PURSUANT TO USCIT R. 56.2(C)

### A.   Administrative Determination Sought to Be Reviewed

Plaintiff Hyundai Electric & Energy Systems, Co., Ltd. ("HEES" or "Hyundai") contests the final results of the Department of Commerce ("Department") in the sixth administrative review of the antidumping duty order covering large power transformers ("LPTs") from the Republic of Korea (Case No. A-580-867) ("POR6 Review"), which covered the period August 1, 2017 through July 31, 2018. *Large Power Transformers from the Republic of Korea: Final Results of Antidumping Duty Administrative Review; 2017-2018*, 85 Fed. Reg. 21827 (Apr. 20, 2020) ("*Final Results*"); *see also* accompanying *Issues and Decision Memorandum for the Final Results of the Administrative Review of the Antidumping Duty Order on Large Power Transformers from the Republic of Korea; 2017-2018* (Apr. 14, 2020) ("*I&D Memo*"). Plaintiff further contests the final results of redetermination issued by the Department following the Court's remand. *See Hyundai Electric & Energy Systems, Co., Ltd. v. United States*, Ct. No. 20-000108, Slip Op. 20-160 at 4 (Nov. 9, 2020) ("*Remand Order*"); *Final Results of Redetermination Pursuant to Court Remand* (Mar. 26, 2021) (ECF 55, 56) ("*Redetermination*").[1]

### B.   Questions Presented and Summary of Argument

### 1.   Was the Department's determination that Hyundai failed to submit service-related revenue documentation supported by substantial evidence and otherwise in accordance with law?

No.   Hyundai reported service-related revenue ("SRR") and provided supporting documentation for SRR in accordance with the Department's requests. The document that the

---

[1]  The record from the POR6 Review is referenced with "C.R." ("confidential record") and "P.R." ("public record"); the remand record is referenced with "R.C.R." ("remand confidential record") and "R.P.R." ("remand public record").

**PUBLIC VERSION**

Department claimed Hyundai "failed to provide" was not relevant to the sales reported in Hyundai's US sales database and was not requested by the Department.

Hyundai reported its US sales as constructed export price ("CEP") sales, meaning that it reported data for sales by its US reseller, Hyundai Corporation USA ("Hyundai USA"), to unaffiliated customers. In all previous segments of the proceeding, the Department had treated Hyundai USA as an affiliate and required Hyundai to report US sales in this way. During POR6, there were changes in the relationship between Hyundai and Hyundai USA that suggested that the companies might not be considered affiliated, but Department precedent cast doubt on this conclusion. Therefore, Hyundai notified the Department of this issue early in the review, repeatedly sought guidance, and offered to report US sales as export price ("EP") sales (*i.e.*, based on sales between Hyundai and Hyundai USA). The Department did not request that Hyundai do so.

As with all data in the CEP sales database, Hyundai reported SRR from the perspective of Hyundai USA. Thus, when the Department requested that Hyundai submit "external" communications, consistent with that instruction and this Court's then-recent jurisprudence, Hyundai provided documentation for external communications between Hyundai USA and unaffiliated customers. The document that the Department claimed Hyundai had "failed to provide" was an internal, intercompany communication between Hyundai and Hyundai USA of the sort that this Court had previously rejected as evidence of SRR. Because Hyundai reported SRR and provided supporting documentation in accordance with the Department's requests, there was no gap in the record. Despite repeated requests for guidance regarding the issue of affiliation and the reporting of US sales on a CEP basis, the Department never provided guidance

or issued a deficiency notice asking Hyundai to report data and provide supporting documents, including for SRR, on an EP basis.

  **2.**   **Was the Department's determination that Hyundai incorrectly reported a [     ] as non-subject merchandise supported by substantial evidence and otherwise in accordance with law?**

  No.  Consistent with the Department's instructions and with the scope of the order, Hyundai reported sales and cost data for all subject and non-subject merchandise included in each sale.  The scope language treats "other" LPT parts "attached to, imported with, or invoiced with the active parts of LPTs" as subject merchandise.  Thus, in accordance with the scope, certain [        ] were subject, while others were non-subject, because some [    ] LPT parts while others did not.  In any event, because Hyundai reported sales and cost information for both subject and non-subject parts, there was no gap in the record.  Moreover, as the Department conceded, it failed to provide Hyundai a deficiency notice, claiming it was excused from doing so because it "discovered" Hyundai's [  ] reporting at verification.  The record disproves this claim.

  **3.**   **Was the Department's determination that Hyundai failed to report an LPT allegedly produced in Korea supported by substantial evidence?**

  No.  The Department concluded that Hyundai failed a completeness test at verification because it did not report the sale of an LPT that the Department speculated "could have been produced in Korea."  To reach this conclusion, the Department disregarded extensive evidence presented by Hyundai that demonstrated that the LPT was produced by its affiliate in Montgomery, Alabama and, therefore, should not have been reported.  The Department gave this evidence no weight.  Because the Department failed "to consider or discuss record evidence

which supports an alternative conclusion" and otherwise ignored "an important aspect of the problem," its conclusion is unsupported by substantial evidence.

> **4.    Was the Department's application of an adverse inference with respect to these issues supported by substantial evidence and otherwise in accordance with law?**

No.  To apply an adverse inference, the Department must find that the respondent failed to act to the best of its ability, rather than merely repeat its findings for the application of facts available ("FA").  With respect to each of the three issues discussed above, the Department failed to demonstrate that Hyundai did not act to the best of its ability, essentially restating the standard for using FA (*e.g.*, the failure to provide information).

> **5.    Was the Department's application of total AFA supported by substantial evidence and otherwise in accordance with law?**

No.  The Department may apply total adverse facts available ("AFA") only if none of a respondent's data is reliable or usable.  Here, even assuming that the Department was justified in applying AFA, the three issues discussed above, singly or in combination, at most justified the use of partial AFA.

## II.    STATEMENT OF FACTS

### A.    Overview

Hyundai participated as a respondent in the POR6 Review.  *Final Results*, 85 Fed. Reg. at 21828.  In the POR6 Review, the Department issued its initial questionnaire, followed by a single supplemental sales questionnaire.  *See Request for Information – Antidumping Duty Administrative Review: Hyundai Electric & Energy Systems Co., Ltd. ("Hyundai") – Korea – Large Power Transformers*, Dec. 17, 2018 (P.R 24) ("*Initial Questionnaire*"); *Antidumping Duty Administrative Review of Large Power Transformers from the Republic of Korea: First Sales*

*Supplemental Questionnaire*, May 29, 2019 (C.R. 351/P.R. 169) ("*Supplemental Questionnaire*"). Hyundai timely responded to both questionnaires.

The Department conducted sales and cost verifications of Hyundai in Korea, and a sales verification of Hyundai USA in California. *See Verification of the Sales Response of Hyundai Electric & Energy Systems Co., Ltd. in the Antidumping Duty Review of Large Power Transformers from the Republic of Korea*, Oct. 9, 2019 (C.R. 666/P.R. 294) ("*Korea Verification Report*"); *Verification of the Cost Response of Hyundai Electric & Energy Systems Co., Ltd. in the Administrative Review of the Antidumping Duty Order on Large Power Transformers from the Republic of Korea*, Oct. 9, 2019 (C.R. 664/P.R. 292) ("*Cost Verification Report*") ; *United States Verification of the Sales Response of Hyundai Electric & Energy Systems Co., Ltd. in the Antidumping Duty Review of Large Power Transformers from the Republic of Korea*, Oct. 9, 2019 (C.R. 667/P.R. 295) ("*CEP Verification Report*").

In the preliminary results, the Department assigned Hyundai a dumping margin of 60.81 percent based on total AFA. *See Large Power Transformers from the Republic of Korea: Preliminary Results of Antidumping Duty Administrative Review; 2017-2018*, 84 Fed. Reg. 55559 (Oct. 17, 2019) ("*Preliminary Results*"); *see also* accompanying *Decision Memorandum for Preliminary Results of Antidumping Duty Administrative Review: Large Power Transformers from the Republic of Korea; 2017-2018* (Oct. 9, 2019) ("*Preliminary Decision Memo*"). The Department claimed that Hyundai had (1) failed to provide documents regarding SRR; (2) "occasionally" classified a non-subject transformer part as subject merchandise; and (3) failed to provide documentation regarding the US sale of an LPT that "could have been produced in Korea." *See Preliminary Decision Memo* at 14-19. The Department further concluded that an adverse inference was justified because Hyundai failed to act to the best of its

ability by providing "attempted justification" with regard to allegedly missing SRR documents and information on the particular part, and because the alleged US sale undermined "the integrity of the U.S. sales database." *Id.* at 18-19.

The Department continued to apply total AFA to Hyundai in the *Final Results* and the *Redetermination* resulting from the Court's remand of this appeal. *See Final Results*, 85 Fed. Reg. at 21828; *I&D Memo* at 4-23; *Redetermination* at 32.

We discuss below the facts relating to each of the Department's bases for applying total AFA.

### B.    SRR Documentation

#### 1.    The Department's Initial Instructions

In the *Initial Questionnaire*, the Department told Hyundai to contact the Department if it had questions on how to report certain information. *See*, *e.g.*, *Initial Questionnaire* at B-4. Hyundai therefore submitted questions regarding various issues, including whether Hyundai USA, through which it made US sales, should be considered an affiliate. *Large Power Transformers from the Republic of Korea: HEES's Initial Methodology Comments*, Dec. 31, 2018 at 2, 21-22 (C.R. 7/P.R. 28) ("*Methodology Comments*").  In the original investigation and every previous review, the Department considered Hyundai USA to be affiliated, because Hyundai's predecessor, Hyundai Heavy Industries Co., Ltd. ("HHI"), owned more than five percent of Hyundai Corporation, which in turn owned 100 percent of Hyundai USA. *See Large Power Transformers from the Republic of Korea: HEES's Responses to the Department's First Sales Supplemental Questionnaire*, June 19, 2019, at 1SS-18, Exhibit 1SS-3 (C.R. 419-59/P.R. 192-95) ("*Supplemental Response*"); 19 U.S.C. § 1677(33)(E).  Thus, in the original investigation and each prior review, Hyundai reported sales by Hyundai USA as CEP sales.

In the POR6 Review, Hyundai explained that, due to changes in shareholding, the Department might find that Hyundai USA was no longer affiliated. *Methodology Comments* at 21. Being uncertain as to whether the Department would agree given its determinations in other cases, Hyundai stated that it would continue to follow the Department's decision in prior reviews to treat the companies as affiliated. *Id.*

The issue of whether the Department would treat Hyundai USA as affiliated was central to Hyundai's US sales reporting. A direct sale to an unaffiliated US purchaser made prior to importation must be reported as an EP sale. 19 U.S.C. § 1677a(a). However, if the first sale is to an affiliated US purchaser, that sale is disregarded, and the subsequent resale by the affiliated reseller to an unaffiliated US customer must be reported. *See* 19 U.S.C. § 1677a(b). Thus, all data in a respondent's US sales database and, by extension, the relevant supporting documentation, depend on whether sales are reported on an EP or CEP basis.

The Department did not provide guidance on whether Hyundai USA was affiliated before Hyundai submitted its response to Section A. Therefore, Hyundai further explained why it believed that the Department might not consider Hyundai USA to be affiliated. *See Large Power Transformers from the Republic of Korea: HEES's Section A Questionnaire Response*, Feb. 19, 2019 at A-1, A-11, A-22 (C.R. 215-31/P.R. 117-19) ("*Section A Response*"). Hyundai explained that, in POR6, its ownership had changed such that it no longer owned more than five percent of Hyundai Corporation. *Id.* at 1SS-18. However, despite this change, there were still other bases upon which the Department might find affiliation. In particular, Hyundai explained that the largest individual shareholder of Hyundai's parent company, Hyundai Heavy Industries Holdings Co., Ltd. ("HHI Holdings"), Mong Joon Chung, owned 8.94 percent of HHI Holdings, and in turn, in Hyundai; while his cousins, Mong-hyuk Chung and Mong-seok Chung, had direct

ownership interests in Hyundai Corporation, which still owned 100 percent of Hyundai USA. *Section A Response* at A-16, A-21–A-23. And, Hyundai's affiliate KCC Corporation indirectly owned Hyundai USA through a 12 percent ownership stake in Hyundai Corporation. *Id.* at A-16, A-22–A-23.[2] The Department had found other Korean companies to be affiliated under similar circumstances.[3] Hyundai stated that, if the Department concluded that US sales should be reported on an EP basis, it was "ready to provide such information in a supplemental response." *See Section A Response* at A-23.

The Department did not provide guidance before Hyundai responded to Section C. Therefore, Hyundai reported US sales as CEP sales, not EP sales (*i.e.*, Hyundai's sales to Hyundai USA). *See Methodology Comments* at 21; *Section A Response* at A-23; *Large Power Transformers from the Republic of Korea: HEES's Section C Questionnaire Response*, Mar. 11, 2019, at C-30, Exhibit C-1 (C.R. 232-39/P.R. 120-21) ("*Section C Response*").

Separately, the *Initial Questionnaire* asked Hyundai to "report revenue in separate fields (*e.g.*, ocean freight revenue, inland freight revenue, oil revenue, installation, *etc.*), and identify the related expense(s) for each revenue." *Initial Questionnaire* at B-1, C-1. The Department stated that the existence of such revenue was to be determined based on sales documents between the entity that made the reported sales and its customers. *See id.* at B-19, C-18 ("If the invoice ***to your customer*** includes separate charges for other services directly related to the sale,

---

[2] KCC Corporation owns 6.68 percent of Hyundai. *Section A Response* at A-16–A-17.

[3] *See, e.g.*, *Certain Cut-to-Length Carbon-Quality Steel Plate Products from the Republic of Korea: Preliminary Results of Antidumping Duty Administrative Review; 2016-2017*, 83 Fed. Reg. 10670 (Mar. 12, 2018), accompanying Decision Memorandum at 12 (finding affiliation due to an uncle-nephew relationship) (unchanged in final); *Certain Oil Country Tubular Goods from India: Preliminary Determination of Sales at Less Than Fair Value, Preliminary Affirmative Determination of Critical Circumstances, in Part, and Postponement of Final Determination*, 79 Fed. Reg. 10493 (Feb. 25, 2014), accompanying Decision Memorandum at 6 (including "first cousins" in the definition of a "family grouping").

PUBLIC VERSION

such as a charge for shipping, create a separate field for reporting each additional charge.")
(emphasis added).  The *Initial Questionnaire* did not otherwise define the documents that
Hyundai was to use to report SRR.  However, this Court had previously addressed this issue in
detail in *ABB Inc. v. United States*, 355 F. Supp. 3d 1206 (Ct. Int'l Trade 2018).  *Id.* at 1220
("Here, the inquiry is whether Commerce may rely on internal company communications, rather
than documentation or communications shared with the unaffiliated customer, to determine that
there is separate service-related revenue to cap.  The court concludes that it may not.").  Hyundai
reported its SRR consistent with the Department's instructions and the Court's ruling, and
provided supporting documentation.  *See*, *e.g.*, *Section C Response* at C-42, Exhibit C-2
(showing separate revenue charged for each sale).

### 2. The Department's Lack of Instruction Regarding Hyundai's Affiliation and Verification

Question 7 of the *Supplemental Questionnaire* requested that Hyundai explain whether
Hyundai USA was an affiliated company and, if so, why.  *See Supplemental Questionnaire* at 4.
The Department also asked Hyundai to explain why it should treat Hyundai's US sales as CEP
sales.  *See id.* at 5.  Hyundai repeated the explanation previously provided.[4]  *Supplemental
Response* at 1SS-17–1SS-18.  Hyundai also reiterated that, if the Department concluded that the
companies were not affiliated, "HEES would request the opportunity to provide any additional
information the Department considers necessary to calculate HEES's dumping margin treating
its U.S. sales as EP sales."  *Id.* at 1SS-17.

---

[4]  Petitioners later disagreed with Hyundai's comments, arguing that the familial relationships
justified finding that Hyundai USA was affiliated.  *See 6th Administrative Review of Large
Power Transformers from South Korea – Petitioners' Comments on the Supplemental Sections B
and C Questionnaire Response of Hyundai Electric & Energy Systems (HEES)*, July 19, 2019 at
2-6 (C.R. 544/P.R. 239) ("*Petitioners' Supplemental Comments*").

**PUBLIC VERSION**

In Question 15, the Department asked Hyundai to report all SRR reflected in its sales documentation. *Supplemental Questionnaire* at 6. In Question 21, the Department asked Hyundai to submit "complete copies of each type of [                    ] and each change order" for SEQHs [          ] and SEQUs [          ]. *Id.* at 7. SEQUs [          ] related to two sales made by Hyundai USA, namely purchase order [                ] issued by [        ] (SEQU [  ]) and purchase order [              ] issued by [        ] (SEQU [  ]). *See Supplemental Response* at Exhibit 1SS-9.

Hyundai requested clarification of these questions. *Large Power Transformers from the Republic of Korea: Clarification of Certain Questions in the Department's First Sales Supplemental Questionnaire*, June 13, 2019, at 1-5 (C.R. 407/P.R. 185). Hyundai explained that separately reporting the SRR listed on "any sales documentation" would be "extremely burdensome" and created a risk that Hyundai would inadvertently omit documentation. *Id.* at 3. In response, regarding Question 15, the Department instructed Hyundai to report SRR as "reflected" on "separate line items" in "*any* documented ***external*** sales correspondence with customers . . . in accordance with Commerce's practice." Letter from Brian C. Davis to Neil R. Ellis, June 20, 2019, at 1-2 (C.R. 471/P.R. 208) (italics original, bold italics added) ("*Clarification Response*"); *id.* n.5.[5] Regarding Question 21, the Department stated that Hyundai should provide "copies of certain documentation ***for the requested SEQH/Us***." *See id.* at 2 (emphasis added).

In accordance with the Department's clarifications, Hyundai reported SRR based on the amounts itemized on external sales documentation between Hyundai USA and unaffiliated US

---

[5] Hyundai understood this reference to reflect this Court's then-recent decision in *ABB*, 355 F. Supp. 3d at 1221 ("Substantial evidence does not support Commerce's application of its capping methodology to those transactions or services for which Commerce relied only on internal communications among Hyundai employees or affiliates.").

customers, and provided supporting documentation. *Supplemental Response* at 1SS-33–1SS-34, Exhibits 1SS-8, 1SS-9 (narrative and exhibits in response to Question 21); *Large Power Transformers from the Republic of Korea: HEES's Responses to the Remainder of the Department's First Sales Supplemental Questionnaire*, July 1, 2019 at 1SS-3–1-SS-4, Exhibit C-1 (Revised), Exhibit C-2 (Revised 2) (narrative and exhibits in response to Question 15) (C.R. 504-16/P.R. 221-23) ("*Remainder Supplemental Response*").

At the CEP verification, the Department reviewed documents relating to a sale made by Hyundai USA on behalf of Hyundai Power Transformers ("HPT"), a wholly-owned subsidiary of Hyundai in the United States, including communications between Hyundai and Hyundai USA related to the sale.[6]  In the *CEP Verification Report*, the Department stated that it had reviewed "a particular document that allocated sales/service revenues and expenses between Hyundai and Hyundai USA, and then subsequently between Hyundai USA and HPT." *CEP Verification Report* at 11.

### 3.  The Department's Determination

In the *Preliminary Results*, the Department concluded that Hyundai and Hyundai USA were not affiliated. *Preliminary Decision Memo* at 13.  It then applied AFA with respect to Hyundai's reporting of SRR based on the "particular document" that it had "discovered" at verification allocating sales/service revenues and expenses between Hyundai and Hyundai USA. *Id.* at 14-16.  Because the Department then, finally, determined that Hyundai and Hyundai USA were not affiliated, it deemed the document to be an "external" communication. *Id.* at 15-16.

In its case brief, Hyundai argued that, prior to the *Preliminary Results*, the Department had not indicated that Hyundai was not affiliated with Hyundai USA, nor asked it to report US

---

[6]  HPT is Hyundai's wholly-owned subsidiary in Montgomery, Alabama, which also produces LPTs in the United States. *Section A Response* at A-12.

**PUBLIC VERSION**

sales on an EP basis and, therefore, Hyundai had reasonably treated the companies as affiliated when responding to the Department's instruction to provide "external" communications. *See Large Power Transformers from the Republic of Korea: HEES's Case Brief*, Dec. 11, 2019, at 20-27 (C.R. 680/P.R. 327), *resubmitted in Large Power Transformers from the Republic of Korea: HEES's Resubmission of Case Brief*, Jan. 3 2020 (C.R. 686/P.R. 338-39) ("*Case Brief Resubmission*").

In the *Final Results*, the Department rejected Hyundai's arguments, stating that the issue of whether US sales were EP or CEP sales did not justify Hyundai's "incomplete response. . . ." *I&D Memo* at 11. The Department faulted Hyundai for "only" reporting SRR "reflected on any external documentation with final U.S. customers," despite the fact that this is exactly what the Department had instructed Hyundai to do. *See id.* at 10; *Clarification Response* at 1-2.

C.     **Reporting of a [                              ]**

In Section B of the *Initial Questionnaire*, the Department requested that Hyundai provide "a detailed list" and explanation of all subject and non-subject merchandise included in each home-market sale. *Initial Questionnaire* at B-1–B-2. Hyundai did so, including the prices for each subject and non-subject component of each sale. *See Large Power Transformers from the Republic of Korea: HEES's Section B Questionnaire Response*, Mar. 11, 2019, at B-7, Exhibit B-2 (C.R. 215-31/P.R. 117-19) ("*Section B Response*"). Hyundai also reported complete cost information for each subject and non-subject component for each sale. *See Large Power Transformers from the Republic of Korea: HEES's Section D Questionnaire Response*, Mar. 11, 2019 at Exhibit D-16 (C.R. 240-59/P.R. 122-24) ("*Section D Response*"); *Large Power Transformers from the Republic of Korea: HEES's Responses to the Remainder of the*

**PUBLIC VERSION**

*Department's 1st Section D Supplemental Questionnaire*, June 10, 2019 at Exhibit D-16 (Revised) (C.R. 392-406/P.R. 183-84) ("*Remainder Supplemental Section D Response*").

Petitioners submitted comments on Hyundai's *Supplemental Response*, in which they claimed that an [      ] designated by Hyundai as non-subject merchandise was within the scope of the antidumping duty order. *See Petitioners' Supplemental Comments* at 10-12. In response, Hyundai explained that Petitioners misinterpreted the scope of the order and mischaracterized the [      ]:

> The scope of the order does not include LPTs, active transformer parts, and ***anything else*** that happens to be sold with the transformer. Rather, the scope of the order includes only LPTs, active transformer parts, and ***any other transformer parts*** attached to, imported with or invoiced with the active parts of LPTs. Stated differently, a component of one of the numerous elements of a{n} electrical power distribution system, which does not have the physical characteristics of a transformer part, does not suddenly become subject merchandise simply because of the way it is invoiced or shipped . . . .
>
> Contrary to Petitioners' unsupported speculation, an [      ] is not part of an LPT. [
>              ]. In fact, ABB itself has marketed [              ] as [
>         ] distinguishing [              ] as products that are different than the transformer. Furthermore, [      ] are neither attached to nor physically "part" of the LPT. They are located remotely in [              ], which are typically 50 to 100 meters removed from the transformer.

*Large Power Transformers from the Republic of Korea: HEES's Rebuttal to Petitioners' Comments on HEES's First Sales Supplemental Response*, Aug. 2, 2019 at 10-11 (C.R. 575/P.R. 244) (emphasis original, footnotes omitted) ("*Rebuttal Comments*").

The agenda for the Korea sales verification included an item regarding this issue. *See 2017-2018 Administrative Review of Large Power Transformers from the Republic of Korea: Korea Sales Verification*, Aug. 5, 2019, at 8 (C.R. 576/P.R. 245) ("*Korea Sales Verification Agenda*"). Verifiers and company officials "discussed at length with Hyundai the issue of [              ]" during which "Hyundai provided a chart demonstrating how an

PUBLIC VERSION

LPT operates in a substation with other equipment . . . .  We discussed [      ], and Hyundai explained that this equipment operates the LPT and other non-subject machinery in a substation." *Korea Verification Report* at 2, 11; *See* Korea Verification Exhibit VE-8 at 78-81 (C.R. 591-97).

During this discussion, the Department claimed that it "discovered" that Hyundai had reported "some [      ] as subject merchandise, depending on what the component operates." *Korea Verification Report* at 11, 16.  The Department stated that Hyundai "considers" [

], "to be subject merchandise because it governs only subject merchandise, while other [      ] govern other items that are non-subject . . . ."  *See id.* at 16.  The Department inexplicably considered this explanation "inconsistent" with Hyundai's questionnaire responses.  *Compare id. with Section B Response*, Exhibit B-2 at 3, 7 (showing that the [      ] at issue in SEQH [   ] – an "[

]" – was subject merchandise, but that the [      ] in, for example, SEQH [   ] – a "[                                        ]" – was non-subject because it was a "[                          ]").

In the *Preliminary Results*, the Department concluded that "Hyundai occasionally classifies" [      ], which Hyundai had reported as non-subject, "as within the scope." *Preliminary Decision Memo* at 17 (footnote omitted).  The Department applied AFA because it concluded that it could not verify Hyundai's information.  *See id.*  The Department did not conclude under what circumstances a [      ] was or was not subject merchandise.  Nor did it explain why the substantial information collected at verification was insufficient to verify the approach taken by Hyundai to differentiate between subject and non-subject parts.  *See id.* at 17-18.

PUBLIC VERSION

In its case brief, Hyundai again explained that the [      ] and [                    ] were distinct parts. *Case Brief Resubmission* at 44. Namely, [

].” *Id.* (footnote omitted). Therefore, they are not subject merchandise. *See id.* [                    ], on the other hand, “are installed to monitor and control the [              ] of the LPT only, and are therefore an integral part of the operation of the LPT.” *Id.* (footnote omitted). Therefore, they are subject merchandise. *See id.* This approach was entirely consistent with Hyundai’s designation of subject merchandise in its *Section B Response* and explanation in its *Rebuttal Comments* of how it determined whether products were subject merchandise. *See Case Brief Resubmission* at 48 (“In every relevant questionnaire response, HEES reported [                    ] as MUC because they are used specifically to operate MUC, and reported [      ] as non-MUC because they are used for [

] (*i.e.*, non-MUC)”) (citing to Exhibits B-2 and D-16).

In the *Final Results*, the Department claimed that Hyundai provided a “new explanation” of its treatment of [                    ] that “emerged during verification” and led it to believe that Hyundai’s sales data was “inaccurate,” “misleading,” and thereby “render{ed} Hyundai’s reported home market gross unit prices unreliable.” *See I&D Memo* at 15-19. The Department did not explain why it could not use the sales and cost information that Hyundai had reported (classified as non-subject merchandise) for the [      ] out of [      ] home-market sales that involved [      ]. *See Section B Response* at Exhibit B-2.

### D.    Reporting of a Single Alleged US Sale

The agenda for the Korea sales verification asked Hyundai to tie “the quantity and value totals reported in the most up-to-date submission of {Hyundai’s} home and U.S. market

**PUBLIC VERSION**

databases" to its general ledger and financial accounting system. *Korea Sales Verification Agenda* at 12. Hyundai did so and the Department verified that information. *See Korea Verification Report* at 12-13 ("We then arrived at the quantity and value of transformers entered during the POR.").

The agenda for Hyundai's CEP verification also included a reconciliation, along with a "completeness" test, pursuant to which the Department would select a sale or related information from the record, and review whether the selection was subject to the scope of the review; related to the US market; and occurred during the POR. *See 2017-2018 Administrative Review of Large Power Transformers from the Republic of Korea: Constructed Export Price Sales Verification*, Aug. 21, 2019, at 8-9 (C.R. 581/P.R. 254). For its first completeness test, the Department selected a sale of a LPT that had been shipped and installed during the POR, but that Hyundai USA had recorded in its accounting system after the POR. *See CEP Sales Verification Report* at 9. Hyundai provided documentation demonstrating that Hyundai USA made this sale on behalf of HPT, which had produced it in Alabama. *See id.* The Department questioned this sale because the invoice included an item for "customs duties." Hyundai explained that, after issuance of the purchase order, Hyundai transferred production to HPT, and that the inclusion of customs duties was a clerical mistake. *See id.* at 9-10; *Case Brief Resubmission* at 33. Hyundai provided documents in response to the verifiers' request to demonstrate that the item was produced by HPT in the United States. *See CEP Verification Report* at 10; *Case Brief Resubmission* at 35-36. The Department otherwise conducted 10 other successful completeness tests at the CEP verification. *See CEP Verification Report* at 9-12.

In the *Preliminary Results*, the Department concluded that Hyundai had failed the CEP verification completeness test, because it failed to provide a [          ] for the [          ].

*Preliminary Decision Memo* at 16 n.2; Memorandum to the File, *Analysis of Data/Questionnaire Responses Submitted by Hyundai Electric & Energy Systems in the Preliminary Results of the 2017-2018 Administrative Review of the Antidumping Duty Order on Large Power Transformers from the Republic of Korea*, Oct. 9, 2019, at 2-3 (C.R. 668/P.R. 296).

In its case brief, Hyundai described the documents provided to the Department at verification showing that the LPT was produced by HPT in Alabama. *See Case Brief Resubmission* at 35-36. These documents included the bill of lading for LPT parts and components; the [                              ] of the [              ] from Alabama; invoices and related payment records from HPT to Hyundai USA related to production of the LPT; and a revised purchase contract between Hyundai USA and HPT showing delivery from HPT's Alabama facility. *Id.* Hyundai challenged the Department's conclusion that the LPT "could have been produced in Korea" given that the Department had successfully verified in Korea the quantity of merchandise exported to the United States, showing that all US sales were accounted for. *Id.* at 37-38; *Preliminary Decision Memo* at 16. In its rebuttal brief, Hyundai further explained that the quantity of the LPTs exported to the United States, which did not include the LPT at issue, was "identical to the quantity reflected in {US Customs and Border Protection ("CBP")} data." *See Large Power Transformers from the Republic of Korea: HEES's Rebuttal Brief*, Dec. 20, 2019, at 14 (C.R. 684/P.R. 334) ("*Hyundai Rebuttal Brief*").

In the *Final Results*, the Department claimed that the documents provided by Hyundai were unpersuasive and, therefore, that "the LPT ***was in fact produced outside the United States***. . . ." *I&D Memo* at 8 (emphasis added). The Department further opined, without pointing to any evidence, that it was "certainly possible that there are other omitted sales that Commerce did not discovered {*sic*} at verification." *I&D Memo* at 6-7, 23.

**PUBLIC VERSION**

### E.    The Department's Remand Redetermination

After initiating this appeal, Hyundai filed, and the Court granted, a motion to supplement the record with documents that the Department reviewed at verification, but did not place on the record, namely: (1) the test report for the LPT that it concluded was produced in Korea ("Test Report"); and (2) a diagram of the nameplate for the LPT at issue ("Nameplate"), made up of a "Rating Plate" (included on page 3 of the Test Report) and a "Connection Plate" (included on page 4 of the Test Report). *See Hyundai Elec. & Energy Sys. v. United States*, 477 F. Supp. 3d 1324, 1327-31 (Ct. Int'l Trade 2020); Pl. Mot. Supp. R., Aug. 20, 2020, at Att. 1, 2 (ECF 28, 29). Defendant then requested, and the Court granted, a voluntary remand "to address the documents in the first instance and, if necessary, reconsider its reliance on total AFA." *Remand Order* at 4.

In its draft redetermination, the Department found that the evidence does not establish that the LPT was produced by HPT in Alabama and continued to apply total AFA. *Hyundai Electric & Energy Systems Co. Ltd. v. United States and ABB Enterprise Software Inc. AND SPX Transformer Solutions, Inc., Court No. 20-00108, Slip Op. 20-160 (CIT November 9, 2020): Draft Results of Redetermination Pursuant to Court Remand*, Feb. 12, 2021 at 9 (R.C.R 5/R.P.R. 6) ("*Draft Redetermination*"). Citing "concerns about internal consistency between the nameplate information located within test reports and the nameplate itself" and a "failure of the nameplate to designate the production location as Alabama," the Department determined that "other record evidence" outweighed the relevance of the Nameplate, and in its view, supported the determination that the LPT was produced in Korea. *Id.* at 10. It likewise determined that such "other record evidence" outweighed the Test Report, which the Department believed "identifies only the testing location not the production location of the LPT in question." *Id.* at 11.

In comments on the *Draft Redetermination*, Hyundai demonstrated that the Department had disregarded extensive evidence showing that the LPT was produced in Alabama. *See generally Large Power Transformers from Korea: Comments on the Department's Draft Results of Redetermination Pursuant to Court Remand*, Feb. 22, 2021 (R.C.R 6/R.P.R. 8) ("*Draft Remand Comments*"). Importantly, Hyundai further demonstrated that the "other record evidence" to which the Department cited in support of its conclusion did not indicate that the LPT was produced in Korea. *See id.* at 14-18.

The Department made no change from the *Draft Redetermination* in the *Redetermination*, concluding that "the weight of the evidence indicates that the LPT in question was produced in Korea" and continuing to find that "Hyundai failed at verification to demonstrate it had reported a complete U.S. sales database, and that the application of total AFA is warranted." *Redetermination* at 12, 21; *see also id.* at 20, 23, 27, 32.

## III.    STANDARD OF REVIEW

The Court will find a determination by the Department to be unlawful if it is unsupported by substantial evidence on the record, or otherwise not in accordance with law.  19 U.S.C. § 1516a(b)(1)(B)(i).

"Substantial evidence "means 'more than a mere scintilla' and 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Huvis Corp. v. United States*, 570 F.3d 1347, 1351 (Fed. Cir. 2009) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938); *Suramerica de Aleaciones Laminadas, C.A. v. United States*, 44 F.3d 978, 985 (Fed. Cir. 1994)).  The Department must consider "the record as a whole, including evidence that supports as well as evidence that 'fairly detracts from the substantiality of the evidence.'" *Huaiyin Foreign Trade Corp. v. United States*, 322 F.3d 1369, 1374 (Fed. Cir. 2003) (quoting

PUBLIC VERSION

*Atlantic Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984)).  The Department's weighing of the evidence must not be unreasonable.  *Zhaoqing New Zhongya Aluminum Co. v. United States*, 929 F. Supp. 2d 1324, 1328 (Ct. Int'l Trade 2013) (citing *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951)).  A single piece of evidence that is contradicted by other evidence is not substantial evidence, unless the Department has considered and reasonably disregarded the contradictory evidence.  *See Diamond Sawblades Mfrs. Coal. v. United States*, 301 F. Supp. 3d 1326, 1347-49 (Ct. Int'l Trade 2018).

As a result, a determination that fails "to consider or discuss record evidence which supports an alternative conclusion" or "an important aspect of the problem" is not supported by substantial evidence and the "court will not accept" such a determination.  *See Jiaxing Brother Fastener Co. v. United States*, 380 F. Supp. 3d 1343, 1360-61 n.26 (Ct. Int'l Trade 2019) (citations omitted); *NSK Corp. v. United States*, 33 C.I.T. 1185, 1190, 637 F. Supp. 2d 1311, (2009) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).  Nor will the Court accept speculation: "It is well established that speculation does not constitute substantial evidence."  *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1327 (Fed. Cir. 2009) (citation omitted).

## IV.    ARGUMENT

### A.    Legal Basis for and Court's Review of AFA

Before addressing its claims, Hyundai summarizes the legal requirements for a finding of total AFA.

#### 1.    Facts Available

Under the statute, the Department must first determine that the application of FA is warranted, which requires meeting numerous criteria.  *See* 19 U.S.C. §§ 1677e(a), 1677m(d), (e).

**PUBLIC VERSION**

Among others, the Department must determine that a respondent has withheld requested information.[7] Thus, the Court "must first consider whether Commerce's determination that, under § 1677e(a), . . . {the respondent} failed to provide requested data is supported by substantial evidence." *Hyundai Steel Co. v. United States*, 282 F. Supp. 3d 1332, 1344 (Ct. Int'l Trade 2018).

If requested information has not been provided, the Department must provide the respondent with notice and an opportunity to remedy the deficiency. *See* 19 U.S.C. § 1677m(d). *See Hyundai Steel*, 282 F. Supp. 3d at 1344 (the Court "must {next} consider whether Commerce met its obligations under § 1677m(d), to notify . . . {the respondent} of deficiencies in its submissions."). The Department's deficiency notice must be sufficiently detailed to let the respondent know what information it "really wants." *Ta Chen Stainless Steel Pipe v. United States*, 23 C.I.T. 804, 820 (1999). Unless the deficiency notice "specifically points out and requests clarification of the deficient responses," it will not satisfy § 1677m(d). *See Hyundai Steel Co. v. United States*, Consol. Ct. No. 19-00099, Slip Op. 21-47 at 20-21 (Apr. 27, 2021)

---

[7] The Department may apply FA only if a respondent:

    (A) withholds information that has been requested by the administering authority . . . ,

    (B) fails to provide such information by the deadlines for submission of the information or in the form and manner requested, subject to subsections (c)(1) and (e) of section 782,

    (C) significantly impedes a proceeding under this title, or

    (D) provides such information but the information cannot be verified as provided in section 782(i) . . . .

19 U.S.C. § 1677e(a)(2).

(quoting *NSK Ltd. v. United States*, 481 F.3d 1355, 1360 n.1 (Fed. Cir. 2007)) (internal quotation marks and brackets omitted).

### 2.    Adverse Inferences

The Department may use an adverse inference in selecting from among the facts available only if "an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information{.}"  19 U.S.C. § 1677e(b)(1)(A); *see also Jiangsu Changbao Steel Tube Co. v. United States*, 884 F. Supp. 2d 1295, 1302 (Ct. Int'l Trade 2012) (AFA is permitted "{o}nce Commerce determines that the conditions established by subsections 1677e(a), 1677m(d) and 1677m(e) are met and that resort to FA is appropriate").

The application of an adverse inference requires that the Department "do more than simply restate its findings . . . supporting the use of neutral facts available{.}"  *Pro-Team Coil Nail Enter. v. United States*, 419 F. Supp. 3d 1319, 1333 (Ct. Int'l Trade 2019).  And, an "adverse inference may not be drawn merely from a failure to respond, but only under circumstances in which it is reasonable for Commerce to expect that more forthcoming responses should have been made{.}"  *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1383 (Fed. Cir. 2003).  As a result, "the court must finally consider whether Commerce drew an adverse influence under § 1677e(b) based on substantial evidence and in accordance with the law."  *Hyundai Steel*, 282 F. Supp. 3d at 1344.

### 3.    Partial versus Total AFA

Total, as opposed to partial, AFA may be used only "where none of the reported data is reliable or usable because, for example, all of the submitted data exhibited pervasive and persistent deficiencies that cut across all aspects of the data."  *Mukand, Ltd. v. United States*, CIT No. 11-00401, Slip Op. 13-41 at 12-13, *aff'd* 767 F.3d 1300, 1307-08 (Fed. Cir. 2014) (citations

and internal quotation marks omitted); *see also China Steel Corp. v. United States*, 393 F. Supp. 3d 1322, 1331-32 n.7 (Ct. Int'l Trade 2019) ("This Court has sustained Commerce's use of total adverse facts available in certain tightly defined circumstances, *e.g.*, (1) the record contained no usable information for core components of Commerce's dumping analysis, or (2) substantial evidence showed that the respondent was egregious in its failure or refusal to comply with Commerce's requests for information.").

### B.  The Department's Application of FA with Respect to Hyundai's SRR Documentation is Unsupported by Substantial Evidence and Contrary to Law

In the *Final Results*, the Department incorrectly applied AFA to Hyundai's US sales reporting, on the grounds that Hyundai did not provide a document allocating SRR between it and Hyundai USA.  Contrary to the Department's claims, Hyundai fully responded to all of the Department's requests.  Specifically, because Hyundai reported its US sales on a CEP basis, the document at issue was not "external" and was not requested by the Department.  Moreover, the Department never issued the statutorily required deficiency notice advising Hyundai that its US sales data, including SRR, should be reported on an EP basis.

### 1.  Hyundai Fully Responded to the Department's Request, Consistent with the Relevant Reporting Requirements

Hyundai fully responded to the Department's requests.  Thus, the first statutory requirement – missing information – is unmet.  *See* 19 U.S.C. § 1677e(a)(2).

In the *Initial Questionnaire*, the Department instructed Hyundai to report SRR in separate fields, based on separate charges in sales documentation to Hyundai's customers.  *See Initial Questionnaire* at C-1, C-18.  Hyundai did exactly this, based on its CEP sales reporting.  *See Section C Response* at C-42–C-46 (explaining its approach to reporting SRR), Exhibit C-2.  All data reported in Hyundai's US sales database were reported on a CEP basis – not just SRR.  *See*

**PUBLIC VERSION**

*Initial Questionnaire* at C-25–C-26, C-33–C-35, C-38 (providing varying instructions for EP versus CEP sales); *see*, *e.g.*, Section *C Response* at C-45 (stating that where US customers "requested that HEES or Hyundai USA contract with a third party for the installation of the transformer . . . . Hyundai USA charged a separate price for the installation service"), C-65 (explaining that "HEES or Hyundai USA incurs the freight . . . to the customer site in the United States").  Hyundai made its CEP reporting clear throughout the review and repeatedly offered to report EP sales, if the Department determined that Hyundai and Hyundai USA were not affiliated.  *See Section A Response* at A-23; *Supplemental Response* at 1SS-17.  Yet, the Department remained silent on this issue until the *Preliminary Determination*.

Later, with respect to Question 15 of the Supplemental Questionnaire, the Department instructed Hyundai (pursuant to its clarification) to report SRR based on "external sales correspondence with customers (*i.e.*, not just the bid or purchase order), in accordance with Commerce's practice."  *Clarification Response* at 1-2 (citation omitted).  Hyundai reasonably understood this to refer to documentation exchanged with unaffiliated customers, not communications with Hyundai USA, which were internal, intercompany communications, consistent with the Department's practice and this Court's precedent.  *See ABB*, 355 F. Supp. 3d at 1219 (identifying "the contract between affiliates HHI and Hyundai USA contain{ing} separate service-related revenue figures" as "internal Hyundai communications, absent any evidence of communication with the unaffiliated customer").  Thus, Hyundai reported the SRR charged to and collected from Hyundai USA's customers.  *See Remainder Supplemental Response* at 1SS-3–1-SS4, Exhibit C-1 (Revised), Exhibit C-2 (Revised 2).

With respect to Question 21, the Department requested "complete copies of each type of [                                        ] and each change order" *for two specific US sales made by Hyundai*

24

*USA* (SEQUs [            ]).  *Supplemental Questionnaire* at 7.  Consistent with this request, Hyundai provided the "purchase order, a summary of the change orders, and copies of the change orders" for SEQU [ ], and noted that the "long-term agreement pursuant to which this LPT was purchased" was included in Exhibit A-14 of its *Section A Response*.  *Supplemental Response* at 1SS-34, Exhibit 1SS-9.  Likewise, Hyundai provided "a blanket agreement and an update to that agreement, the purchase order, a summary list of the change orders, and copies of the change orders issued between HEES and the customer" for SEQU [   ].  *Id.*  The information and documents Hyundai provided fully met the Department's request with respect to the two CEP sales.

### 2.  The Department Did Not Notify Hyundai of a Deficiency

The Department never issued a deficiency notice to Hyundai requesting that SRR, or any other aspect of Hyundai's US sales data, be reported on an EP basis.  It failed to do so despite being on notice from the outset of the review that Hyundai was reporting CEP sales.[8]  "The failure by Commerce to provide a respondent with the statutorily required notice of a deficiency in its questionnaire response can render the decision to apply facts available unsupported by substantial evidence and otherwise contrary to law."  *Hyundai Steel*, Consol. Ct. No. 19-00099, Slip Op. 21-47 at 20 (internal quotation marks, brackets, and citation omitted).  Indeed, the Department even held a *CEP verification* of Hyundai USA – indicating that, up to that point, it agreed with Hyundai's reporting of CEP sales.  *See Case Brief Resubmission* at 26.

---

[8]  The Court has previously ruled against the Department for applying AFA against Hyundai when Hyundai repeatedly sought guidance from the Department on a specific reporting issue and the Department failed to provide that guidance.  *See Hyundai Heavy Indus. Co. v. United States*, 393 F. Supp. 3d 1293, 1313-17 (Ct. Int'l Trade 2019) (finding that "Commerce did not provide clear guidance to HHI on how it should report accessories" despite the fact that "HHI repeatedly informed Commerce that its reporting methodology was consistent with the scope of the antidumping duty order and repeatedly requested guidance from Commerce on the definition of accessories.").

**PUBLIC VERSION**

As discussed above, the Department issued one supplemental sales questionnaire, containing questions concerning affiliation (Questions 4 through 7); two questions concerning SRR (Questions 15 and 16); and one question that the Department cited in the *I&D Memo* to justify AFA that was unrelated to SRR or affiliation (Question 21).   *See Supplemental Questionnaire* at 5-7.  The Department contends that the questions with respect to SRR and sales documentation constituted the requisite deficiency notice.  *See I&D Memo* at 11 ("Commerce again requested related documentation related to service-related revenues, as well as other sales-related documentation, related to the two home market sales and two U.S. sales, in the First Sales Supplemental Questionnaire").  Yet, none of these questions instructed Hyundai to revise its sales database – let alone its SRR reporting – to an EP basis.  *See id.* ("Hyundai failed to disclose that there was a category of sales-related documentation that it omitted from its responses – *i.e.*, the service-related revenue allocation document between Hyundai and Hyundai USA").  Consequently, these questions do not meet the level of specificity needed to satisfy the statutory obligation under § 1677m(d).  *See, e.g., NSK Ltd.*, 481 F.3d at 1360 n.1 (affirming Department deficiency notice because it "specifically point{ed} out and request{ed} clarification of {the respondent's} deficient responses"); *Hyundai Steel* Consol. Ct. No. 19-00099, Slip Op. 21-47 at 20; *Ta Chen*, 23 C.I.T. at 820 (stating that a deficiency notice must let the respondent know what the Department "really wants").

The Court should reject the Department's attempts to excuse itself from issuing a deficiency notice.  First, the Department seeks to blame Hyundai, stating that it "bears the burden to build the record by reporting accurate and complete responses to Commerce's initial and supplemental questionnaires."  *I&D Memo* at 13.  Reciting this "general principle" does not excuse the Department from meeting its statutory obligations, in particular the obligation to issue

PUBLIC VERSION

a sufficiently detailed deficiency notice.  *See, e.g., Jacobi Carbons AB v. United States*, 313 F. Supp. 3d 1344, 1359 n.27 (Ct. Int'l Trade 2018); *Jinan Yipin Corp. v. United States*, 35 C.I.T. 1254, 1349-50, 800 F. Supp. 2d 1226, 1305 (2011); *Taian Ziyang Food Co. v. United States*, 35 C.I.T. 863, 908, 783 F. Supp. 2d 1292, 1331 (2011); *Ta Chen*, 23 C.I.T. at 820.

Second, the Department attempted to justify the application of FA because it "discovered" the "previously undisclosed" document allocating SRR between Hyundai and Hyundai USA at verification.  *I&D Memo* at 12-13.  Yet, the fact that Hyundai notified the Department of its CEP sales reporting from the very outset of, and throughout, the review, and repeatedly sought guidance from the Department on this issue, belies any such "discovery."  *See Methodology Comments* at 21; *Section A Response* at A-23; *Section C Response* at C-30.

C.   **The Department's Application of FA with Respect to Hyundai's Reporting of the [                    ] is Unsupported by Substantial Evidence and Contrary to Law**

The Department claimed that it was justified in using total AFA, in part, on the grounds that Hyundai incorrectly reported some [       ] as non-subject merchandise.  In doing so, the Department overlooked Hyundai's clear explanation of the valid manner in which it had differentiated between subject [                ] and other, non-subject [       ].  The Department also overlooked the fact that Hyundai reported sales and cost data for all subject and non-subject parts and, therefore, the Department had the data needed to treat the [       ] in whatever way it wanted.  In short, Hyundai provided all of the information requested by the Department and there was no gap in the record.  The Department, on the other hand, conceded its failure to issue the statutorily required deficiency notice.  It follows that the Department's application of FA with respect to the [       ] is not supported by substantial evidence nor in accordance with law.

1.  **Hyundai reported [        ] consistent with the scope of the order, and consistently throughout the review**

The Department's accusation that Hyundai "inconsistently" reported [        ], contrary to the scope of the order, is incorrect.  This is because the Department's interpretation of the scope is incorrect.  The Department claims that *any* "parts physically attached to, imported with, or invoiced with active parts of merchandise under consideration {are} within the scope of the order."  *See I&D Memo* at 17.  This is a misreading of the scope.  During the POR6 Review, Hyundai explained that "parts" refers to *transformer parts*, and that the Department's broad reading could cause significant problems with respect to its enforcement of the order.  *See Rebuttal Comments* at 10-11.  That is, "a component of one of the numerous elements of a{n} electrical power distribution system, which does not have the physical characteristics of a transformer part, does not suddenly become subject merchandise simply because of the way it is invoiced or shipped. . . ."  *Id.* at 11.

Hyundai's reporting of [        ] was therefore consistent with the scope of the order. Exhibits B-2 and D-16 showed that different types of [        ] were classified as either subject or non-subject merchandise, depending on what they controlled – which was, in turn, consistent with Hyundai's explanation to the Department at verification.  *See id.* (alleging the emergence of a "new explanation . . . during verification" that "confirms that Hyundai's prior explanations were inaccurate and indeed misleading").

For example, Exhibit B-2 shows that, for SEQH [   ] (*i.e.*, the sale reviewed by the Department at verification and over which it applied AFA regarding this issue), LPT project number [        ], involved a *subject* "[        ]."  *Section B Response*, Exhibit B-2 at 3 (emphasis added).  Exhibit D-16 correspondingly identifies that same "[        ]" as "MUC" (*i.e.*, merchandise under consideration).

PUBLIC VERSION

*Remainder Supplemental Section D Response* Exhibit D-16 (Revised) at 126; *see also Section D Response*, Exhibit D-16 at 3.

Conversely, Exhibit B-2 shows that a "[

]" sold with the transformer at issue in SEQH [    ], project number [                    ]

was "***Non-Subject***" because it was a "[                              ]." *Section B Response*,

Exhibit B-2 at 7.  Likewise, Exhibit D-16 identifies that "[

]" as "Non-MUC." *Remainder Supplemental Section D Response*, Exhibit D-16 (Revised)

at 127; *see also Section D Response*, Exhibit D-16 at 6-7.

Before, during, and after verification, Hyundai explained to the Department that the categorization of [      ] as subject or non-subject depended on whether they controlled other subject components of the LPT, and were therefore transformer parts. *See Rebuttal Comments* at 10-11; *Case Brief Resubmission* at 44.  The fact that the Department appears to have either misunderstood or disregarded this explanation does not mean that Hyundai failed to submit it or impeded the review.  To the contrary, it renders the Department's decision to apply FA unsupported by substantial evidence, as it evinces the Department's failure to consider "the record as a whole." *Huaiyin Foreign Trade Corp.*, 322 F.3d at 1374 (citation omitted).  Put differently, the Department had no reason to be confused about Hyundai's allegedly "opaque" reporting. *See I&D Memo* at 18.

To defend its conclusion that Hyundai's reporting contradicts the scope of the Order, the Department recites that it has "applied total AFA to Hyundai on the basis of inconsistent reporting of parts in previous reviews." *Id.* at 16.  This is irrelevant.  The Department has repeatedly argued and this Court has agreed – in appeals of those very same reviews – that a party "may not . . . rely on Commerce's factual conclusions from prior reviews in the instant

PUBLIC VERSION

review because each review is separate and based on the record developed before the agency in the review." *See*, *e.g.*, *Hyundai Heavy Indus., Co. v. United States*, 332 F. Supp. 3d 1331, 1342 (Ct. Int'l Trade 2018).

### 2.      There was no gap in the record

Moreover, Hyundai provided sales and cost information for all subject and non-subject components. *See Section B Response* at Exhibit B-2; *Remainder Supplemental Section D Response* at Exhibit D-16 (Revised); *Section D Response* at Exhibit D-16.  Counsel for Hyundai also met with Department officials to discuss and explain the company's reporting process for this information. *See Memorandum to the File from John K. Drury, 2017/2018 Administrative Review of the Antidumping Duty Order on Large Power Transformers from the Republic of Korea: Meeting with Counsel for Hyundai Heavy Industries Co., Ltd.*, May 8, 2019 (P.R. 153).  Thus, even if the Department was correct in concluding that Hyundai did not report [      ] correctly, the record belies its conclusion that Hyundai did not report prices and costs of subject and non-subject parts.  Because there was no gap in the record, the Department's resort to FA was unjustified. *See* 19 U.S.C. § 1677e(a)(2).

### 3.      The Department Failed to Notify Hyundai of a Deficiency

As the Department concedes, it failed to notify Hyundai of any deficiency with respect to the issue of Hyundai's reporting of subject parts.  Nevertheless, the Department asserts that, because "the inaccuracy in Hyundai's explanation only became apparent during verification," it had "no obligation to inform Hyundai of the deficiency prior to verification." *I&D Memo* at 18-19.  This is incorrect.

The Department was, or should have been, aware far before verification of Hyundai's reporting of certain [      ] as subject or non-subject, based on Hyundai's thorough responses to

Sections B and D.  *See Section B Response* at Exhibit B-2; *Section D Response* at Exhibit D-16. Moreover, Petitioners highlighted this issue to the Department on July 19 – almost one month before verification, and Hyundai provided an explanation on August 2 – almost two weeks before the Department held verification in Korea from August 12 to August 16.  *See Petitioners' Supplemental Comments* at 10-12; *Rebuttal Comments* at 10-11; *Korea Verification Report* at 1. Hyundai's explanation in its *Rebuttal Comments*, as explained above, was also consistent with that provided to the Department at verification.  *Compare Rebuttal Comments* at 10-11 *with Case Brief Resubmission* at 49-50.  The record thus belies the Department's claim that Hyundai's reporting of [       ] did not "become apparent" until verification.

D.   **The Department's Application of FA with Respect to the LPT Allegedly Produced in Korea is Unsupported by Substantial Evidence**

In both the *Final Results* and the *Redetermination*, the Department cited to the fact that Hyundai did not provide a [                ] for the [            ] of a single LPT, and concluded that the LPT was produced in Korea, rather than in Alabama.  In doing so, the Department disregarded overwhelming evidence supporting the opposite conclusion.

1.   **Sales and cost reconciliations and CBP data**

At Hyundai's Korea sales verification, the Department reconciled Hyundai's US sales reporting to the company's income statement and trial balance, confirming "the accuracy and thoroughness of reported sales" to the United States and "arriv{ing} at the quantity and value of transformers entered during the POR."  *Korea Sales Verification Agenda*  at 8-9; *Korea Sales Verification Report* at 13.  It likewise reconciled the total POR costs for all POR projects at the cost verification.  *Cost Verification Report* at 9-11.  As Hyundai explained, the "fact that the Department verified Hyundai's US sales and cost reporting at the verifications in Korea, and reconciled this reporting to the company's books and records, negates the possibility that the

company would have produced and shipped a [        ] to HPT in Alabama." *Draft Remand Comments* at 13.

This conclusion was corroborated by the fact that the quantity reported in the US sales database was identical to the quantity reflected in CBP data placed on the record by the Department for purposes of respondent selection. *Hyundai Rebuttal Brief* at 14, 44. Specifically, the CBP data demonstrate that HEES imported [   ] LPTs *{CBP BPI}* into the United States during the POR. *See Large Power Transformers from the Republic of Korea: Hyundai's Comments on Respondent Selection*, Nov. 8, 2018, at 3-5 (C.R. 3/P.R. 17). This is the [   ] number of LPTs *{CBP BPI}* reported by Hyundai in the POR6 Review and verified by the Department. *See Large Power Transformers from the Republic of Korea: HEES's Revised Home Market and U.S. Sales Databases*, Sept. 10, 2019, at Exhibit C-1 (Revised 2) (C.R. 628/P.R. 273).

On remand, the Department cast this highly probative evidence aside, stating that, even though the LPT "was [        ] during the POR, {it} was recorded and sold outside the POR in Hyundai USA's books and records" and therefore "Commerce's review of this information does not contradict Commerce's findings with respect to the LPT in question." *Redetermination* at 27. This makes absolutely no sense: the Department verified, and the CBP data reflects, LPTs *entered* during the POR.[9] The absence of this LPT in the data to which the US sales data were or could be reconciled is extremely strong evidence that the LPT was not produced in Korea.

---

[9]   The Department's statement is especially confounding given that the review covered "merchandise under the review that {Hyundai} sold during the period of review (POR). . . ." *Initial Questionnaire* at A-1. The fact that, as the Department states, the LPT "was sold outside the POR" leads reason to doubt that it is subject to the POR6 Review, even if it had been produced in Korea.

**PUBLIC VERSION**

Otherwise, the sales and cost reconciliations that the Department confirmed during the verifications, and CBP's official import data, must all be wrong.

### 2.      Sales documents provided at verification

The Department cited the fact that Hyundai could not provide a [          ] for the [          ] as the reason why it concluded that the LPT was produced in Korea. *See I&D Memo* at 7. However, Hyundai provided a slew of documents supporting the conclusion that the LPT, including the [          ], was produced in Alabama. These included the bill of lading for LPT parts and components; the [                    ] of the [                    ] from Alabama; invoices and payment records from HPT to Hyundai USA related to the production of the LPT; and a revised purchase contract between Hyundai USA and HPT showing delivery from HPT's Alabama facility. *Case Brief Resubmission* at 35-36.

In both the *Final Results* and the *Redetermination*, the Department summarily dismissed these documents as "only" or "merely" confirming that the LPT was shipped from Alabama and installed at the destination site. *I&D Memo* at 7; *Redetermination* at 26. As Hyundai has already explained to the Court, it would be "unusual for an LPT to be shipped from Korea to Alabama for testing, and then reshipped to the customer in [          ]." Pl.'s Reply Def.'s Opp'n Mot. Suppl. R., Sept. 14, 2020 at 6 (ECF 37, 38). Moreover, the [          ] requested by the Department would have simply confirmed that the LPT was shipped from Alabama. It would not definitively show where it was produced. It was therefore inconsistent and unreasonable for the Department to put such decisive weight on this single document or to conclude that the absence of the document was evidence that the LPT was made in Korea.

### 3.   Serial number differences between the United States and Korea

Hyundai pointed out that the serial number for the LPT, included in both the Test Report and the Nameplate, was fundamentally different from that of LPTs produced in Korea.  *Draft Remand Comments* at 8-9; *December 21 Comments* at 2-3.  Specifically, LPTs produced in Korea have unique 14-digit project numbers, used as serial numbers, and which include the [          ].  *See Draft Remand Comments* at 8-9 (citing *December 21 Comments* at 2-3; *Section A Response* at A-63).

Thus, for example, project number [                    ] was: (1) created in 2016; (2) that year's 4,344th order; (3) an LPT with a capacity between [        ] MVA and a high line voltage of less than or equal to [   ] kV; and (4) the ninth such product in 2016.  *Section A Response* at A-64.  The LPT in question, on the other hand, had the serial number [

    ], reflected throughout both the Test Report and the Nameplate.  *See generally* ECF 28, Att. 1 (Test Report) (containing the serial number on almost every single page); *id.* Att. 2 (Nameplate) at 1 (containing a "serial no." line).

The Department did not dispute this, but simply concluded, without further explanation, that "when weighed against other substantial record evidence" it did "not establish that the [

  ] was produced in Alabama."  *Redetermination* at 14-15, 25.

### 4.   Other information in the Test Report and Nameplate

Hyundai demonstrated that information in the Test Report and Nameplate indicated that the LPT in question was produced in Alabama.  Namely, multiple pages of both documents identify HPT and/or Montgomery, Alabama.  These include the Connection Plate portion of the Nameplate, ECF 28, Att. 2 at 2 (reading "Hyundai Power Transformers Montgomery, AL"); and almost every page of the Test Report.  *See generally id.*, Att. 1.  As Hyundai explained and the

**PUBLIC VERSION**

Court recognized, there exists "a relationship between the place of production and the place of testing{.}" *Hyundai Elec. & Energy Sys.*, 477 F. Supp. 3d at 1331."

Here again, the Department seeks to deny the record, claiming in the *Redetermination* that there is "no record evidence of the 'strong relationship' that Hyundai contends exists between the testing site and the place of production." *Redetermination* at 16. Yet, the Department verified this relationship. *See*, *e.g.*, *Sales Verification Report* at 8 (stating "many customers want testing and acceptance prior to shipment" and will "come to Korea to witness testing" – after which "the unit is ready for shipment"); *Cost Verification Report* at 4 (describing a single, unitary production process from start to finish, including the testing of the LPT upon completion).

Elsewhere, the Department attempts to create support for its conclusion through obviously incorrect interpretations of the documents. In particular, the *Redetermination* focuses repeatedly on the fact that page 17 of the Test Report lists the manufacturer as "[          ]," in relation to which the Department asserts "Hyundai has not identified any record evidence to demonstrate that '[          ]' is in fact HPT in Alabama." *Redetermination* at 11-12, 15-16, 24-25. Yet, just three lines above "[          ]," the same page "identifies the company as 'Hyundai Power Transformers USA' and contains the same serial number ([          ]) demonstrating that the LPT was not produced in Korea." *Draft Remand Comments* at 17; *see also* ECF 28, Att. 1 at 17.

Finally, Hyundai pointed to documentation in the Test Report showing that components used in the LPT were shipped to Alabama, thereby supporting the conclusion that the LPT was produced there. *See December 21 Comments* at 5-6; *Draft Remand Comments* at 10-11; ECF 28, Att. 1 at 224, 235-243, 250-253, 254-258. The Department again cast this aside, claiming that it

PUBLIC VERSION

is "not evidence that the [          ] was produced in Alabama," but rather that the "LPT may have been assembled at the Alabama plant." *Redetermination* at 16-17.  Both the *Final Results* and the *Redetermination* are devoid of any citation to the record, or even suggestion, that Hyundai could or would "assemble" an LPT in this manner.

### 5. "Other Record Evidence" Cited by the Department Does Not Indicate that the LPT was Produced in Korea

In the *Redetermination*, the Department cited to three categories of "other record evidence" that, it concluded, outweighed the evidence above to support its conclusion that the LPT was produced in Korea. *See Redetermination* at 17-18.  The record, however, undermines the Department's conclusions with respect to these documents.

First, the Department notes that the purchase order for the LPT required production in Korea, and that if production were shifted to the United States, Hyundai was required "to notify the customer in writing and to get explicit approval from the customer{,}" which Hyundai did not provide at verification. *Redetermination* at 17.  This is not substantial evidence that the LPT was produced in Korea.  The purchase order did not specify that approval must be in writing, providing a phone number in addition to a mailing address with respect to this requirement. *See* CEP Verification Exhibit VE-8 at 11 (C.R. 625-27).  And, documentation collected by the Department at verification demonstrates that the customer, [     ], paid for the LPT at issue after receiving it – an LPT that, as described above, contained a Nameplate explicitly identifying HPT in Alabama as the producer, and a serial number demonstrating that it was not produced in Korea.  CEP Sales Verification Exhibit VE-8 at 17-18, 25-29, 31-32.  [     ] made "[

                    ]." *Section A Response*, Exhibit A-18 at 8 ([                    ]).  The record therefore reflects the customer's approval.

**PUBLIC VERSION**

Second, the Department contends that it collected documents demonstrating that customs duties were paid for the LPT at issue. *Redetermination* at 18. This is incorrect. It is true that the Department reviewed at verification purchase orders and an invoice that listed customs duties. *See* CEP Sales Verification Exhibit VE-8 at 5, 10-11, 59, 63-64, 71. But these documents do not show that such payments were made; they only show that, at certain points in the sales process, customs duties were (erroneously) listed. Indeed, one of the documents includes "customs duties" and lists Hyundai (along with Hyundai USA and HPT) as the involved parties, but was subsequently updated to remove customs duties, and list only Hyundai USA and HPT. *Compare id.* at 71 (earlier version) *with id.* at 70 (revised version). Moreover, the lack of any international freight documentation in the file maintained by Hyundai USA in the ordinary course of business for the sales (which only contained records for US inland freight) further undermines the Department's claim that customs duties were paid. *See generally id.*; *Case Brief Resubmission* at 37-38 (explaining Hyundai's practice with respect to customs documentation in detail).

Moreover, both at verification and in its case brief, Hyundai provided a detailed explanation of how and why the inclusion of customs duties on the initial purchase order was an error, and that "no such duties were incurred by either party." *Case Brief Submission* at 34. The Department's observation, therefore, that Hyundai "has identified no record evidence or a refund for a 'clerical error'" misses the point. *Redetermination* at 18. Whether any revenue was returned to the customer is not determinative of whether duties were paid to CBP.

Finally, the Department contends that it made "three separate requests to Hyundai to provide shipping documentation to demonstrate that the [          ] was shipped from the Alabama plant to the customer" and that "Hyundai was unable to provide any shipping information regarding the [          ]." *Redetermination* at 18. This, too, is incorrect. The

37

record demonstrates that Hyundai provided a [                          ] for the [            ].
*Case Brief Resubmission* at 36; CEP Verification Exhibit VE-8 at 33.   The document plainly
states that the [            ] was "successfully shipped from the factory" in Alabama to [        ].
CEP Verification Exhibit VE-8 at 33.   The Department has not accounted for why a
[                          ] does not qualify as "shipping documentation," nor how this
document indicates that the LPT was produced in Korea.

### 6. The Department Gave No Weight to Evidence Contradicting Its Conclusion

In light of the record evidence discussed above, it is clear that the Department gave no
weight to the evidence supporting the conclusion that the LPT was produced in Alabama,
rendering its determination with respect to this issue unsupported by substantial evidence.
Hyundai made this clear to the Department on remand, through a side-by-side comparison of
evidence supporting, and evidence detracting from, its conclusion that the LPT was produced in
Korea. *See Draft Remand Comments* at 19.

As summarized there, the only evidence supporting the Department's conclusion and
which the record does not conclusively undermine is the lack of [        ]'s written approval to
shift production of the LPT to HPT in Alabama. ***All other evidence supports the conclusion
that the LPT or [            ] was produced in the United States*** – particularly the Department's
successful reconciliation of Hyundai's US sales and cost data, and the exact match to CBP data.
The Department's failure to consider record evidence that supports an alternative conclusion
renders its determination unsupported by substantial evidence. *Jiaxing Brother Fastener Co.*,
380 F. Supp. at 1360-61 n.26 (citation omitted).

Further, the Department's failure to cite to any record evidence to support its statements
that the [            ] was produced in Korea, or that the LPT was only assembled in Alabama,

amounts to speculation.  For example, the Department posits that the LPT at issue "***may have*** been assembled at the Alabama plant" and "***could*** be the single exception, or there ***may*** be others."  *Redetermination* at 16 (emphasis added).  As the Department itself stated in the *Final Results*, its determination "must be based on evidence on the record – not speculation that evidence on the record does not show what it purports to show."  *I&D Memo* at 7.  Yet, that is exactly what the Department has done, in direct contravention to controlling precedent.  *Lucent Techs., Inc.*, 580 F.3d at 1327 (stating that "speculation does not constitute substantial evidence."); *see also Hyundai Heavy Indus. Co. v. United States*, 485 F. Supp. 3d 1380, 1399 (Ct. Int'l Trade 2020).

In sum, the Department failed to give weight to directly relevant and credible evidence contradicting its conclusion, supported by a "mere scintilla" of evidence, that the [          ] was produced in Korea.  *See Diamond Sawblades Mfrs. Coal.*, 301 F. Supp. 3d at 1347-49.  As a result, substantial evidence does not support its application of FA with respect to this issue.  *See, e.g.*, *Allegheny Ludlum Corp. v. United States*, 24 C.I.T. 452, 479, 112 F. Supp. 2d 1141, 1165 (2000).

E. **The Department's Application of an Adverse Inference to Hyundai Was Unsupported by Substantial Evidence and Otherwise Not in Accordance with Law**

As demonstrated above, the Department was unjustified in applying FA for any of the issues.  In the event that the Court disagrees, the Department was unjustified in applying an adverse inference to Hyundai.

With respect to SRR, the Department stated that Hyundai "failed to cooperate to the best of its ability because it did not provide the requested documentation regarding service-related revenues and expenses. . . ."  *I&D Memo* at 14; *see also id.* at 23.  The Department's finding

PUBLIC VERSION

simply restates the basis for FA – *i.e.*, that Hyundai failed to provide information.  That finding alone does not support an adverse inference.  *See Pro-Team Coil Nail Enter.*, 419 F. Supp. 3d at 1333.  Moreover, given Hyundai's repeated requests of the Department to provide guidance and offer to provide EP sales data if necessary, it was not "reasonable for Commerce to expect that more forthcoming responses should have been made."  That is, Hyundai's responses were reasonable, cooperative, and sufficiently "forthcoming" under the circumstances  *See Nippon Steel*, 337 F.3d at 1383.

With respect to the [     ], the Department incorrectly combined the legal standard for FA with the legal standard for an adverse inference by stating that "Hyundai impeded this review by failing to act to the best of its ability in providing Commerce with complete and accurate information with respect to merchandise under consideration."  *I&D Memo* at 19.  Thus, here again, it has supported the application of an adverse inference by restating the basis upon which it applied FA.  It otherwise seeks to justify an adverse inference by asserting that Hyundai provided "shifting and opaque explanations for its classifications of certain parts and components as out of scope."  *Id.* at 23.  Yet, given Hyundai's extensive and consistent reporting of subject and non-subject merchandise, such discussion was neither "shifting" nor "opaque."  It is likewise unclear as to how Hyundai's discussion of this issue could have been more "forthcoming" under *Nippon Steel*.  Indeed, the Court has previously found that an adverse inference was not justified where Hyundai "provided the information to Commerce but disagreed with the agency as to whether it related to foreign like product."  *Hyundai Heavy Indus. Co.*, 485 F. Supp. 3d at 1399-1401.  The same applies here.

Finally, with respect to the LPT produced in Alabama, the Department seeks to justify an adverse inference through its conclusion that "Hyundai failed to demonstrate that it reported all

required sales in its U.S. sales database" and, therefore, failed to cooperate to the best of its ability. *I&D Memo* at 23. Once again, the Department grafts onto the alleged failure to respond to a request for information (*i.e.*, the basis for FA) a failure to act to the best of one's ability. Hyundai's behavior at verification indicates that the company made every effort to satisfy the Department with respect to this issue. As discussed above, Hyundai provided extensive documentation in response to the Department's request for information regarding the production location of the LPT – documentation indicating that the LPT was produced in Alabama. The fact that the Department did not find such information persuasive does not speak to Hyundai's degree of cooperation, which involved an entire day of verification responding to the Department's requests. *See Draft Remand Comments* at 18.

**F.     There Was No Basis for the Application of Total AFA**

Even assuming that an adverse inference was warranted, the Department's use of total AFA is unjustified. As the Court has stated, total AFA is appropriate only where "***none*** of the reported data is reliable or usable because, for example, all of the submitted data exhibited pervasive and persistent deficiencies that cut across all aspects of the data." *Mukand, Ltd.*, CIT No. 11-00401, Slip Op. 13-41 at 12-13, *aff'd* 767 F.3d at 1307-08 (emphasis added, citations and internal quotation marks omitted). Whether considered singly or in combination, the issues identified by the Department did not warrant disregarding all of the US and home-market sales information submitted by Hyundai and verified by the Department, nor all of the cost information submitted by Hyundai and verified by the Department.

With respect to SRR, Hyundai provided the information and documentation requested and needed to support its CEP reporting. The rationale that the Department has identified for applying AFA (*i.e.*, the lack of an intercompany, internal document) neither gives rise to doubt

Hyundai's SRR reporting, nor to find that ***any***, let alone ***none*** of the data, are unusable.  Rather, the reliability of Hyundai's SRR reporting would only be undermined by the document if the Department had instructed Hyundai to report sales on an EP basis.  But the Department did not do so.  Moreover, the Department has previously found, and the Court has affirmed that, at most, partial AFA is justified with respect to misreporting of SRR.  *See ABB Inc. v. United States*, 437 F. Supp. 3d 1289, 1300-01 (Ct. Int'l Trade 2018), *pending appeal* CAFC No. 20-2114.

With respect to Hyundai's reporting of the [     ], even if information were missing from the record (which it is not), this gap would not affect the entirety of the home-market sales database.  As evident from exhibits B-2 and D-16, only [     ] out of a total of [     ] home-market sales contained non-subject [     ].  *See Section B Response* at Exhibit B-2.  Just as in *Hyundai Heavy Industries*, any deficiency related to these components for these transactions would be too limited to affect the entirety of Hyundai's home-market sales database.  *See* 485 F. Supp. 3d at 1399-1400 (noting that "the failure to report the sales of two parts {was} limited to 'discrete categories of information'" in a limited number of sales and therefore "did not, by itself, suggest that all of HHI's home market sales information" was unusable).  Just as in that case, "it is not clear how these . . . sales undermined the reliability of other documented sales which did not include" the part in question.  *See id.* at 1399.

Finally, assuming that the Department is correct that the LPT was produced in Korea, this does not undermine the entirety of Hyundai's US sales reporting.  This Court has explicitly found that the omission of a single sale is insufficient to justify total AFA.  *See Fujian Mach. & Equip. Imp. & Exp. Corp. v. United States*, 27 C.I.T. 1059, 1061, 276 F. Supp. 2d 1371, 1374 (2003) (finding that total AFA based on the respondent's failure to report a single sale was a form of "impermissible bootstrapping" and that this single error cannot justify the "conclusion

that the entirety of the respondent's submissions concerning other classes of subject merchandise are unreliable."). Likewise, in other cases, the Department has applied partial AFA when discovering the omission of one or more US sales at verification. *See Case Brief Resubmission* at 42-44 (citing and explaining Department practice in *Off-the-Road Tires from China* and *Paper Tissue from China*, in which the Department applied partial AFA after discovering unreported US sales at verification).

Thus, singly or in combination, even if the Court agrees that AFA was justified with respect to the three issues cited in the *Final Results*, it should find that the use of ***total*** AFA was not supported by substantial evidence and is not otherwise in accordance with law.

**PUBLIC VERSION**

## V.    CONCLUSION AND RELIEF SOUGHT

For the reasons discussed above, Plaintiffs respectfully request that the Court:

1)      Enter judgment in favor of Plaintiff;

2)      Hold and declare that the 60.81 percent dumping margin assigned by the Department to Hyundai in the *Final Results* on the basis of total AFA is unsupported by substantial evidence and otherwise not in accordance with law;

3)      Remand this matter to the Department to reconsider the *Final Results*, and to issue revised final results in conformity with the Court's decision; and

4)      Grant Plaintiff such additional relief as the Court may deem just and proper.

Respectfully submitted,

WHITE AND CASE LLP

  /s/ David E. Bond
David E. Bond
William J. Moran
Ron Kendler
WHITE AND CASE LLP
701 Thirteenth Street, NW
Washington, DC 20005
(202) 626-3600

Counsel to Plaintiff Hyundai Electric & Energy Systems Co., Ltd.

Date: August 23, 2021

CERTIFICATE OF COMPLIANCE

I, David E. Bond, certify that the attached brief complies with the word limitation requirement, as stated in the Standard Chambers Procedures.  The word count for Hyundai's Rule 56.2 Brief, as computed by the White & Case word processing system (Microsoft Word 2016) is 13,044.


_____/s/David E. Bond_____
David E. Bond