**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE:  THE HONORABLE MARK A. BARNETT, CHIEF JUDGE**

_____

|  |  |  |
|---|---|---|
| | ) | |
| HYUNDAI ELECTRIC & ENERGY | ) | |
| SYSTEMS, CO., LTD., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| UNITED STATES, | ) | Court No. 20-00108 |
| | ) | |
| Defendant, | ) | |
| | ) | Public Version |
| and | ) | BPI redacted on pages 15, 16, 18 |
| | ) | |
| ABB ENTERPRISE SOFTWARE INC. AND | ) | |
| SPX TRANSFORMER SOLUTIONS, INC., | ) | |
| | ) | |
| Defendant-Intervenors. | ) | |

_____ )

**DEFENDANT'S RESPONSE TO PLAINTIFF'S**
**MOTION FOR JUDGMENT ON THE AGENCY RECORD**

Pursuant to Rule 56.2 of the Rules of this Court, defendant, the United States, respectfully responds to the motion for judgment on the administrative record filed by plaintiff Hyundai Electric & Energy Systems, Co. Ltd. (Hyundai).

Plaintiff challenges the final results of the sixth administrative review of the antidumping duty order covering large power transformers (LPTs) from the Republic of Korea (Korea) for the period of review from August 1, 2017, through July 31, 2018.  As we explain below, Commerce's determination is supported by substantial evidence and in accordance with law.  Accordingly, the Court should deny the motion and enter judgment for the United States.

<u>STATEMENT PURSUANT TO RULE 56.2</u>

## I.   <u>Administrative Determination Under Review</u>

The administrative determination at issue is Commerce's Final Results in *Large Power Transformers from the Republic of Korea: Final Results of Antidumping Duty Administrative Review; 2017-2018*, 85 Fed. Reg. 21,827 (Dep't of Commerce Apr. 20, 2020) (Final Results) (P.R. 370), and accompanying Issues and Decision Memorandum (IDM) (P.R. 368).  The period of review is August 1, 2017, through July 31, 2018.  Also under review is Commerce's voluntary remand redetermination pursuant to this Court's order of Nov. 9, 2020.  *See* Confidential Remand Results (ECF No. 55) (Remand Results).

## II.   <u>Statement of the Issues</u>

1.   Whether Commerce's determination that Hyundai failed to report all of its United States sales was based on substantial evidence.

2.   Whether Commerce's determination that Hyundai failed to report certain service-related revenue expenses was based on substantial evidence.

3.   Whether Commerce reasonably concluded that Hyundai misclassified certain parts and components of subject merchandise, ultimately affecting the gross-unit price.

4.   Whether Commerce reasonably applied total facts available with an adverse inference to Hyundai.

## STATEMENT OF FACTS

### I.  Sixth Administrative Review

On August 31, 2018, Commerce received a request for an administrative review from Hyundai, for its imports from the period of review covering August 1, 2017, through July 31, 2018.  *See Large Power Transformers From the Republic of Korea: Preliminary Results of Antidumping Duty Administrative Review; 2017*–2018, 84 Fed. Reg. 55,559 (Dep't of Commerce Oct. 17, 2019) (Preliminary Results) (P.R. 302), and accompanying Preliminary Decision Memorandum at 1 (PDM) (P.R. 290).  On October 4, 2018, Commerce published a notice of initiation of the sixth administrative review, and on December 13, 2018, Commerce selected Hyundai and Hyosung as mandatory respondents.  *Id.* at 2.  On January 29, 2019, Commerce exercised its discretion to toll all deadlines affected by the partial closure of the Federal Government from December 22, 2018, through January 25, 2019.  *See* PDM at 2.  Commerce then extended the deadline for the Preliminary Results from June 7, 2019, to October 17, 2019.  *Id.*  In August 2019, Commerce conducted sales verification at Hyundai in Korea and at Hyundai Corporation USA (Hyundai USA) in California, and in September 2019, Commerce conducted cost verification at Hyundai in Korea.  *Id*.

In a letter to Commerce, before responding to the initial questionnaire and before the Preliminary Results were published, Hyundai informed Commerce of its intention to report affiliated companies and customers in a manner consistent with the prior review. *Id.* at 12; *see also* Hyundai's Letter Dated Dec. 31, 2018 at 21 (P.R. 28).  However, because of its spin-off from Hyundai Heavy Industries (HHI), Hyundai explained that "a

number of Hyundai's affiliates in prior reviews are no longer affiliates of {Hyundai} in
the current review, according to the statutory definition of that term (found at 19
U.S.C1677(33))." *Id.* Hyundai, in its Section A questionnaire response, clarified that
although it made sales to the United States through Hyundai USA, these companies were
not affiliated and explained that the only relationship between Hyundai USA and
Hyundai "arises by virtue of {Hyundai USA} being a 100%-owned subsidiary of
Hyundai Corporation . . ." and a company, KCC Corporation, owns 12% of Hyundai
Corporation and thus indirectly over 5% of Hyundai USA and KCC Corporation owns
more than 5% of Hyundai. Hyundai's Section A Questionnaire Response Pt. 1 at A-22
through A-33, Ex. A-10 at 33 (PDF page 429) (C.R. 136).

## II.   **The Preliminary Results**

In the Preliminary Results, after reviewing Hyundai's questionnaire responses,
Commerce determined that Hyundai and Hyundai USA are not affiliated parties under the
statute. *See* PDM at 13. Additionally, Commerce based Hyundai's dumping margin on
facts available with an adverse inference. *Id.* at 14. In its analysis, Commerce explained
that, in the initial questionnaire, it asked Hyundai to report revenue in separate fields
(*e.g.*, ocean freight revenue, inland freight revenue, oil revenue, installation, etc.) and to
identify related expenses for each revenue for home market sales and sales to the United
States. *Id.* at 15. In response to the initial questionnaire, Hyundai explained that it
reported "service revenue in separate fields as instructed . . . based on the amounts listed
in the documents between {Hyundai} and the customer." *See* Hyundai's Section C
Questionnaire Response Part 1 at C-6 (P.R. 120). In its supplemental questionnaire

response, Hyundai stated that it reported "service-related revenues as reflected on any sales documentation with the customer."  Sales Supplemental Questionnaire Response Part 1 at 1SS-3 (P.R. 221).

However, during the constructed export price sales verification at Hyundai USA, Commerce learned of a previously unreported commission agreement in which Hyundai USA allocates revenue from the sale of subject merchandise to its subsidiary Hyundai Platform Corporation (HPC).  *See* PDM at 15; *see also* Hyundai CEP Verification Report at 9-12 (C.R. 667).  Commerce also discovered unreported sales documentation in which Hyundai and Hyundai USA negotiated and allocated expenses and revenues between each other.  *See* PDM at 15; *see also* Hyundai CEP Verification Report at 9-12.  Hyundai explained that every United States sale has these documents.  *Id.*  During verification, upon Commerce's request, Hyundai provided these documents for two additional United States transactions.  *Id.*  When Commerce asked why Hyundai had not previously provided such documentation for all United States sales (pursuant to Commerce's initial and supplemental questionnaires), Hyundai responded that it considers these documents to be intercompany, internal communications.  *Id.*

Commerce preliminarily determined that this justification for withholding documents contradicted Hyundai's other responses stating that Hyundai and Hyundai USA are not affiliated parties.  *See* PDM at 12-13, 16; *see also* Hyundai's Section A Questionnaire Response at A-11.  Commerce preliminarily determined that these communications between Hyundai and Hyundai USA were not internal company communications, as Hyundai claimed at verification.  Instead, as Hyundai had already

argued, these were sales negotiations and communications between one company, Hyundai, and its unaffiliated trading company, Hyundai USA, which should have been reported to Commerce. *See* PDM at 16. Commerce explained that Hyundai could not present evidence that it was unaffiliated with Hyundai USA and then, at verification when Commerce discovered the communications, make a completely contradictory affiliation argument. *Id.* Because of this inconsistency, Commerce preliminarily determined that, without this information, it could not determine the actual price for each United States sale to calculate a dumping margin. *Id.*

Moreover, in the initial questionnaire to Hyundai, Commerce requested that Hyundai provide a data file containing each sale of subject merchandise produced in the United States during the period of review. Hyundai Initial Questionnaire at C-2 (P.R. 24). In response, Hyundai reported what was supposed to be Hyundai's universe of United States sales. Hyundai Sec. C Questionnaire Response at C-2. However, during verification at Hyundai USA, Commerce discovered a subsidiary of Hyundai in Alabama (Hyundai Power Transformers, or HPT), that manufactures LPTs in the United States and sold LPTs through Hyundai USA. *See* Hyundai CEP Verification Report at 9-11. During Commerce's completeness check at verification (*i.e.* the process that confirms the accuracy and thoroughness of reported sales and expenses), Commerce discovered conflicting information as to whether a certain LPT had been produced in the United States or in Korea. *Id.* If the LPT had been produced in Korea, it should have been reported in Hyundai's United States sales database. PDM at 16; *see also* Hyundai Preliminary Analysis Memorandum at 2 (C.R. 668) (Prelim Analysis Memo).

Specifically, Commerce noted that Hyundai USA invoiced customs duties to the customer for an LPT which – according to Hyundai – was manufactured in the United States.  *See* Prelim Analysis Memo at 2; *see also* Hyundai CEP Verification Report at 9-11.  It was also unclear why Hyundai USA would collect payment for customs duties on a sale of an LPT purportedly manufactured in the United States and which was sold to a customer in the United States.

Commerce asked for additional documents to ascertain whether this LPT was produced in the United States or Korea; Hyundai failed to provide some of the requested documents, and Commerce preliminarily determined that because Hyundai failed to report this sale, in addition to other failures discussed below, Hyundai failed the completeness test at verification.  *See* PDM at 16; *see also* Prelim Analysis Memo at 2-3; *see also* Hyundai CEP Verification Report at 9-11 (noting that much of this discussion revolves around BPI).  Based on this, Commerce preliminarily determined that Hyundai's failures also called into question the completeness and accuracy of its submissions and its reporting of United States sales in general.  *See* PDM at 17.

Finally, in its initial questionnaire response, Hyundai identified certain LPT components as being outside the scope of the order, and excluded them from its home market sales.  *See* Hyundai First Sales Supplemental Questionnaire Response at Exhibit B-2 (C.R. 419); *see also* PDM at 17-18.  In response to this exclusion, petitioners argued that Hyundai had misclassified these components as being outside the scope of the order; Hyundai filed a rebuttal to the assertion.  *See* Petitioners' July 19, 2019 Letter at 9-12 (C.R. 544); *see also* Hyundai's Aug. 2, 2019 Rebuttal Letter at 9-14 (C.R. 575).  In its

rebuttal, Hyundai argued that these components are neither attached to, nor physically part of the LPT, but are typically located 50 to 100 meters from the LPT, and accordingly should be treated as being out-of-scope.  Hyundai's Aug. 2, 2019 Rebuttal Letter at 11 (C.R. 575).  During verification, Commerce explained that Hyundai occasionally classifies these same components as being covered by the scope of the order.  *See* Hyundai Korea Sales Verification Report at 11 (C.R. 666).  Because of this discrepancy between Hyundai's letter and verification, Commerce was unable to verify the information provided by Hyundai regarding whether these components should have been included in its United States sales.  *See* Hyundai's Aug. 2, 2019 Rebuttal Letter at 9-14; *see also* Hyundai Korea Sales Verification Report at 16; *see also* Prelim Analysis Memo at 2-3.  Commerce preliminarily determined that the use of facts available with a total adverse inference was appropriate given that Hyundai failed a completeness test at verification, failed to provide necessary service-related revenue information, and inconsistently reported certain subject components for home market sales.  *See* PDM at 17-21.

## III.   <u>The Final Results</u>

After receiving the parties' administrative case and rebuttal briefs, Commerce published the final results.  *See generally,* Final Results.  Commerce continued to apply facts available with a total adverse inference to Hyundai and selected the rate from the 2014-2015 administrative review of this proceeding, 60.81 percent.

**IV.    Hyundai's Complaint And Motion To Supplement The Administrative Record**

On May 18, 2020, Hyundai initiated this appeal.  *See* Hyundai's Summons (ECF No. 1).  After filing its complaint on May 27, 2020, Hyundai filed a motion to supplement the administrative record on August 20, 2020.  *See* Hyundai's Complaint (ECF No. 13, 18); *see also* Hyundai's Confidential Motion to Supplement the Record (ECF No. 28) (Motion to Supplement).  In its Motion to Supplement, Hyundai alleged that two documents were missing from the administrative record:  (1) The test report for an LPT sold by Hyundai USA and (2) A diagram of the nameplate for the same LPT.  *See* Administrative Record (ECF No. 24, July 6, 2020); *see also* Motion to Supplement at 1. Hyundai argued that "{19 U.S.C. § 1516a(b)(2)(A)(i)} defines the 'record for review' as 'all information presented to or obtained by' the Department during the administrative proceeding.  Rule 73.2(a)(1) of this Court defines the record using identical language (internal emphasis and citations omitted)."  *See* Motion to Supplement at 2.  Hyundai argued that because the two documents were presented to, and reviewed by, Commerce at verification, the two documents became a part of the administrative record.  *See* Motion to Supplement at 3.

On October 30, 2020, this Court granted Hyundai's Motion to Supplement.  *See* Slip Op. 20-153 Granting Hyundai's Motion to Supplement (ECF No. 40).  In its decision, this Court agreed with Hyundai's argument that the administrative record was incomplete.  *Id.* at 9.  Additionally, this Court rejected the contention that the versions of the documents attached to Hyundai's Motion to Supplement materially differed from the

versions presented to Commerce at verification.  *Id*.  This Court granted Hyundai's

Motion to Supplement and accepted the two documents as part of the administrative

record.  *Id*. at 11.

**V.    Commerce's Voluntary Remand Request And Remand Redetermination**

Following a telephonic conference with the parties and this Court, the United

States requested, and this Court granted, a voluntary remand for Commerce to address the

two documents that were now part of the administrative record and, if necessary,

reconsider its reliance on total adverse facts available to determine Hyundai's dumping

margin.  *See* Slip Op. 20-160 Granting Commerce's Voluntary Remand Request (ECF

No. 51 Nov. 9, 2020).

On March 26, 2021, Commerce filed its final results of redetermination.  *See*

Remand Results.  In the Remand Results, Commerce considered the test report and

nameplate document, concluding that the documents were not sufficient to satisfy the

requests made by Commerce officials as part of the verification "completeness" test.  *See*

Remand Results at 10-11; *see also* Motion to Supplement, at Attachment 1 (Test Report)

and Attachment 2 (Nameplate) (ECF No. 28-2).  Commerce continued to find it

appropriate to apply facts available with a total adverse inference.  *Id.*

## SUMMARY OF THE ARGUMENT

The Court should sustain Commerce's Final Results and Remand Results because

they are supported by substantial evidence and are otherwise in accordance with law.

First, Commerce reasonably concluded that the disputed LPT was produced in

Korea, not in the United States, because Hyundai failed to provide documentation that

substantiated the place of manufacture.  Second, Commerce's decision to apply facts available with an adverse inference to Hyundai for its failure to report certain service-related revenue is supported by substantial evidence and consistent with previous holdings of this Court.  Third, Commerce reasonably concluded that Hyundai understated the gross-unit price of subject merchandise by misclassifying certain parts and components as being out-of-scope.  Finally, Commerce reasonably applied facts available with a total adverse inference to Hyundai because of its repeated failures to report consistent information, its failure of a completeness check at verification, and its misleading characterization of subject merchandise.  Hyundai did not act to the best of its ability and significantly impeded Commerce's review due to its conduct throughout this review.

## ARGUMENT

### I.   Standard Of Review

In reviewing Commerce's antidumping duty determinations, "the Court of International Trade must sustain 'any determination, finding, or conclusion found' by Commerce unless it is 'unsupported by substantial evidence on the record, or otherwise not in accordance with law.'" *Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034, 1038 (Fed. Cir. 1996) (quoting 19 U.S.C. § 1516a(b)(1)(B)). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951); *accord Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927, 933 (Fed. Cir. 1984).

11

The possibility of drawing two inconsistent conclusions from the evidence in the record does not preclude Commerce's determination from being supported by substantial evidence. *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966). Moreover, Commerce is accorded a particular deference in antidumping duty determinations. *See e.g., Fujitsu*, 88 F.3d at 1039 ("Antidumping and countervailing duty determinations involve complex economic and accounting decisions of a technical nature, for which agencies possess far greater expertise than courts."); *cf. United States v. Eurodif*, 555 U.S. 305, 316 (2009) (explaining the scope of Commerce's discretion under the antidumping statute).

Further, this Court reviews Commerce's conduct of its administrative proceedings under the abuse of discretion standard. *See Dongtai Peak Honey Indus. v. United States*, 777 F.3d 1343, 1350 (Fed. Cir. 2015); *Jiangsu Jiasheng Photovoltaic Tech. Co. v. United States*, 28 F. Supp. 3d 1317, 1323 (Ct. Int'l Trade 2014) (citation omitted). This Court "(1) must consider whether {Commerce's} decision was based on a consideration of relevant factors and whether there has been a clear error of judgment, and (2) analyze whether a rational connection exists between {Commerce's} fact findings and its ultimate action." *Consol. Fibers, Inc. v. United States*, 535 F. Supp. 2d 1345, 1352-54 (Ct. Int'l Trade 2008). "An agency action is arbitrary when the agency offer{s} insufficient reasons for treating similar situations differently." *SKF USA, Inc. v. United States*, 263 F.3d 232, 237 (D.C. Cir. 1996).

## II.   Commerce's Application Of Facts Available With An Adverse Inference Is Support By Substantial Evidence

Commerce reasonably applied facts available with an adverse inference to Hyundai for:  1) its failure to pass a completeness test at verification that rendered its United States sales database unreliable; 2) its failure to report service-related revenues and provide sales documentation associated with United States sales; and 3) its failure to consistently report the sales of certain components in the home market.  Reliable information is crucial to Commerce's antidumping calculations, yet Hyundai withheld information requested by Commerce and significantly impeded the review.  As we demonstrate below, Commerce complied with the remand order, law, and its practice when it applied facts available with a total adverse inference to Hyundai.

### A.   Legal Framework

Commerce will use facts otherwise available to fill gaps in the record if (1) necessary information is not available or (2) an interested party withholds information requested by Commerce, fails to provide the information by the deadline or in the manner requested, significantly impedes the proceedings, or provides information that cannot be verified.  19 U.S.C. § 1677e(a).  If Commerce finds that a respondent "failed to cooperate by not acting to the best of its ability to comply with a request for information," it may apply an adverse inference in its selection of facts otherwise available.  19 U.S.C. § 1677e(b)(1).

Commerce may apply an adverse inference for a respondent's "failure to cooperate to the best of respondent's ability, regardless of motivation or intent."  *Nippon*

*Steel*, at 1382.  A respondent fails to act to the best of its ability when it does not exert

"maximum effort to provide Commerce with full and complete answers to all inquiries in

an investigation."  *Id*.  Further, the standard requires that importers "conduct prompt,

careful and comprehensive investigations of all relevant records that refer or relate to the

imports in question to the full extent of the importers' ability to do so."  *Id*.  In selecting

information to use as an adverse inference, Commerce may rely on information from (1)

the petition, (2) the final determination in the investigation, (3) any previous

administrative review, or (4) any other information placed on the record.  *See* 19 U.S.C.

§ 1677e(b)(2); 19 C.F.R. § 351.308(c).

When selecting an adverse rate from among the possible sources, Commerce seeks

to use a rate that is sufficiently adverse to effectuate the statutory purpose of inducing

respondents to provide Commerce with complete and accurate information in a timely

manner.  See *Ozdemir Boru San. Ve Tic. Ltd. v. United States*, 273 F. Supp. 3d 1225,

1245 (Ct. Int'l Trade 2017).  This ensures "that the party does not obtain a more

favorable result by failing to cooperate than if it had cooperated fully."  *See* Statement of

Administrative Action (SAA), H.R. Doc. No. 103-316, vol. 1, at 870, *reprinted* in 1994

U.S.C.C.A.N. 4040, 4199.

### B.   Commerce's Determination That Hyundai Withheld Information, Impeded The Review and Did Not Act To The Best Of Its Ability Is Supported By Substantial Evidence

#### 1.   Hyundai Failed A Completeness Test At Verification

Hyundai's conduct during the review merits the application of facts available with

a total adverse inference because Hyundai was unable to support its claim that the LPT in

question was manufactured and shipped in the United States by Hyundai Power

Transformers (HPT).  Hyundai contests Commerce's application of total adverse facts

available, alleging that it transferred the production of the LPT from Korea to HPT in

Alabama, and therefore HPT, not Hyundai, produced and sold this LPT.  *See* Pl. Br. at

16, 31 (ECF No. 67).  According to Hyundai, there is no basis for Hyundai to include this

sale in its United States sales database.  *Id*.

Hyundai requested that two documents be added to the administrative record – a

Test Report and a Nameplate document – both allegedly related to the sale of the LPT at

issue.  *See* Motion to Supplement at Attachment 1 and Attachment 2.  The Court granted

its request and Commerce considered these documents in its analysis for the Remand

Results.  *See* Remand Results at 11-17.  However, despite Hyundai's arguments, the

Nameplate does not indicate where the [ ▮▮▮▮ ] of the LPT was produced.  Pl. Br. at

34; *see also* Hyundai's Draft Remand Comments at 8-9 (Remand C.R. 6).  Moreover, the

nameplate information in the Test Report is inconsistent, because it identifies the

manufacturer as [ ▮▮▮ ], while a separate test report for the same customer leaves

that field blank.  *See* Motion to Supplement at Attachment 1, PDF p. 18 (internal p. 17);

*see also* Hyundai's Sec. A Questionnaire Response Pt. 2 at Exhibit A-14, PDF p. 140

(C.R. 137) (noting for the Court that Exhibit A-14 begins in C.R. 136 and that there is no

heading for that Exhibit in C.R. 137).  This discrepancy between the information

contained in the two documents highlights Commerce's concerns with internal

consistency in Hyundai's reporting.  Further, this inconsistency demonstrates that the

mere presence of [ ▮▮▮ ] in the manufacturer information field is not an indication of

the manufacture location of [█████████] of the LPT.  *See* Motion to Supplement at

Attachment 1, PDF p. 18 (internal p. 17).  Because the nameplate does not designate the

production location as Alabama, Commerce's determination that Hyundai should have

included this sale in its United States sales database – and that its database was therefore

incomplete – is supported by substantial evidence.

Moreover, the Test Report lists HPT in the letterhead and says that the LPT was

inspected, indicating that the LPT in question was tested at the Alabama plant.  *See*

Motion to Supplement at Attachment 1 at PDF p. 2.  However, because the Test Report

contains no information indicating the place of manufacture of the [█████████] of the

LPT, Commerce could not conclude that the LPT was *manufactured* in Alabama based

on this information.  *See* Motion to Supplement at Attachment 1 at PDF p. 2.  Given the

inconsistency highlighted above – with [█████D] listed as the manufacturer – neither

document serves to establish a definitive place of manufacture.  Hyundai similarly has

not submitted any record evidence to indicate that "[█████████]" means HPT.  Because of

this discrepancy, it was reasonable for Commerce to conclude that the LPT in question

was *tested* in Alabama, but that neither the Test Report nor the Nameplate establish that

the LPT was *manufactured* in the United States.

Additionally, Hyundai could not provide the documents that Commerce requested

at verification that would serve to establish the place of manufacture:  communications

between the customer ([█████████████]) and Hyundai granting - as required

under the terms of the contract – permission to shift production from Hyundai's Korean

facility to the Alabama facility, or a billing of lading [█████████████████]

███ ].  *See* Hyundai CEP Verification Report at 10.  In litigation involving a prior segment of this proceeding, this Court held that Commerce may not rely on "internal documentation," rather than communication with the actual customer, as evidence of separate service-related revenue to which the capping practice applies.  *See ABB Inc. v. United States*, 355 F. Supp. 3d 1206, 1220 (Ct. Int'l Trade 2018) ("Here, the inquiry is whether Commerce may rely on internal company communications, rather than documentation or communications shared with the unaffiliated customer, to determine that there is separate service-related revenue to cap.  The court concludes that it may not.") (*ABB Inc*).  Here, the contract between the customer and Hyundai required the customer's permission to shift production from Hyundai's Korean facility to any other location.  *See* Hyundai CEP Verification Report at 10.  Commerce requested documentation from Hyundai reflecting that this permission was obtained from the customer, yet Hyundai could not provide it.  Hyundai's proffering of a Test Report and Nameplate, both internal communications, as proof that the LPT in question was manufactured in the United States, thus does not resolve the issue and contravenes the Court's rationale in *ABB Inc*.  *See* Motion to Supplement at Attachment 1 and Attachment 2; *see also ABB Inc.*, 355 F. Supp. 3d at 1220.

During verification, Commerce collected documents demonstrating that customs duties were paid for the LPT at issue.  *See* Hyundai's CEP Verification Report at 9-11.  These duties were charged to the customer, and the customer in turn reimbursed Hyundai USA for them.  *Id*.  Hyundai asserts – without support – that this is a clerical error.  Pl. Br. at 16.  However, the record shows that the duties were paid and that expense was

17

ultimately passed on to the customer, and Hyundai has provided *no evidence* on the record of a refund for this "clerical error."  Moreover, at verification, Commerce also made three separate requests for Hyundai to provide shipping documentation to demonstrate that the [          ] of the LPT was shipped from Alabama to the customer, but Hyundai was only able to provide information regarding certain parts and components.  *See* Hyundai CEP Verification Report at 9-11; *see also* IDM at 7.

Hyundai also argues that the serial number listed in the Test Report and the serial number on the Nameplate differ from serial numbers used by Hyundai in Korea, and that there is a "strong relationship" between the testing location and production location.  *See* Pl. Br. at 34.  These assertions, however, are unavailing because Hyundai's own test report – that fails to list a place of manufacture – shows that there is no definitive connection between the testing site and the place of manufacture, and at the very least undermines the idea that Hyundai's reporting is consistent.  *See* Hyundai's Sec. A Questionnaire Response Pt. 2 at PDF p. 140; *see also* Pl. Br. at 35.

Given the small number of sales at issue in this review,[1] and the impact that one sale can have on the dumping margin, complete reporting is critical to Commerce's analysis.  Commerce's conclusion that the record demonstrates that [          ] of the LPT was produced in Korea, not Alabama, is supported by substantial evidence and in accordance with law.

---

[1]  Hyundai reported [   ] sales during the period of review.  *See* IDM at 8; *see also* Respondent Selection Memo. (C.R. 6).

### 2. Hyundai Failed To Report Service-Related Revenues And Sales Documentation Associated With United States Sales

Commerce asked Hyundai – on two occasions – to report service-related revenues and associated expenses. *See* Hyundai's Initial Questionnaire at B-1 (PDF p. 34); *see also* Hyundai First Sales Supplemental Questionnaire at 6 (P.R. 170). Additionally, because of the importance of service-related revenue to this proceeding, Commerce sent a clarifying letter to Hyundai regarding the nature of Commerce's question in the First Sales Supplemental Questionnaire. *See* Commerce's June 20, 2019 Letter to Hyundai (C.R. 471). In response, Hyundai stated that it reported "service-related revenues as reflected on any sales documentation with the customer." Sales Supplemental Questionnaire Response Part 1 at 1SS-3. However, Hyundai failed to submit other information that was responsive to Commerce's questionnaire. Specifically, Hyundai failed to submit documentation – that, Hyundai claims, exists for every single sale – showing a service-related revenue allocation between Hyundai and Hyundai USA. *Id*.

Hyundai argues that Commerce knew that Hyundai was reporting its United States sales as constructed export price sales through Hyundai USA, despite Hyundai and Hyundai USA not being affiliated parties under the statute, and that if Commerce wanted an export price sales database it should have asked for one. *See* Pl. Br. at 2. However, Hyundai's argument does not justify its incomplete responses to Commerce's requests for information. In the initial questionnaire, Commerce requested that Hyundai:

> Describe your agreement(s) for sales in the United States and the foreign market (e.g., long-term purchase contract, short-term purchase contract, purchase order, order confirmation). Provide a copy of each type of agreement and all sales-related

> documentation generated in the sales process (including the
> purchase order, internal and external order confirmation,
> invoice, and shipping and export documentation) for a sample
> sale in the foreign market and U.S. market during the POR.

Hyundai's Initial Questionnaire at A9 through A-10.

Similarly, in the First Supplemental Sales Questionnaire, Commerce requested

that Hyundai "separately report all service-related revenues (*i.e.*, not grouped together or

bundled) if those revenues are reflected on any sale documentation (e.g., invoice,

purchase order, contract, proposal, etc.)." First Sales Supplemental Questionnaire at 6-7.

Based on these requests, Hyundai should have provided information on service-related

revenue allocation documents between Hyundai and Hyundai USA – the same

information discovered by Commerce at verification – in its initial questionnaire response

and in its supplemental questionnaire response; Hyundai did not. Sales Supplemental

Questionnaire Response Part 1 at 1SS-3; *see also* Hyundai CEP Verification Report at 9-

11. Contrary to Hyundai's claims that Commerce gave every indication that it would

treat Hyundai's United States sales as constructed export price sales, Commerce did not

make a decision on how to treat Hyundai's sales until the Preliminary Results, which

were published after verification took place. *See* PDM; *see also* Pl. Br. at 12. Moreover,

Hyundai cites no authority for the proposition that a party may be less than forthcoming

with its questionnaire responses if it expects Commerce will not require the information

for its analysis.

It is Hyundai's burden to build the record of this proceeding. *See Fujian Lianfu

Forestry Co. Ltd. v. United States*, 638 F. Supp. 2d 1325, 1340 (Ct. Int'l Trade 2009) ("A

respondent has a statutory obligation to prepare an accurate and complete record in response to questions plainly asked by Commerce.") (*quoting Tung Mung Dev. Co. v. United States,* 25 C.I.T. 752, 758 (2001)).  The failure to report service-related revenues has previously been upheld by this Court – based on similar facts – as a basis to apply adverse facts available.  *See Hyundai Heavy Indus. v. United States*, 332F. Supp. 3d 1331, 1340-43 (Ct. Int'l Trade 2018); *see also Hyundai Heavy Indus. v. United States*, 399 F. Supp. 3d 1305, 1311-12 (Ct. Int'l Trade Aug. 2, 2019) (sustaining Commerce's conclusion that Hyundai did not report certain service-related revenues and sustaining Commerce's application of adverse facts available).  Commerce's decision to apply adverse facts available to Hyundai in this review is based on substantial evidence, in accordance with law, and consistent with Commerce's treatment of Hyundai's previous failures to report service-related revenue information in this proceeding.

### 3. Hyundai Understated Its Home Market Gross Unit Price By Misclassifying Certain Parts And Components As Not Covered By The Scope Of The Order

Hyundai further impeded the review by providing inconsistent explanations for certain in-scope or out-of-scope parts and components.  The Initial Questionnaire's description of products under review states:

> The scope of this order covers large liquid dielectric power transformers (LPTs) having a top power handling capacity greater than or equal to 60,000 kilovolt amperes (60 megavolt amperes), whether assembled or unassembled, complete or incomplete.  Incomplete LPTs are subassemblies consisting of the active part and any other parts attached to, imported with or invoiced with the active parts of LPTs.  The 'active part' of the transformer consists of one or more of the following when attached to or otherwise assembled with one

> another: the steel core or shell, the windings, electrical
> insulation between the windings, the mechanical frame for an
> LPT.

Hyundai Initial Questionnaire at Appendix III.

The Initial Questionnaire to Hyundai and the scope of the order itself identify parts

physically attached to, imported with, or invoiced with active parts of merchandise under

consideration as being within the scope of the order.  Commerce also issued the First

Sales Supplemental Questionnaire, which requested that Hyundai include all merchandise

under consideration in a home market sales reconciliation.  *See* First Sales Supplemental

Questionnaire at 6.

Notwithstanding this, Hyundai failed to report certain in-scope parts and

components.  After its First Supplemental Sales Questionnaire Response, and initially at

verification, Hyundai stated that certain parts and components should be treated as being

out-of-scope because they are neither attached to, nor physically part of the LPT, and are

typically located 50 to 100 meters from the LPT and attached by cables.  *See* Hyundai

Korea Sales Verification Report at 11; *see also* Hyundai's Aug. 2, 2019 Rebuttal Letter at

9-14.  However, during verification, Commerce discovered there are other parts and

components that have exactly these same features – *i.e.*, they are neither attached to, nor

physically part of the

LPT, and are typically located 50 to 100 meters from the LPT and attached by cables –

and yet Hyundai classified them in this review as being in-scope.  *See* Hyundai Korea

Sales Verification Report at 16.  Based on the plain language of the products under

review, as well as the initial questionnaires, Hyundai should have known that such parts

22

and components needed to be included in the gross unit price, and its failure to do so was inaccurate and misleading.

Further, contrary to Hyundai's claims, record evidence shows these items have significantly high values in comparison to complete LPTs and can, in fact, represent a large portion of the gross unit price of an LPT.  *See* Hyundai's Initial Questionnaire Response at Exhibit B-2; *see also* Hyundai First Sales Supplemental Questionnaire Response at Exhibit B-2.  Hyundai claims that Commerce never informed it of the deficiencies in its submissions, however, Hyundai's inaccuracy only became apparent during verification, at which time the record was already closed.  Because these inaccuracies, which include Hyundai's failure to report service-related revenues and its failure to report the entire universe of its United States sales, were discovered at verification, Commerce could not have alerted Hyundai to these deficiencies before verification took place.  *See* Hyundai's Initial Questionnaire Response at Exhibit B-2; *see also* Hyundai First Sales Supplemental Questionnaire Response at Exhibit B-2; *see also* Hyundai's Section A Questionnaire Response at A-11; see also Hyundai CEP Verification Report at 9-11.  Commerce reasonably concluded that it was unable to verify this information given the inconsistencies discovered at verification and the other inconsistencies discussed above.

### 4. Commerce's Decision To Apply Total Adverse Facts Available With An Adverse Inference Is Based On Substantial Evidence And In Accordance With Law

As demonstrated above, Commerce reasonably applied facts available with a total adverse inference to Hyundai because Hyundai failed a completeness test at verification,

failed to provide necessary documents regarding service-related revenue, and inconsistently reported certain parts and components for home market sales.

Commerce's determination is consistent with this Court's decisions.  In *Hyundai Steel Co. v. United States*, 282 F.Supp.3d 1332, 1348-49 (Ct. Int'l Trade 2018) (*Hyundai Steel*), Commerce issued multiple supplemental questionnaires to respondent Hyundai. The Court found that, while some supplemental questionnaires are issued for the simple purpose of requesting additional information, other are "clearly aimed at remedying deficiencies" in the respondent's questionnaire responses.  *See Hyundai Steel*, 282 F. Supp. 3d at 1348.  The Court agreed that the supplemental questionnaires in that case "adequately notified Hyundai of the nature of its deficiencies, and requested specific corrections." See *Hyundai Steel*, 282 F. Supp. 3d at 1348.  As in this case, Hyundai was notified of inconsistencies in its questionnaire responses and the inconsistent data it provided.  *See id*.  Here, consistent with 19 U.S.C. 1677m(d), Hyundai was given ample notice of the deficiencies in its questionnaire responses and Commerce tied these deficiencies to inconsistencies between Hyundai's data and its Questionnaire responses. *See* Final Results at 21-22; *see also* Supplemental Questionnaire Response Part 1 at 1SS-3; *see also* Hyundai CEP Verification Report at 9-11

Indeed, the Court of Appeals for the Federal Circuit has "held that an adverse inference may be appropriate where an interested party has been notified of a defect in its questionnaire response yet continues to provide a defective response." *Hyundai Electric & Energy Systems Co., Ltd. v. United States*, 15 F.4th 1078 at *9 (Fed. Cir. Oct. 4, 2021) (*citing Maverick Tube Corp. v. United States*, 857 F.3d 1353, 1361 (Fed. Cir. 2017)

24

("Borusan had already failed to provide the information requested in Commerce's original questionnaire, and the supplemental questionnaire notified Borusan of that defect. § 1677m(d) does not require more.")).  Commerce notified Hyundai of the deficiencies in its initial questionnaire responses when it issued its supplemental questionnaires, and the statute does not require Commerce to do more than that.

Commerce's decision to apply facts available with a total adverse inference to Hyundai is reasonable and is based on substantial evidence.  Hyundai failed to demonstrate that it reported a complete United States sales database; failed to cooperate by not acting to the best of its ability to comply with requests for documentation, including service-related revenue expenses; and impeded the review by providing inconsistent explanations for its classification of certain parts and components as outside the scope of the order.

## **CONCLUSION**

For these reasons, we respectfully request that this Court deny plaintiff's motion for judgment upon the agency record and enter judgment for the United States.

Respectfully submitted,

BRIAN M. BOYNTON
Acting Assistant Attorney General

PATRICIA M. MCCARTHY
Director

/s/ L. Misha Preheim
L. MISHA PREHEIM
Assistant Director

OF COUNSEL:                                  /s/Kelly A. Krystyniak
IAN MCINERNEY                                Kelly A. Krystyniak
Counsel                                      Trial Attorney
Department of Commerce                       Department of Justice
Office of the Chief Counsel                  Commercial Litigation Branch
  for Trade Enforcement & Compliance      P.O. Box 480
                                             Ben Franklin Station
                                             Washington, D.C. 20044
                                             Tel: (202) 307-0163
                                             Fax: (202) 514-8640
November 15, 2021                            Email: Kelly.A.Krystyniak@usdoj.gov

## **CERTIFICATE OF COMPLIANCE**

Pursuant to Rule 2(b) of the Court's Standard Chambers Procedures, defendant's counsel certifies that this motion complies with the Court's type-volume limitation rules.  According to the word count calculated by the word processing system with which the brief was prepared, the public version of the brief contains a total of 6,430 words.

<u>s/ Kelly A. Krystyniak</u>

November 15, 2021