## UNITED STATES COURT OF INTERNATIONAL TRADE
## BEFORE THE HONORABLE MARK A. BARNETT, CHIEF JUDGE

| | |
|---|---|
| HYUNDAI ELECTRIC & ENERGY SYSTEMS CO., LTD.,<br><br>　　　　　Plaintiff,<br><br>v.<br><br>　UNITED STATES,<br><br>　　　　　Defendant,<br><br>and<br><br>ABB ENTERPRISE SOFTWARE INC. AND SPX TRANSFORMER SOLUTIONS, INC.<br><br>　　　　　Defendant-Intervenors. | Court No. 20-00108<br><br># NON-CONFIDENTIAL<br><br>**Business Proprietary Information has been deleted from the Table of Contents and on Pages 1-22.** |

#### REPLY IN SUPPORT OF PLAINTIFF'S RULE 56.2 MOTION
#### FOR JUDGMENT UPON THE AGENCY RECORD

David E. Bond
William J. Moran
Ron Kendler

WHITE & CASE LLP
701 Thirteenth Street, NW
Washington, DC 20005
(202) 626-3600

January 18, 2022

PUBLIC VERSION

## TABLE OF CONTENTS

I.     INTRODUCTION ..................................................................................................1

II.    ARGUMENT .........................................................................................................1

    A.    Hyundai's SRR Documentation Was Consistent with the Reported CEP
         Sales and Satisfied the Department's Requests ..................................................1

    B.    Hyundai Reported Revenue for [    ] in Accordance with the Scope and
         the Department Had the Information Needed to Treat Them Differently, if
         It Wanted..............................................................................................................3

         1.    The United States repeats the Department's incorrect factual and legal
               conclusions without addressing Hyundai's arguments ..........................4

         2.    Petitioners' response mischaracterizes Hyundai's reporting and cites
               to inapplicable precedent .......................................................................7

    C.    The United States and Petitioners Fail to Counter the Overwhelming
         Evidence that the LPT at Issue Was Produced in Alabama ...............................8

         1.    The United States and Petitioners ignore the most probative evidence
               regarding the accuracy of Hyundai's US sales data...............................9

         2.    The United States does not respond to Hyundai's arguments .............10

         3.    Petitioners' "additional points" do not support the conclusion that the
               LPT was produced in Korea .................................................................13

              a.    The [             ] does not identify the
                    production location ....................................................13

             b.    Petitioners' citation to timing is irrelevant...................14

              c.    Petitioners fail to demonstrate that the alleged lack
                 of customer approval demonstrates the production
                 location of the LPT .....................................................14

              d.    Petitioners' argument regarding a [      ] is
                 speculative and contradictory ....................................16

              e.    Conclusion .................................................................16

    D.    The United States and Petitioners Do Not Demonstrate that Total AFA
         Was Justified.....................................................................................................17

**PUBLIC VERSION**

1.    The United States' and Petitioners' Discussions of the Statutory
      Requirements to Apply FA are Incorrect ...............................................17

2.    The United States and Petitioners Have Not Justified the Application
      of an Adverse Inference ........................................................................19

3.    The United States and Petitioners Have Not Justified the Application
      of Total AFA ..........................................................................................21

III.   CONCLUSION ............................................................................................23

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*ABB Inc. v. United States*,
   355 F. Supp. 3d 1206 (Ct. Int'l Trade 2018) ............................................................2, 11, 12

*ABB Inc. v. United States*,
   437 F. Supp. 3d 1289 (Ct. Int'l Trade 2018) ........................................................................21

*Ceramark Tech., Inc. v. United States*,
   61 F. Supp. 3d 1371 (Ct. Int'l Trade 2015) ..........................................................................14

*Diamond Sawblades Mfrs. Coal. v. United States*,
   301 F. Supp. 3d 1326 (Ct. Int'l Trade 2018) ........................................................................10

*Hyundai Elec. & Energy Sys. v. United States*,
   477 F. Supp. 3d 1324 (Ct. Int'l Trade 2020) ........................................................................11

*Hyundai Electric & Energy Systems Co., Ltd. v. United States*,
   15 F.4th 1078 (Fed. Cir. 2021) .............................................................................................20

*Hyundai Heavy Indus. Co. v. United States*,
   332 F. Supp. 3d 1331 (Ct. Int'l Trade 2018) ..........................................................................8

*Hyundai Heavy Indus. Co. v. United States*,
   485 F. Supp. 3d 1380 (Ct. Int'l Trade 2020) ...................................................................8, 21

*Hyundai Steel Co. v. United States*,
   518 F. Supp. 3d 1309 (Ct. Int'l Trade 2021) ........................................................................18

*Nippon Steel Corp. v. United States*,
   337 F.3d 1373 (Fed. Cir. 2003).............................................................................................20

*Nippon Steel Corp. v. United States*,
   458 F.3d 1345 (Fed. Cir. 2006).........................................................................................9, 20

*NSK Ltd. v. United States*,
   481 F.3d 1355 (Fed. Cir. 2007).............................................................................................18

*Pro-Team Coil Nail Enter. v. United States*,
   419 F. Supp. 3d 1319 (Ct. Int'l Trade 2019) ........................................................................20

*Ta Chen Stainless Steel Pipe v. United States*,
   23 C.I.T. 804 (1999) .............................................................................................................18

*Taian Ziyang Food Co. v. United States*,
   918 F. Supp. 2d 1345 (Ct. Int'l Trade 2015) ........................................................15

*Universal Camera Corp. v. NLRB*,
   340 U.S. 474 (1951).............................................................................................9

*Zhaoqing New Zhongya Aluminum Co. v. United States*,
   929 F. Supp. 2d 1324 (Ct. Int'l Trade 2013) ........................................................9

## STATUTES AND REGULATIONS

19 U.S.C. § 1677e(a)(2) .........................................................................................7

19 U.S.C. § 1677e(b) ............................................................................................20

19 U.S.C. § 1677m(d) ...........................................................................................18

19 U.S.C. § 1677m(e) ......................................................................................18, 19

## ADMINISTRATIVE DETERMINATIONS

*Large Power Transformers from the Republic of Korea: Preliminary Results of*
   *Antidumping Duty Administrative Review; 2017-2018*,
   84 Fed. Reg. 55559 (Oct. 17, 2019),
   and accompanying Preliminary Decision Memorandum .........................................19

*Large Power Transformers from the Republic of Korea: Final Results of*
   *Antidumping Duty Administrative Review; 2017-2018*,
   85 Fed. Reg. 21827 (Apr. 20, 2020),
   and accompanying Issues & Decision Memorandum .......................................8, 20

## I.       INTRODUCTION

Plaintiff Hyundai Electric & Energy Systems Co., Ltd. ("Hyundai") replies to Defendant

United States' Response to Plaintiff's Motion for Judgment on the Agency Record (ECF 72, 73)

("Def. Br.") and Defendant-Intervenors ABB Enterprise Software Inc. and SPX Transformer

Solutions Inc.'s ("Petitioners") Response in Opposition to Plaintiff's Motion for Judgment on the

Agency Record (ECF 75, 76) ("Petrs. Br.").[1]

## II.      ARGUMENT

In its initial brief ("Brief"), Hyundai demonstrated that neither facts available ("FA") nor

an adverse inference ("AFA") was justified with respect to (1) documentation related to service-

related revenue ("SRR"); (2) reporting of a [                                      ]; and (3) a large

power transformer ("LPT") allegedly produced in Korea.  *See* Hyundai Br. at 20-43. The United

States and Petitioners fail to address the arguments raised in Hyundai's Brief.  With respect to

the application of FA for each of the three issues, the United States selectively responds to

Hyundai's Brief by repeating the Department's incorrect legal and factual conclusions, and

ignores key arguments raised by Hyundai.  Petitioners likewise misstate both facts and relevant

legal standards.  Both parties further fail to justify the use of either total FA or AFA.

### A.       Hyundai's SRR Documentation Was Consistent with the Reported CEP Sales and Satisfied the Department's Requests

The Department's application of FA to Hyundai over the issue of allegedly missing SRR

documentation was unsupported by substantial evidence and contrary to law.  Hyundai fully

responded to the Department's request for such documentation with respect to the reported US

---

[1]  We refer to underlying documents from the record using the abbreviated names set forth in
Hyundai's Memorandum of Points and Authorities in Support of Plaintiff's Rule 56.2 Motion for
Judgment Upon the Agency Record (ECF 68, 69) ("Hyundai Br.").

sales, and the Department did not provide a sufficiently specific deficiency notice to warrant further action by Hyundai.  *Id.* at 23-27.  The United States does not meaningfully respond to these arguments, but simply repeats the Department's reasoning from below.  *See generally* Def. Br. at 19-21.[2]

As Hyundai explained, its responses to the Department were consistent with Hyundai's CEP reporting and this Court's precedent in *ABB Inc. v. United States*, 355 F. Supp. 3d 1206 (Ct. Int'l Trade 2018) ("*ABB Inc.*").  Hyundai Br. at 9-10, 23-25.  Pursuant to that precedent, Hyundai was required to report SRR based only on, and support such reporting with, documents exchanged with the unaffiliated customer.  *See id.*  Because Hyundai reported US sales on a CEP basis, the reported sales were those between Hyundai USA and unaffiliated US customers.  The Department requested documents with respect to two specific CEP sales, SEQUs [          ].  *See Supplemental Questionnaire* at 6; Hyundai Br. at 10.  Communications between Hyundai and affiliated parties were not relevant to SRR for these sales to unaffiliated customers.  The United States disregards the observation-specific request it made, instead repeating in overly broad terms that the Department requested SRR on "any sales documentation."  The United States likewise ignores its subsequent instruction to provide "***external*** sales correspondence with customers."  *See Clarification Response* at 1-2; Hyundai Br. at 24-27 (emphasis added).  In accordance with the Department's instructions, Hyundai provided all SRR documentation exchanged with "external" customers with respect to SEQUs [          ].  *See* Hyundai Br. at 24; *Supplemental Response* at 1SS-33–1SS-34, Exhibits 1SS-8, 1SS-9.

In this regard, it is important to reiterate that Hyundai was crystal clear in describing how it was reporting US sales (*i.e.*, as CEP sales), beginning with a request made to the Department

---

[2]  Petitioners make no further arguments with respect to this issue.  Petrs. Br. at 8.

PUBLIC VERSION

for guidance before responding to the initial questionnaire.  *See* Hyundai Br. at 6-9; 23-25.  Yet, the Department never issued a deficiency notice asking Hyundai to report US sales on an EP basis.  *Id.* at 9-12, 25-27.  Indeed, the United States concedes, "Commerce did not make a decision on how to treat Hyundai's sales until the Preliminary Results, which were published after verification took place."  Def. Br. at 20 (citation omitted).

The United States concludes by mischaracterizing Hyundai's argument as standing for "the proposition that a party may be less than forthcoming with its questionnaire responses if it expects Commerce will not require the information for its analysis."  *Id.* at 20.  Hyundai neither stated nor implied any such thing.  Rather, Hyundai flagged the classification of its US sales and related reporting at the beginning of the review; sought guidance several times; and responded fully to the Department's requests.  *See* Hyundai Br. at 23-27.  It met its obligations and was not required to do more.  For its part, the Department ignored Hyundai's requests for guidance, made a determination on the issue after closing the record, and then sought to cast blame on Hyundai.  *See id.*  Thus, the Department's determination in the *Final Results* with respect to Hyundai's SRR documentation was unsupported by substantial evidence and contrary to law.

**B.**     **Hyundai Reported Revenue for [          ] in Accordance with the Scope and the Department Had the Information Needed to Treat Them Differently, if It Wanted**

Hyundai's classification of [          ] throughout the review was consistent with the scope of the order.  Hyundai reported [          ] that controlled or related to the LPT itself as within the scope, and [          ] that controlled or related to non-subject components (*e.g.*, [          ]) as outside the scope.  *Id.* at 28-29.  Further, Hyundai submitted sales and cost information for all [          ] regardless of how they were reported, meaning that there was no gap in the record that justified the use of FA.  *Id.* at 30.  In any case, the Department never questioned Hyundai's

interpretation of the scope or issued a deficiency notice.  *See id.* at 30-31.  The United States'
and Petitioners' response briefs do not address these points.

      1.      **The United States repeats the Department's incorrect factual and
legal conclusions without addressing Hyundai's arguments**

      Reciting the scope language, the United States asserts that Hyundai's reporting was
deficient because "parts physically attached to, imported with, or invoiced with active parts of
merchandise under consideration" are within the scope of the order.  Def. Br. at 22.  This
recitation of the scope does not respond to Hyundai's arguments.  Instead, it suggests that the
Department misunderstands the scope, which only applies to "***transformer parts***".  Hyundai Br.
at 28 (emphasis original) (citing *Rebuttal Comments* at 10-11).  An [      ] that is a part of some
other element of a distribution system is not within the scope.  As Hyundai explained during the
review:

> {A} component of one of the numerous elements of a{n} electrical power
> distribution system, which does not have the physical characteristics of a
> transformer part, ***does not suddenly become subject merchandise simply because
> of the way it is invoiced or shipped***.  Such an interpretation of the scope would be
> an absurd expansion of the antidumping duty order – as is made apparent from a
> diagram of an electric distribution system.  As seen in the diagram . . . the
> electricity generation equipment (turbines) and transmission lines are all attached
> by wires to LPTs.  However, ***they would not become subject merchandise merely
> because they happened to be invoiced or shipped with an LPT***.

*Rebuttal Comments* at 11 (emphasis added).  Hyundai reinforced this point by referring to the
following diagram of a distribution system:

4



Source: *Large Power Transformers from Korea, Inv. No. 731-TA-1189 (Final)*, USITC Publication 4346, August 2012, p. I-6.

*Large Power Transformers from the Republic of Korea: HEES's Rebuttal Information on Petitioner's Comments on HEES's Sections B and C Responses*, Apr. 16, 2019, Att. 1 at 23 (C.R. 332-33/P.R. 144-45).

While Hyundai was clear, neither the United States nor Petitioners have ever stated, either below or before this Court, how the scope is to be interpreted. If the United States and Petitioners admit, as they must, that various parts – *e.g.*, [

]³ – are used to operate either an LPT or other, non-LPT elements of a distribution system, they must explain how the scope is to be applied to such parts. But, they have studiously avoided doing so. In fact, as Petitioners admit, "the Department did not ultimately reach a conclusion on this issue" in the previous review that, Petitioners claim, should have put Hyundai

---

³ *See Section B Response*, Exhibit B-2 at 2-4; *Supplemental Response*, Exhibit B-2 (Revised) at 2-4). That is, Hyundai reported each of these components as either in- or out-of-scope depending on their use.

**PUBLIC VERSION**

on notice that the Department disagreed with its reporting.  *Petitioners' Supplemental Comments* at 12.  In order for the Department or Petitioners to conclude that Hyundai got it wrong, they must state what the correct interpretation of the scope is and explain why ***all*** [      ] are in-scope.

Next, the United States repeats the incorrect conclusion that FA was justified because of allegedly "inconsistent" reporting.  Def. Br. at 22 (stating that there exist "other parts and components that have exactly the same features" as out-of-scope [      ] "and yet Hyundai classified them in this review as being in-scope.") (citations omitted).  This argument ignores Hyundai's statements that there are different types of [      ], and that Hyundai classified them as in-scope or not based on the description set forth above.  *See* Hyundai Br. at 12-15, 27-29.  Like the Department below, the United States does not respond to Hyundai's explanation.

The United States concludes by repeating the incorrect statement that the "inaccuracy only became apparent during verification," claiming this justified its failure to issue a deficiency notice.  Def. Br. at 23.  Hyundai has already disproven this statement.  The combination of its questionnaire responses (containing the rationale for its reporting); comments by Petitioners and Hyundai; and an in-person meeting between Hyundai's counsel and the Department all raised this issue well before verification.  Hyundai Br. at 30-31.

Perhaps most importantly, the United States fails to respond to Hyundai's argument that there was no gap in the record because it submitted complete sales and cost information for all [      ] – both in and out of scope.  *See Supplemental Response* at Exhibit B-2 (Revised); Hyundai Br. at 30 (citing *Section B Response* at Exhibit B-2; *Remainder Supplemental Section D Response* at Exhibit D-16 (Revised); Section D Response at Exhibit D-16); Def. Br. at 21-23.  Therefore, even if the United States were correct that Hyundai's reporting of [      ] was

inconsistent with the scope, the Department still had all information necessary to include or exclude them, at its discretion, from the gross unit price for the LPTs.  Therefore, the statutory requirements for using FA are not satisfied.  *See* 19 U.S.C. § 1677e(a)(2).

### 2.    Petitioners' response mischaracterizes Hyundai's reporting and cites to inapplicable precedent

For their part, Petitioners largely repeat arguments made by the United States and conclusions reached by the Department, claiming that Hyundai "failed to explain its methodology until verification" and that "Hyundai's questionnaire responses indicated that it was classifying [      ] as non-foreign like product."  Petrs. Br. at 9.  Hyundai has addressed these arguments above.

Petitioners' two additional arguments mischaracterize the facts and applicable law.  First, Petitioners quote Hyundai's explanation from the *Rebuttal Comments*, in which Hyundai explained that a particular [      ] was not a foreign like product, to assert that "Hyundai's questionnaire responses indicated that it was classifying [      ] as non-foreign like product" for all home-market sales.  *Id.* (quoting *Rebuttal Comments* at 11).  This clearly was not the case, as is evident in Exhibit B-2, which showed that some [      ] were reported as a foreign like product and others were not.  *See Section B Response* at Exhibit B-2; *Supplemental Response* at Exhibit B-2 (Revised).  Hyundai provided the explanation cited by Petitioners specifically with respect to the [      ] in SEQH [   ], in response to arguments that Petitioners raised about that [    ].  *See Rebuttal Comments* at 10-11; *Petitioners' Supplemental Comments* at 10.  As Hyundai made clear, that specific [      ] was not a foreign like product because it was used for a [                          ].  *See Section B Response*, Exhibit B-2 at 8; *Supplemental Response*, Exhibit B-2 (Revised) at 8.  Hyundai's statement regarding the [      ] for SEQH [   ] was not a general statement about all [      ].

Second, Petitioners cite to *Hyundai Heavy Indus. Co. v. United States*, 332 F. Supp. 3d 1331 (Ct. Int'l Trade 2018) ("POR3 Appeal"), in which they claim that a "similar issue" arose. *See* Petrs. Br. at 10-11. However, the record and the determination in POR3 were distinct from the record and determination in this case. In the POR3 Appeal, the Court concluded that "Plaintiff understood it was required to report the gross unit price to reflect" the part in question and did not do so. *Hyundai Heavy Indus. Co.*, 332 F. Supp. 3d at 1345. Here, Hyundai explained why the part was not a foreign like product and the Department later disagreed. *See* Hyundai Br. at 28-30. Thus, this case actually is like *Hyundai Heavy Indus. Co. v. United States*, 485 F. Supp. 3d 1380, 1401 (Ct. Int'l Trade 2020) ("POR4 Appeal"), where the Court determined that AFA was not justified because Hyundai reported certain parts as a non-foreign like product based on its "good faith position" and interpretation of the scope.[4]

## C.    The United States and Petitioners Fail to Counter the Overwhelming Evidence that the LPT at Issue Was Produced in Alabama

The application of FA with respect to a single LPT that the Department claimed "was in fact produced in Korea" was unsupported by substantial evidence. *See* Hyundai Br. at 31-39; *I&D Memo* at 7. The Department gave no weight to extensive, probative evidence showing that the LPT was produced in Alabama. Instead, it relied on inconclusive evidence. No reasonable person weighing this evidence could conclude the LPT was produced in Korea – or even that it might have been. *See* Hyundai Br. at 31-39.

---

[4] We note that in the POR4 Appeal, the Court affirmed the use of partial, neutral FA because it concluded that substantial evidence supported the conclusion that the parts were foreign like products. *See Hyundai Heavy Indus. Co.*, 485 F. Supp. 3d at 1397-98. To be clear, Hyundai does not argue that FA was warranted here. Hyundai was consistent and clear regarding its reporting of [     ] throughout the POR6 review, and provided sales and cost data for all [     ]. Moreover, the Department failed to meet the statutory prerequisites for the application of FA, given that there was no gap in the record and it did not provide a deficiency notice.

### 1.   The United States and Petitioners ignore the most probative evidence regarding the accuracy of Hyundai's US sales data

The United States and Petitioners focus on specks of evidence, paying no attention to the most probative evidence on the record.  At both Hyundai's Korea sales verification *and* cost verification, the Department reconciled the reported US LPTs to Hyundai's accounting and production records, and its audited financial statements, which the Department concluded "*confirmed the accuracy and thoroughness*" of Hyundai's reported US sales and costs. Hyundai Br. at 31-32 (emphasis added, citations omitted).  This negates the possibility that an unreported [          ] was produced in and shipped from Korea.  *See id.*  If this were not enough, the quantity reported in the US sales database was *identical* to, and thus reconciled to, official Customs & Border Protection ("CBP") import data.  *Id.* at 32.[5]

For the Court to affirm the Department's decision, there must be "an adequate basis in support of the {agency's} choice of evidentiary weight{.}"  *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1359 (Fed. Cir. 2006).  The Department's weighing of evidence, in turn, must not be unreasonable.  *Zhaoqing New Zhongya Aluminum Co. v. United States*, 929 F. Supp. 2d 1324, 1328 (Ct. Int'l Trade 2013) (citing *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951)). This Court has held that, where the Department does not consider evidence "of cogent materiality," and instead relies on a single piece of evidence as "the only buttress" upholding its

---

[5]  Petitioners, citing "public import data," allege that "as many as 27 similarly situated sales (*i.e.*, sales that *may have* consisted of [               ]) *may not* have been reported by Hyundai during the review period."  Petrs. Br. at 15 (emphasis added) (citing *Large Power Transformers from the Republic of Korea: Petitioners' Case Brief for Hyundai*, Dec. 12, 2019 at 44-45 (C.R. 681/P.R. 328) ("*Petitioners' Case Brief*").  These data reflect a search on "Panjiva" in which the word "transformer" was included for imports made by any Hyundai entity.  *See Petitioners' Case Brief* at 21, 44.  Petitioners do not explain how this information casts doubt on the official data of CBP.

**PUBLIC VERSION**

determination, the determination is unsupported by substantial evidence. *See Diamond Sawblades Mfrs. Coal. v. United States*, 301 F. Supp. 3d 1326, 13449 (Ct. Int'l Trade 2018).

That is exactly what the Department did here. On remand, the Department concluded that "the weight of the evidence" supported the conclusion that the LPT was produced in Korea. *See Redetermination* at 12, 20, 23, 27. In doing so, the Department did not give any weight to evidence "of cogent materiality" – above all, the reconciliations discussed above – that contradict its conclusion. *See Diamond Sawblades Mfrs. Coal.*, 301 F. Supp. 3d at 1349. The United States simply repeats the Department's conclusions.

> **2.      The United States does not respond to Hyundai's arguments**

The United States begins by stating that "the Nameplate does not indicate where the [          ] of the LPT was produced." Def. Br. at 15. Yet, as Hyundai explained, the Nameplate identifies "Hyundai Power Transformers Montgomery, AL," *Remand Comments* at 7, and a nameplate "lists the manufacturer of the LPT." *Large Power Transformers from Korea: Comments on Hyundai Documents*, Dec. 21, 2020 at 5 (R.C.R 3/R.P.R 4) ("For example, the test report included in Exhibit VE-11b of Hyundai's Korea Sales Verification Exhibits lists "Manufacturer EES" – i.e., HEES. Likewise, the identification of "Hyundai Power Transformers Montgomery, AL" on the nameplate identifies the manufacturer of the LPT as HPT in Alabama.") (footnote omitted). The United States' argument evokes the Department's reasoning on remand that "the LPT *may have* been assembled at the Alabama plant" with a [          ] that was produced in Korea. *See Redetermination* at 17 (emphasis added). Neither the Department below nor the United States before this Court has cited to *any* record evidence indicating Hyundai would ever produce an LPT in this manner. *See* Hyundai Br. at 38-39. The Nameplate remains strong evidence that the LPT was produced in Alabama.

Next, the United States claims that the Nameplate only identifies the manufacturer as "[          ]." Def. Br. at 15-16.  Hyundai has demonstrated that this overlooks that fact that "just three lines above '[          ]'" the Nameplate "'identifies the company as 'Hyundai Power Transformers USA' and contains the same serial number ([          ]) demonstrating that the LPT was not produced in Korea.'"  Hyundai Br. at 35 (quoting *Remand Comments* at 17 and ECF 28, Att. 1 at 17).  The United States fails to address this point in any convincing way.[6]

The United States then repeats the conclusion that, even though the LPT "was tested at the Alabama plant . . . .  Commerce could not conclude that the LPT was *manufactured* in Alabama based on this information."  Def. Br. at 16 (emphasis original, citation omitted).  This contradicts the Department's own conclusions.  The Department stated in both the sales and cost verification reports that LPTs are tested where they are produced because customers typically "want testing and acceptance prior to shipment."  Hyundai Br. at 34-35 (quoting *Sales Verification Report* at 8); *see also Cost Verification Report* at 4.  This Court likewise recognized the same compelling logic.  *Hyundai Elec. & Energy Sys. v. United States*, 477 F. Supp. 3d 1324, 1331 (Ct. Int'l Trade 2020).  The United States acts as if the Department never made these statements.

Next, the United States claims that Hyundai acted contrary to this Court's holding in *ABB Inc.* because providing "a Test Report and Nameplate, both internal communications, as proof that the LPT in question was manufactured in the United States . . . does not resolve the issue and contravenes the Court's rationale in *ABB Inc.*"  Def. Br. at 17.  There are two major flaws with this argument.  First, as a factual matter, it is not true that the Nameplate and Test Report are

---

[6] The United States' responses to other, highly probative evidence likewise fail.  For example, the United States deems the serial number "unavailing" by repeating the incorrect conclusion that the Test Report "fails to list a place of manufacture" and "shows that there is no definitive connection between the testing site and the place of manufacture{.}"  Def. Br. at 18.

**PUBLIC VERSION**

"internal communications."  Hyundai USA sold the LPT to [          ].  [          ] Request for

Quote ("RFQ") provided in Hyundai's *Section A Response* states that, Hyundai was required to

submit test results for the LPT to [          ], including [

].  *Section A Response*, Exhibit A-14, "Step 1 – Request for Quote (RFQ)" at 22.

Likewise, the same document sets out multiple requirements for a Nameplate to be included on

the LPT.  *Id.* at 23-24.  Second, the Court's holding regarding internal communications related to

SRR reporting.  *See ABB Inc.*, 355 F. Supp. at 1220.  The Court's logic there was that

negotiations or communications between affiliated entities was not, *per se*, evidence of

negotiations with unaffiliated customers.  *See id.* at 1219.  The Court did not find that

communications between affiliates were irrelevant in other circumstances. *See id.* at 1219-20.

The United States goes on to repeat the incorrect conclusion that "the record shows" that

"customs duties ***were paid*** for the LPT at issue."  Def. Br. at 17 (emphasis added).  It adds that

"Hyundai has provided *no evidence* on the record of a refund for this 'clerical error.'"  *Id.* at 18

(emphasis original).  The United States' use of the term "paid" is misleading.  Hyundai explained

that it did not make such payments.  *Case Brief Resubmission* at 33-34, 37-38; Hyundai Br. at

37.  Nor is there evidence of such payment on the record: none of the documents reviewed by the

Department that listed "customs duties" actually showed that payments were made to CBP.  *See*

Hyundai Br. at 37 (citing CEP Sales Verification Exhibit VE-8 at 5, 10-11, 59, 63-64, 71).

Furthermore, the lack of evidence of a refund to the customer "is not determinative of whether

duties were paid to CBP." [7]  *Id.*

---

[7]  The Court should reject Petitioners' similar claims.  Petitioners point to the fact that [

], post-dates documents supporting the conclusion that the LPT
was produced in Alabama.  Petrs. Br. at 4-5.  As discussed above, this does not demonstrate the
payment of customs duties.  Likewise, the [                    ] to which Petitioners refer is not

Finally, the United States, like the Department, claims that Hyundai was "only able to provide information" regarding the shipment of "certain parts and components" and not the [          ]. Def. Br. at 18.  Again, Hyundai has already demonstrated that this is incorrect, as it provided a [                    ] for the [          ].  *See* Hyundai Br. at 17, 33, 37-38; CEP Verification Exhibit VE-8 at 33.

> **3.  Petitioners' "additional points" do not support the conclusion that the LPT was produced in Korea**
>
> > **a.  The [                         ] does not identify the production location**

Petitioners point to the [

], noting that it [

]. Def. Br. at 3 (emphasis added).  Yet, the issue is who manufactured the LPT and where, not who sold it, and the [                    ] does not identify a manufacturer or manufacturing location.  *See* CEP Sales Verification Exhibit VE-8 at 36.  Petitioners then claim that "the mere existence of the document" supports the conclusion that the LPT was produced in Korea, because [

] Petrs. Br. at 3.  Yet, Hyundai explicitly explained in its response during the review: "Hyundai USA pays a commission to its parent, Hyundai Corporation **for all sales**."  *Section C Response* at C-70, n.26 (emphasis added). The identification of [                                        ] is not evidence of who manufactured the LPT or where.

---

evidence of payment.  *See* Petrs. Br. 4.  It is evidence that Hyundai [                         ], not that the customs duties were paid to CBP.  And, as Hyundai has noted, multiple documents on the record were revised during the sales process to remove references to customs duties. Hyundai Br. at 37 (citing CEP Sales Verification Exhibit VE-8 at 70-71; *Case Brief Resubmission* at 37-38).

### b.     Petitioners' citation to timing is irrelevant

Petitioners claim that the date of the [                                        ], is proof

that the LPT was produced in Korea.  *See* Petrs. Br. at 4.  Given that the [                    ]

has nothing to do with who manufactured the LPT, the date of the document is irrelevant.

Petitioners conclude this point by stating, "Hyundai has not explained why the earlier-in-time

documents it cites are more probative than the later-in-time documents that Commerce relied

upon to conclude that the LPT was produced in Korea."  *Id.* at 5.  The reason these "earlier-in-

time" documents are more probative is simple:  they demonstrate that the LPT was produced in

Alabama.  *See* Hyundai Br. at 33-38.  Conversely, the "later-in-time" documents do not show

that the LPT was produced in Korea nor disprove that it was produced in Alabama.  They simply

show that a [            ] was owed for the sale.

### c.     Petitioners fail to demonstrate that the alleged lack of customer approval demonstrates the production location of the LPT

Petitioners allege "several flaws" in Hyundai's argument that the purchase order "did not

specify that approval" of a production transfer "must be in writing" and that the customer's

payment for, and approval of, the LPT reflected its approval of a production transfer.  Petrs. Br.

at 5-7; Hyundai Br. at 36.  None of these "flaws" is true.

Petitioners first assert that Hyundai did not exhaust its argument regarding written

approval because it did not raise the argument in its case brief.  *See* Petrs. Br. at 5-6.  However,

Petitioners omit the fact that Hyundai made this argument to the Department on remand.  *See*

*Draft Remand Comments* at 17.  Accordingly, the Department had, in the first instance, the

requisite "opportunity to set forth its position in a manner that would facilitate judicial review"

consistent with the doctrine of exhaustion.  *Ceramark Tech., Inc. v. United States*, 61 F. Supp. 3d

1371, 1376 (Ct. Int'l Trade 2015) (citation, internal quotation marks, and bracketing omitted); *cf.*

*also Taian Ziyang Food Co. v. United States*, 918 F. Supp. 2d 1345, 1361 (Ct. Int'l Trade 2015) (recognizing that a "party failed to exhaust administrative remedies by not raising issue in comments on draft remand results") (citation omitted). Petitioners' claim that Hyundai failed to exhaust is incorrect.

Then, Petitioners repeat the incorrect claim that "the purchase order explicitly requires Hyundai to *notify the customer in writing* of any change in production site." Petrs. Br. at 6 (emphasis original). Yet, the "purchase order did not specify that approval must be in writing, providing a phone number in addition to a mailing address with respect to this requirement." Hyundai Br. at 36. Indeed, neither the words "in writing" nor any express writing requirement are found anywhere on the page of the purchase order cited by the Department and Petitioners. *See* Petrs. Br. at 6; *CEP Verification Report* at 10 (citing "USSVE-8, page 11"); CEP Verification Exhibit VE-8 at 11.

Nor does Petitioners' quotation of language concerning [                    ] demonstrate that Hyundai USA was required to obtain written approval to transfer the production location. *See* Petrs. Br. at 6-7. The quoted terms state that [          ] – *i.e.*, Hyundai USA – [                                                                                    ]. CEP Verification Exhibit VE-8 at 15. Production of the LPT was not a [

                              ]; the same terms identify a separate [                    ] – *i.e.*, HEES, and later, HPT. *Id.* at 12, 14 (emphasis added) (stating that [


                                        ]).

**PUBLIC VERSION**

In any event, Petitioners' concerns were not shared by [          ], which accepted and paid

for the LPT that was clearly identified as having been produced by HPT in Alabama.  *See*

Hyundai Br. at 36.

> **d.    Petitioners' argument regarding a [          ] is speculative and contradictory**

Petitioners seek to rebut Hyundai's argument that a [          ] for the [          ]

would not have definitively shown where the LPT was produced by deeming it "pure

speculation" because the [          ] "***may*** have showed that it was shipped from Korea, not

Alabama."  Petrs. Br. at 7 (emphasis added).  As demonstrated above, the record contains other

evidence (the [          ]) showing that the LPT was shipped from Alabama, not

Korea.  Petitioners further claim that "shipment from Korea would have been highly probative

evidence of production in Korea."  *Id.*  By this logic, the [          ] from

Alabama is "highly probative evidence" of production in Alabama.

> **e.    Conclusion**

Neither the United States nor Petitioners have effectively responded to Hyundai's

demonstration that the Department gave no weight to highly probative evidence showing that the

LPT was produced in Alabama.  Rather than considering the record as a whole, the United States

and the Petitioners have cherry-picked a few minor pieces of evidence to support their

conclusions.  Chief among the overlooked evidence were: (1) Hyundai's reconciliations of the

LPTs sold to the United States to its accounting and production records, and audited financial

statements; and (2) the fact that Hyundai's US sales quantity was identical to CBP import data.

Hyundai Br. at 31-32; *see also Korea Sales Verification Report* at 13; *Cost Verification Report* at

9-11; *Hyundai Rebuttal Brief* at 14, 44.  These reconciliations were corroborated by other

credible evidence, including the US-specific serial number; repeated identification of HPT as the

16

manufacturer in the Test Report and Nameplate; and the established relationship between testing

and production locations.  *See* Hyundai Br. at 33-36.  In contrast, the only evidence that could be

said to support the Department's conclusion is the lack of [      ]'s written approval to shift

production – which, as the record demonstrates, was not explicitly required.  *See* Hyundai Br. at

38; *see also Draft Remand Comments* at 19 (side-by-side comparison of evidence supporting and

evidence detracting from the Department's conclusion that the LPT was produced in Korea).

Based on this record, a reasonable person could only conclude that the LPT was produced

in Alabama.  Hyundai Br. at 33-36.  The Department's conclusion that the LPT "was in fact"

produced elsewhere was mere speculation.

> **D.    The United States and Petitioners Do Not Demonstrate that Total AFA Was Justified**

Neither an adverse inference, nor total facts available, was justified on the basis of the

record, the statutory requirements for total AFA, and this Court's precedent.  *See* Hyundai Br. at

39-43.  The United States and Petitioners' responses fail to prove otherwise.

> **1.    The United States' and Petitioners' Discussions of the Statutory Requirements to Apply FA are Incorrect**

Both the United States and Petitioners begin their discussion of total AFA by citing to

statutory and procedural prerequisites for the finding of FA.  As explained below, their

discussions are incorrect and do not support the conclusion that FA was justified.

Without specifying the issue to which it refers, the United States contends that "Hyundai

was given ample notice of the deficiencies in its questionnaire responses and the inconsistent

data it provided."  Def. Br. at 24 (citation omitted).  The discussion in Sections II.A through II.C

above, as well as throughout Hyundai's Brief, demonstrate that this is not true with respect to the

**PUBLIC VERSION**

SRR documentation issue or the [      ] reporting issue.[8]  As the Court has held, only a deficiency notice that "specifically points out and requests clarification of the deficient responses,' and identifies the information needed to make the required showing" meets the standard of 19 U.S.C. § 1677m(d).  *Hyundai Steel Co. v. United States*, 518 F. Supp. 3d 1309, 1323 (Ct. Int'l Trade 2021) (quoting *NSK Ltd. v. United States*, 481 F.3d 1355, 1360 n.1 (Fed. Cir. 2007)) (internal quotation marks and brackets omitted)); *see also Ta Chen Stainless Steel Pipe v. United States*, 23 C.I.T. 804, 820 (1999) (stating that a deficiency notice must let the respondent know what the Department "really wants").  In this case, the Department's broad requests for SRR based on "external sales correspondence with customers" and all sales documentation for SEQUs [

], despite knowledge of Hyundai's CEP reporting; and failure to notify Hyundai of any deficiency with respect to [      ], despite Hyundai's clear and consistent classification of in- and out-of-scope merchandise, do not meet this standard.  *See* Hyundai Br. at 9-11, 25-27, 30-31.

Petitioners claim that the Department satisfied both 19 U.S.C. § 1677m(d) and § 1677m(e).  As discussed above, the Department's deficiency notices did not satisfy § 1677m(d).  *See generally supra*; *see* Hyundai Br. at 25-27; 30-31.  With respect to § 1677m(e), Petitioners quote this Court to argue that this provision is "inapplicable" where a party has "failed to demonstrate that it acted to the best of its ability in providing the information and meeting the requirements" therefor.  Petrs. Br. at 18-19 (citation omitted).  Yet, as Hyundai has shown, it acted to the best of its ability in providing information with respect to all three discrete issues.  *See* Hyundai Br. at 39-41.

Thus, the onus was on the Department to demonstrate that Hyundai's information did not meet the requirements set forth in § 1677m(e).  In the *Final Results*, the Department did not

---

[8]  The question of a deficiency notice does not appear to be relevant to the LPT allegedly produced in Korea.

demonstrate that Hyundai's information failed to meet any one of the five requirements established therein. *See generally I&D Memo.* Further, the *Preliminary Results* only cited to two of the five requirements: the Department concluded that Hyundai "failed to act to the best of its ability," and that its "information cannot be used without undue difficulties." *Preliminary Decision Memo* at 21. These two conclusions were incorrect: the record shows that Hyundai acted to the best of its ability, and that the information submitted by Hyundai could be used without undue difficulty. For example, the Department had sales and cost information for all [    ], and the SRR information on the record was accurate for the reported CEP sales. Although Petitioners quote the Department's statement that it "could not verify" Hyundai's information, at no point has the Department elaborated on this claim. *See* Hyundai Br. at 14 ("The Department applied AFA because it concluded that it could not verify Hyundai's information . . . . {It did not} explain why the substantial information collected at verification was insufficient to verify the approach taken by Hyundai to differentiate between subject and non-subject parts.").

Thus, contrary to Petitioners' claims, § 1677m(e) remains applicable. And, because the record demonstrates that Hyundai's information met each of its five requirements,[9] there was no basis for the Department to reject that information.

### 2. The United States and Petitioners Have Not Justified the Application of an Adverse Inference

The United States asserts that "an adverse inference may be appropriate where an interested party has been notified of a defect in its questionnaire response yet continues to

---

[9] That is, Hyundai's information was submitted by the established deadline; was verifiable; was not "so incomplete" so as to preclude the Department from "reaching the applicable determination;" Hyundai acted to the best of its ability in submitting the information; and the Department could use the information without undue difficulties. *See* 19 U.S.C. § 1677m(e).

provide a defective response."  Def. Br. at 24 (quoting *Hyundai Electric & Energy Systems Co., Ltd. v. United States*, 15 F.4th 1078, 1090 (Fed. Cir. 2021)).  Petitioners likewise claim that an adverse inference was justified because "Hyundai possessed relevant information . . . that it did not provide in response to Commerce's questionnaires."  Petrs. Br. at 15-18.

Yet, as shown above, Hyundai complied with the Department's requests by reporting SRR based on documents exchanged with "external" customers for the reported CEP sales; providing all relevant sales documentation for the sales identified by the Department (SEQUs [

]); and reporting [      ] throughout the POR6 Review consistent with both its explanations and the scope of the antidumping duty order.  Hyundai Br. at 23-25, 27-30.

Furthermore, to support an adverse inference, the Department must "do more than simply restate its findings . . . supporting the use of neutral facts available{.}" *Pro-Team Coil Nail Enter. v. United States*, 419 F. Supp. 3d 1319, 1333 (Ct. Int'l Trade 2019).  It must demonstrate, based on substantial evidence, that the respondent failed to act to the best of its ability, *see* 19 U.S.C. § 1677e(b), and that it was not "reasonable to expect that more forthcoming responses should have been made{.}" *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1383 (Fed. Cir. 2003).  The Department did not make such a demonstration in the *Final Results*, and the United States has likewise failed to do so.  *See I&D Memo* at 14, 19, 23; Hyundai Br. at 39-41; Def. Br. at 23-25.  Although Petitioners invoke the *Nippon Steel* language in their brief, they fail to demonstrate that the Department could have reasonably expected Hyundai to be more "forthcoming" in light of the arguments presented in Hyundai's Brief.  *See* Petrs. Br. at 16-17; Hyundai Br. at 39-41.

**3.** **The United States and Petitioners Have Not Justified the Application of Total AFA**

The United States does not discuss the legal standard for the application of "total" FA. *See* Def. Br. at 23-25. Petitioners, on the other hand, claim that "the three reporting issues . . . were pervasive and affected both the home market and U.S. sales reporting in a fundamental way." Petrs. Br. at 13-15. Hyundai has demonstrated that these three issues, whether considered singly or in combination, were not pervasive and did not warrant the use of total FA. *See* Hyundai Br. at 41-43.

With respect to the SRR documentation, this documentation would only be relevant to the accuracy of Hyundai's US sales database *if* the Department had instructed Hyundai to report sales on an EP basis. However, it did not do so and there is no indication that the SRR reported for the CEP sales in the US sales database was incorrect. *See* Hyundai Br. at 41-42. In fact, the Department verified SRR at Hyundai's CEP verification in relation to another sale and "noted no discrepancies." *See* CEP Verification Report at 11. In any case, the Department has previously found and this Court has affirmed that, at most, partial AFA is justified with respect to missing SRR. *See ABB Inc. v. United States*, 437 F. Supp. 3d 1289, 1300-01 (Ct. Int'l Trade 2018), *pending appeal* CAFC No. 20-2114.

With respect to the [     ], the record shows that this affected only [     ] out of a total of [   ] home-market sales. *See Section B Response* at Exhibit B-2; *Supplemental Response* at Exhibit B-2 (Revised). This is exactly the "discrete category of information" that the Court has held does not justify total FA. *See Hyundai Heavy Industries Co.*, 485 F. Supp. 3d at 1399-1400. And, in any case, the Department had sales information on the record for all [     ] sales.

With respect to the LPT that the Department claimed was produced in Korea, even if true, this affected a single sale. Both this Court and the Department itself have refused to apply

21

total FA over the lack of a single sale.  *See* Hyundai Br. at 42-43; *Case Brief Resubmission* at 42-44 (citing relevant precedent).[10]

Finally, even when considered in combination, these issues were not so pervasive as to justify disregarding all of Hyundai's cost and sales data.  The Department could have resolved each discrete issue by making the minor changes of (1) adding the prices of any [     ] designated as out-of-scope that it believed were in-scope; (2) using available information to apply FA for SRR; and (3) adding the LPT to the US sales database.  ***Total*** AFA is unwarranted.

---

[10]  As discussed *supra* n. 5, Petitioners' claim that there may be more such LPTs is speculative. *See* Pets. Br. at 15.

**III.    CONCLUSION**

Plaintiff respectfully requests that the Court:

1)        Enter judgment in favor of Plaintiff;

2)        Hold and declare that the 60.81 percent dumping margin assigned by the
Department to Hyundai in the *Final Results* on the basis of total AFA is
unsupported by substantial evidence and otherwise not in accordance with law;

3)        Remand this matter to the Department to reconsider the *Final Results*, and to
issue revised final results in conformity with the Court's decision; and

4)        Grant Plaintiff such additional relief as the Court may deem just and proper.

Respectfully submitted,

WHITE AND CASE LLP

 /s/ David E. Bond
David E. Bond
William J. Moran
Ron Kendler
WHITE AND CASE LLP
701 Thirteenth Street, NW
Washington, DC 20005
(202) 626-3600

Counsel to Plaintiff Hyundai Electric & Energy
Systems Co., Ltd.

Date: January 18, 2022

CERTIFICATE OF COMPLIANCE

I, David E. Bond, certify that the attached brief complies with the word limitation requirement, as stated in the Standard Chambers Procedures.  The word count for Hyundai's Reply Brief, as computed by the White & Case word processing system (Microsoft Word 2016), is 6,821.


    /s/ David E. Bond          
David E. Bond
