Slip Op. 22-42

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| HYUNDAI ELECTRIC & ENERGY SYSTEMS CO., LTD., <br><br> Plaintiff, <br><br> v. <br><br> UNITED STATES, <br><br> Defendant, <br><br> and <br><br> HITACHI ENERGY USA INC. and PROLEC-GE WAUKESHA, INC., <br><br> Defendant-Intervenors. | Before: Mark A. Barnett, Chief Judge <br> Court No. 20-00108 <br><br> **PUBLIC VERSION** |

## OPINION AND ORDER

[Sustaining in part and remanding in part the U.S. Department of Commerce's remand redetermination of the final results in the sixth administrative review of the antidumping duty order on large power transformers from the Republic of Korea]

Dated: May 10, 2022

Ron Kendler, White & Case LLP, of Washington, D.C., argued for Plaintiff Hyundai Electric & Energy Systems Co., Ltd. With him on the brief were David E. Bond and William J. Moran.

Kelly A. Krystyniak, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., argued for Defendant United States. With her on the brief were Brian M. Boynton, Acting Assistant Attorney General, Patricia M. McCarthy, Director, and L. Misha Preheim, Assistant Director. Of counsel on the brief was Ian McInerney, Counsel, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, D.C.

Melissa M. Brewer, Kelley Drye & Warren LLP, of Washington, D.C., argued for Defendant-Intervenors Hitachi Energy USA Inc. and Prolec-GE Waukesha, Inc. With her on the brief were R. Alan Luberda and David C. Smith.

Barnett, Chief Judge:  This matter is before the court following the U.S.

Department of Commerce's ("Commerce" or "the agency") remand results in the sixth

administrative review of the antidumping duty order on large power transformers

("LPT(s)") from the Republic of Korea ("Korea") for the period of review August 1, 2017,

to July 31, 2018 ("the POR").  *See* Confid. Final Results of Redetermination Pursuant to

Court Remand ("Remand Results"), ECF No. 55-1; *see also Large Power Transformers*

*from the Republic of Korea*, 85 Fed. Reg. 21,827 (Dep't Commerce Apr. 20, 2020) (final

results of antidumping duty administrative review; 2017-2018) ("*Final Results*"), ECF

No. 24-4, and accompanying Issues and Decision Mem., A-580-867 (Apr. 14, 2020)

("I&D Mem."), ECF No. 24-5.[1]

Plaintiff Hyundai Electric & Energy Systems, Co., Ltd. ("HEES") commenced this

case challenging several aspects of the *Final Results*.  *See* Confid. Compl., ECF No.

13; Summons, ECF No. 1.  HEES moved to supplement the administrative record with

two additional documents relating to Commerce's finding that a particular LPT was

produced in Korea rather than the United States, which the court granted.  *See Hyundai*

*Elec. & Energy Sys. Co. v. United States*, 44 CIT __, 477 F. Supp. 3d 1324 (2020).

Defendant United States ("the Government" or "Defendant") then requested a remand of

---

[1] The administrative record for this case is divided into a Public Administrative Record
("PR"), ECF No. 24-1, and a Confidential Administrative Record ("CR"), ECF No. 24-2.
The administrative record associated with the remand results is contained in a Public
Remand Record, ECF No. 58-3, and Confidential Remand Record, ECF No. 58-2.  The
parties submitted joint appendices containing record documents cited in their briefs.
*See* Public J.A., ECF No. 82; Am. Confid. J.A. ("CJA"), ECF No. 92.

the *Final Results* to address these two additional documents, which the court also

granted.  *See Hyundai Elec. & Energy Sys. Co. v. United States*, Slip Op. 20-160, 2020

WL 6559158 (CIT Nov. 9, 2020).

On June 30, 2021, Commerce filed its Remand Results.  In the Remand Results,

Commerce determined to use "total facts available with an adverse inference" to

calculate HEES's dumping margin because HEES (1) "failed to cooperate by not acting

to the best of its ability to comply with a request for sales documentation"; (2) "impeded

the proceeding by providing shifting and opaque explanations for its classification of

certain parts and components as out-of-scope"; and (3) "failed to demonstrate that it

reported all required sales in its U.S. sales database and therefore that its reporting of

all U.S. sales of subject merchandise during the POR was complete."  Remand Results

at 31.

HEES has moved for judgment on the agency record, challenging Commerce's

application of facts available, adverse facts available, and total adverse facts available

in both the *Final Results* and Remand Results.  Confid. Rule 56.2 Mot. for J. on the

Agency Rec. on Behalf of Pl. [HEES], ECF No. 68; Confid. Am. Mem. of P. & A. in

Supp. of Pl.'s Rule 56.2 Mot. for J. Upon the Agency R. ("Pl.'s Rule 56.2 Mot."), ECF

No. 88; Confid. Am. Reply in Supp. of Pl.'s Rule 56.2 Mot. for J. Upon the Agency R.,

ECF No. 90. ("Pl.'s Reply").  Specifically, HEES avers that Commerce's determinations

that HEES (1) failed to submit service-related revenue documentation, (2) incorrectly

reported certain contested part(s)[2] as non-scope merchandise, and (3) failed to report

the sale of an LPT to a U.S. customer were not supported by substantial evidence and

that, with respect to these issues, substantial evidence did not support the agency's

application of adverse and total adverse facts available. *See* Pl.'s Rule 56.2 Mot. at 1–

4.

Defendant-Intervenors Hitachi Energy USA Inc. and Prolec-GE Waukesha, Inc.[3]

(together, "Defendant-Intervenors") and the Government urge the court to sustain both

the *Final Results* and Remand Results. *See generally* Confid. Def.-Ints.' Resp. in Opp'n

to Pl.'s Mot[ ]. for J. on the Agency R., ECF No. 75 ("Def.-Ints.' Resp."); Confid. Def.'s

Resp. to Pl.'s Mot. for J. on the Agency R., ECF No. 72 ("Def.'s Resp.").

On March 9, 2022, the court heard confidential oral argument. Docket Entry,

ECF No. 97.

For the reasons discussed below, the *Final Results*, as amended by the Remand

Results, are again remanded to Commerce to clarify or reconsider its use of facts

available with respect to HEES's reporting of the contested part(s) and to clarify or

reconsider its use of total adverse facts available.

---

[2] The "contested part(s)" refers to certain [[                                                    ]], reference
to which is treated as business proprietary information.
[3] Hitachi Energy USA Inc. and Prolec-GE Waukesha, Inc. previously went by the names
ABB Enterprise Software Inc. and SPX Transformer Solutions, Inc., respectively. *See*
Order (Feb. 22, 2022), ECF No. 96 (granting motion to amend the caption).

JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to section 516A(a)(2)(B)(iii) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(iii) (2018),[4] and 28 U.S.C. § 1581(c).

The court will uphold an agency determination that is supported by substantial evidence and otherwise in accordance with law.  19 U.S.C. § 1516a(b)(1)(B)(i).  While Commerce's conclusions must be supported by substantial evidence, *id.*, "the possibility of drawing two different conclusions from the evidence does not prevent [Commerce's] finding from being supported by substantial evidence," *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966).

DISCUSSION

## I.    Legal Framework

### A.  Basic Antidumping Principles

Commerce imposes an antidumping duty on foreign merchandise that "is being, or is likely to be, sold in the United States at less than its fair value" and results in material injury or threat of injury to a U.S. domestic industry.  19 U.S.C. § 1673.  The antidumping duty imposed is "an amount equal to the amount by which the normal value exceeds the export price (or the constructed export price) for the merchandise."  *Id*. Accordingly, antidumping analysis requires Commerce to compare the export price ("EP") or constructed export price ("CEP") of the subject merchandise with the normal value of the foreign like product.  *Id*. § 1677b(a) (Commerce must make "a fair

---

[4] All citations to the Tariff Act of 1930, as amended, are to Title 19 of the U.S. Code, and references to the U.S. Code are to the 2018 edition unless otherwise stated.

comparison . . . between the export price or constructed export price" and "normal value" of the subject merchandise); *see also* 19 C.F.R. § 351.401(a).

The EP is "the price at which the subject merchandise is first sold . . . by the producer or exporter of the subject merchandise . . . to an unaffiliated purchaser in the United States or to an unaffiliated purchaser for exportation to the United States." 19 U.S.C. § 1677a(a). The CEP is "the price at which the subject merchandise is first sold . . . by or for the account of the producer or exporter of such merchandise or by a seller affiliated with the producer or exporter, to a purchaser not affiliated with the producer or exporter." *Id.* § 1677a(b). In other words, generally speaking, direct sales made to unaffiliated U.S. purchasers prior to importation must be reported as EP sales, whereas, if the first sale is made to an affiliated purchaser, the affiliated party sale is disregarded, and the subsequent resale by the affiliated reseller to an unaffiliated U.S. customer must be reported as a CEP sale. *See id*. § 1677a(a)–(b).

### B. Facts Otherwise Available

When "necessary information is not available on the record," or an interested party "withholds information" requested by Commerce, "fails to provide" requested information by the submission deadlines, "significantly impedes a proceeding," or provides information that cannot be verified pursuant to 19 U.S.C. § 1677m(i), Commerce "shall . . . use the facts otherwise available." *Id.* § 1677e(a).

Commerce's authority to use facts otherwise available is subject to 19 U.S.C. § 1677m(d), which requires Commerce, upon determining that a response does not comply with its request for information, to "promptly inform the person submitting the

response of the nature of the deficiency" and provide "an opportunity to remedy or

explain the [deficient response]."  Broadly drawn initial or supplemental questionnaires

may not sufficiently place a respondent on notice of the nature of the deficiency and

may thus deprive the respondent of the opportunity to remedy that deficiency.  *See,

e.g.*, *Ta Chen Stainless Steel Pipe v. United States*, 23 CIT 804, 820 (1999).

        If a party provides further information in response to such deficiency, subject to

19 U.S.C. § 1677m(e), Commerce may disregard all or part of the original and

subsequent responses if the agency finds the response not satisfactory or the response

is not timely submitted.  19 U.S.C. § 1677m(d).  Section 1677m(e) provides that

Commerce may not "decline to consider information that is . . . necessary to the

determination but does not meet all the applicable requirements" when the information

is timely submitted; "the information can be verified"; "the information is not so

incomplete that it cannot serve as a reliable basis for reaching the applicable

determination"; the proponent of the information "has demonstrated that it acted to the

best of its ability in providing the information and meeting the requirements established

by [Commerce]"; and "the information can be used without undue difficulties."  *Id*.

§ 1677m(e).

### C.  Adverse Facts Available

        If Commerce determines that a party "has failed to cooperate by not acting to the

best of its ability to comply with a request for information," Commerce "may use an

inference that is adverse to the interests of that party in selecting from among the facts

otherwise available."  *Id*. § 1677e(b).  "Compliance with the 'best of its ability' standard

is determined by assessing whether a respondent has put forth its maximum effort to

provide Commerce with full and complete answers to all inquiries in an investigation."

*Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1382 (Fed. Cir. 2003); *see also*

*Essar Steel Ltd. v. United States*, 678 F.3d 1268, 1275–76 (Fed. Cir. 2012).

Commerce uses total adverse facts available to determine dumping margins

when "none of the reported data is reliable or usable."  *Zhejiang DunAn Hetian Metal*

*Co. v. United States*, 652 F.3d 1333, 1348 (Fed. Cir. 2011) (citation omitted); *see also*

*Nat'l Nail Corp. v. United States*, 43 CIT __, __, 390 F. Supp. 3d 1356, 1374 (2019)

(explaining that "Commerce uses 'total adverse facts available'" when it applies

"adverse facts available not only to the facts pertaining to specific sales or

information . . . not present on the record, but to the facts respecting all of respondents'

production and sales information that the [agency] concludes is needed for an

investigation or review") (citation omitted).

## II.   Service-Related Revenue

### A.  Overview

In an antidumping duty review, Commerce compares the EP or CEP of subject

merchandise (i.e., the price at which subject merchandise is sold in the United States)

to the "normal value," which is the price of like products in the exporting country or a

third country.  19 U.S.C. §§ 1677(35), 1677a(a), 1677b(a).  In determining the price of

subject merchandise, Commerce declines to treat service-related revenues (e.g., ocean

freight revenue, inland freight revenue, oil revenue, installation) as an addition to the EP

or CEP.  *See ABB Inc. v. United States*, 44 CIT __, __, 437 F. Supp. 3d 1289, 1295

(2020); Request for Information—Antidumping Duty Administrative Review: [HEES]—

Korea—[LPTs] (Dec. 17, 2018) ("Initial Questionnaire") at C-1, PR 24, CJA Tab 3 (listing

categories of service-related revenues).  Accordingly, "[w]hen Commerce finds that a

service is separately negotiable, its practice has been to cap the service-related

revenue by the associated expenses when determining the U.S. price."  *Id*. (quoting

*Hyundai Heavy Indus. Co. v. United States*, 42 CIT __, __, 332 F. Supp. 3d 1331, 1340

(2018)).

     In this sixth administrative review of LPTs from Korea, Commerce determined

that HEES withheld necessary service-related revenue information and failed to

cooperate to the best of its ability and, therefore, the agency used adverse facts

available to determine HEES's dumping margin.  *See* I&D Mem. at 14; Remand Results

at 31.

     During the review, Commerce twice asked HEES to report service-related

revenue and associated expenses.  *See* Initial Questionnaire at C-1; First Sales Suppl.

Questionnaire (May 29, 2019) ("FSSQ") at 6, CR 351, PR 169, CJA Tab 12.  The Initial

Questionnaire specifically requested HEES to

> [d]escribe your agreement(s) for sales in the United States and the foreign
> market (e.g., long-term purchase contract, short-term purchase contract,
> purchase order, order confirmation).  Provide a copy of each type of
> agreement and *all sales-related documentation* generated in the sales
> process (including the purchase order, internal and external order
> confirmation, invoice, and shipping and export documentation) for a
> sample sale in the foreign market and U.S. market during the POR.

Initial Questionnaire at A-9–A-10 (emphasis added).

In response to the Initial Questionnaire, HEES explained that ownership changes had occurred such that there were differences between the identity of its affiliates in this period of review and previous reviews.  HEES's Initial Methodology Cmts. (Dec. 31, 2018) ("HEES Methodology Cmts.") at 21, CR, 7, PR 28, CJA Tab 4.  Specifically, HEES explained that, according to the statutory definition of the term, Hyundai USA was no longer its affiliate.[5]  *Id*.  Despite acknowledging this change in status, HEES informed Commerce that it would continue to follow the approach used in prior reviews and treat Hyundai USA as an affiliate of HEES because there were other bases upon which the agency might find affiliation.  *Id*.

Commerce did not determine whether HEES and Hyundai USA were affiliated prior to HEES's submission of its Section A Questionnaire Response.  *See* Pl.'s Rule 56.2 Mot. at 7.  In its Section A Questionnaire Response, HEES again stated that it no longer owned more than five percent of Hyundai Corporation, but that there were other bases upon which Commerce might find that HEES was affiliated with Hyundai USA. *See* AQR at A-17, A21–A-23.  HEES again stated that it would report its U.S. sales through Hyundai USA as CEP sales.  *See id.* at A-23.  HEES further stated that if

---

[5] In the original investigation and each subsequent review prior to the POR, Commerce considered Hyundai Corporation USA ("Hyundai USA") and HEES to be affiliated because HEES's predecessor, Hyundai Heavy Industries Co., Ltd. ("HHI"), owned more than five percent of Hyundai Corporation, which in turn owned one hundred percent of Hyundai USA.  *See* Pl.'s Rule 56.2 Mot. at 6.  During the POR, HEES's ownership changed such that it no longer owned more than five percent of Hyundai Corporation, and thus, no longer owned more than five percent of Hyundai USA.  *See id* at 7; HEES's Sec. A Questionnaire Resp. (Feb. 19, 2019) ("AQR") at A-22–A-23, CR 136–37, PR 89–98, CJA Tab 5.

Commerce believed its U.S. sales should be reported on an EP basis, it was "ready to provide such information in a supplemental response."  *Id*.

Commerce then issued the First Sales Supplemental Questionnaire, in which it requested that HEES explain whether Hyundai USA was affiliated and why Commerce should treat HEES's U.S. sales on a CEP basis.  FSSQ at 4–5.  HEES again explained that Hyundai USA was not affiliated according to the statutory definition of "affiliate." HEES's Resps. to the Dep't's [FSSQ] (June 19, 2019) ("Resps. to FSSQ") at 1SS-17– 1SS-18, CR 419–59, PR 192–95, CJA Tab 15.  In response to Commerce's questions as to why HEES's U.S. sales should be reported on a CEP basis, HEES answered that if Commerce found that Hyundai USA was not an affiliate, U.S. sales should be treated as EP sales.  *Id*. at 1SS-17.

The First Sales Supplemental Questionnaire again asked HEES to "separately report all service-related revenues (i.e., not grouped together or bundled) if those revenues are reflected on any sale documentation."  FSSQ at 6.  Commerce asked HEES to submit "complete copies of each type of [[                    ]] and each change order" related to certain sales made by Hyundai USA.  *Id*. at 7.  HEES requested clarification of these questions.  Clarification of Certain Questions in the Dep't's [FSSQ] (June 12, 2019) at 1–5, CR 407, PR 185, CJA Tab 14.  Commerce responded that if HEES bundled related expenses and service-related revenue, it should provide an explanation as to why it did so and reiterated that HEES "should report service-related revenues if they [were] reflected on *any* documented external sales correspondence with customers . . . in accordance with Commerce's practice."

Letter from Brian C. Davis to Neil R. Ellis (June 20, 2019) ("Commerce Ltr.") at 1–2, CR

471, PR 208, CJA Tab 16.  Commerce also explained that, regarding its request for

sales documentation for the selected sales, HEES should submit copies of the

requested documents.  *Id.* at 2.

HEES responded by reporting "service-related revenue as reflected on any sales

documentation with the customer."  HEES's Resps. to the Remainder of the

Department's [FSSQ] (July 1, 2019) ("Resps. to Remainder of FSSQ") at 1SS-3–1SS-4,

Exhibit C-1 (Revised), Exhibit C-2 (Revised 2), CR 504–16, PR 221–23, CJA Tab 17;

Resps. to FSSQ at 1SS-33–1SS-34.  HEES's response maintained that HEES was not

affiliated with Hyundai USA but, nevertheless, did not provide service-related revenue

documentation between HEES and Hyundai USA.  Despite HEES's claim of non-

affiliation, HEES stated that documentation between the companies was "intercompany,

internal communications."  *See* I&D Mem. at 13.

Commerce conducted a CEP verification of the sales responses of HEES and

Hyundai USA.  *See* U.S. Verification of the Sales Resp. of [HEES] (Oct. 9, 2019) ("CEP

Verification Report") at 1, CR 667, PR 295, CJA Tab 28.  At verification, Commerce

discovered that there were "several types of documents related to the sales process

that had not been placed on the record."  *Id.* at 10.  After being asked why these

documents had not been placed on the record, HEES officials explained that they were

"considered . . . internal documentation."  *Id.*  In particular, Commerce noted a

document that allocated sales and service revenues and expenses between HEES and

Hyundai USA, and then subsequently between Hyundai USA and Hyundai Power

Transformers USA ("HPT"); HEES affirmed that every U.S. sale had similar documentation allocating sales and service revenues and expenses.  *Id.* at 11.

Based on HEES's failure to report all requested service-related revenue documentation as outlined above, Commerce found that HEES withheld necessary information, impeded the review, and failed to cooperate to the best of its ability; accordingly, Commerce used adverse facts available for the *Final Results*.  *See* I&D Mem. at 8, 10–14.

### B.  Parties' Contentions

HEES contends that Commerce's use of adverse facts available with respect to its reporting of service-related revenue was unsupported by substantial evidence and contrary to law because it fully responded to Commerce's requests and Commerce failed to notify HEES of deficiencies in its responses.  *See* Pl.'s Rule 56.2 Mot. at 23–27; Pl.'s Reply at 1–3.

The Government and Defendant-Intervenors contend that Commerce's use of adverse facts available was supported by substantial evidence because HEES failed to submit documentation regarding the allocation of service-related revenue between HEES and Hyundai USA.  *See* Def.'s Resp. at 19–21; Def.-Ints.' Resp. at 8 (incorporating by reference Defendant's arguments).  They also contend that Commerce was not required to notify HEES of deficiencies in its responses because

Commerce did not determine how to treat HEES's sales until the preliminary results,[6]

and that HEES's argument "does not justify its incomplete responses to Commerce's

requests for information."  Def.'s Resp. at 19.

### C.  Analysis

#### i.  Substantial Evidence Supports Commerce's Finding that HEES Withheld Necessary Information and Otherwise Impeded the Administrative Review

Commerce may use facts available if, *inter alia*, "necessary information is not

available on the record," or an interested party withholds information requested by

Commerce or significantly impedes a proceeding.  19 U.S.C. § 1677e(a).  The court

finds that substantial evidence supports Commerce's decision that necessary

information was not on the record, that HEES withheld requested information, and that

HEES's failure to provide the requested information significantly impeded the

proceeding.

It is undisputed that necessary information was not on the record.  As noted

above, Commerce ultimately determined that HEES and Hyundai USA were not

affiliated; thus, HEES was required to provide documentation of service-related revenue

allocation between the two unaffiliated companies to allow Commerce to calculate an

accurate dumping margin.  *See* I&D Mem. at 13–14.  However, because HEES decided

to report its U.S. sales in the same manner as it had in prior administrative reviews,

---

[6] For Commerce's preliminary results, *see Large Power Transformers From the Republic of Korea*, 84 Fed. Reg. 55,559 (Dep't Commerce Oct. 17, 2019) (preliminary results of antidumping administrative review; 2017-2018), and accompanying Decision Mem., A-580-867 (Oct. 9, 2019).

despite acknowledging the change in ownership and affiliation status, HEES did not

submit the necessary service-related revenue documentation between HEES and

Hyundai USA.  *See* I&D Mem. at 14.

Commerce twice asked HEES to report service-related revenue and associated

expenses.  *See* Initial Questionnaire at B-1; FSSQ at 6.  Commerce clearly directed

HEES to report "all service-related revenues," FSSQ at 6, and later clarified that HEES

should document all such revenue allocated between HEES and its external customers,

*see* Commerce Ltr. at 1–2.  HEES does not dispute that it did not provide

documentation of service-related revenue between itself and Hyundai USA, which

HEES maintained, and Commerce agreed, was not an affiliated customer.  *See* I&D

Mem. at 13–14; Resps. to FSSQ at 1SS-17–1SS-18.  Thus, the statutory requirements

for using facts available were met not only because necessary information was not

available on the record, but also because HEES withheld from Commerce the

requested documentation of "all service-related revenue" between HEES and its

customers.  *See* 19 U.S.C. § 1677e(a).

HEES's contention that Commerce was barred from using facts available

because it fully responded to Commerce's requests is without merit.  Specifically, HEES

argues that because Commerce knew that HEES was proceeding under the assumption

that Hyundai USA would be treated as an affiliate, and because Commerce did not

indicate anything to the contrary, HEES was not required to submit documentation

showing service-related revenue allocation between itself and Hyundai USA.  Pl.'s Rule

56.2 Mot. at 23–25; Pl.'s Reply at 2–3.  HEES asserts that it "reasonably understood

[Commerce's request to report service-related revenue based on external sales correspondence with customers] to refer to documentation exchanged with unaffiliated customers, not communications with Hyundai USA," based on prior Commerce practice and the court's precedent in *ABB Inc. v. United States*, 42 CIT __, 355 F. Supp. 3d 1206, 1219 (2018).  Pl.'s Rule 56.2 Mot. at 24; *see also* Pl.'s Reply at 2.

HEES's reliance on the court's finding in *ABB* is misplaced.  In *ABB*, the court found that contracts between HEES (then-called HHI) and Hyundai USA containing service-related revenue figures were "internal . . . communications."  *See ABB*, 355 F. Supp. 3d at 1219.  *ABB*, however, is inapposite because the factual predicate for the court's holding in that case—affiliation—no longer exists between HEES and Hyundai USA.  *See id.*  Indeed, HEES does not challenge Commerce's determination that HEES and Hyundai USA were not affiliated during the POR.  As the U.S. Court of Appeals for the Federal Circuit has recognized, "[t]he mere failure of a respondent to furnish requested information—for any reason—requires Commerce to resort to other sources of information to complete the factual record on which it makes its determination."  *Nippon Steel*, 337 F.3d at 1381.  Thus, for the reasons stated above, the court finds that substantial evidence supports Commerce's use of facts available with respect to HEES's reporting of service-related revenue and expenses.

### ii. Commerce Provided HEES with an Appropriate Deficiency Notice

In order to rely on facts available, upon finding that a response does not comply with its requests for information, Commerce must promptly inform the respondent that

its response is deficient and provide the respondent with an opportunity to remedy or explain the deficiency.  19 U.S.C. §§ 1677e(a), 1677m(d).

HEES argues that Commerce failed to provide a deficiency notice requesting the reporting of service-related revenue on an EP basis.  Pl.'s Rule 56.2 Mot. at 25.  HEES contends, in effect, that Commerce had notice that HEES did not report sales to Hyundai USA and should have provided a deficiency notice requesting HEES to do so.  *See id*. at 25–27.  The court finds, however, that Commerce provided HEES an opportunity to address the deficiency.

The fundamental problem for HEES is that it sought to maintain inconsistent factual and reporting positions and to place the burden on Commerce to resolve those inconsistencies.  HEES asserted that, as a factual matter, its corporate structure had changed for the POR such that it was no longer affiliated with Hyundai USA.  *See* HEES Methodology Cmts. at 21.  Notwithstanding that factual change, HEES reported its U.S. sales on a CEP basis as if they were affiliated, as it had in prior administrative reviews.  *See id*.  HEES failed to reconcile these two positions before Commerce.

In its First Sales Supplemental Questionnaire, Commerce again asked HEES to provide relevant sales documentation and specified that HEES should report service-related revenue as "reflected on *any* documented external sales correspondence."  Commerce Ltr. at 1–2 (clarifying Commerce's requests for information in the First Sales Supplemental Questionnaire).  While it is clear to the court that HEES chose to interpret that clarification as relating to documentation between Hyundai USA and its U.S. customers, HEES's interpretation flies in the face of its contemporaneous position that

HEES was no longer affiliated with Hyundai USA (such that HEES's correspondence with Hyundai USA would constitute external correspondence).

Commerce was not required to issue a second deficiency notice after preliminarily finding Hyundai USA not to be affiliated, nor was HEES entitled to withhold certain information in order to force the timing of Commerce's determination of the relevance of such information.  *See Hyundai Heavy Indus. Co. v. United States*, 44 CIT __, __, 485 F. Supp. 3d 1380, 1398–99 (2020) ("[S]ection 1677m(d) is not meant to allow an interested part[y] 'to submit information that cannot be evaluated adequately within the applicable deadlines.'") (citation omitted).

As a respondent, HEES had the burden to build the record of the proceeding. *See QVD Food Co. v. United States*, 658 F.3d 1318, 1324 (Fed. Cir. 2011).  HEES was not entitled to maintain that it was no longer affiliated with Hyundai USA yet seek to assign blame to Commerce when HEES did not report its sales consistent with HEES's position.  HEES was asked to and failed to provide service-related revenue documentation between it and its unaffiliated customers, including Hyundai USA. Instead, HEES withheld this information, resulting in an incomplete record.

### iii.  Substantial Evidence Supports Commerce's Use of Adverse Facts Available

The court also examines whether Commerce's analysis of HEES's failure to provide the requested service-related revenue documentation supports the agency's determination to draw an adverse inference pursuant to 19 U.S.C. § 1677e(b).  HEES argues that Commerce should not have expected more forthcoming responses because

HEES repeatedly requested guidance and offered to provide EP sales data if Commerce requested it.  HEES maintains that its responses were "reasonable, cooperative and sufficiently 'forthcoming' under the circumstances."  *See* Pl.'s Rule 56.2 Mot. at 40.  The court finds that substantial evidence supports Commerce's determination that HEES failed to act to the best of its ability in complying with Commerce's repeated requests that all service-related revenue be reported.

        To avoid the risk of an adverse inference, a party must act to the best of its ability to comply with a request for information by Commerce.  19 U.S.C. § 1677e(b).  Substantial evidence supports Commerce's determination that HEES did not act to the best of its ability to provide documentation of all service-related revenue.  HEES knew that as a result of changes in its ownership structure, it was no longer affiliated by ownership with Hyundai USA, yet it chose to report its U.S. sales on a CEP basis.  HEES Methodology Cmts. at 21.  Commerce reasonably concluded that HEES failed to act to the best of its ability by so doing.  I&D Mem. at 14.  The fact that Commerce had found the two companies affiliated in previous reviews does not excuse HEES's failure to provide all requested documentation.  *See Hyundai Heavy Indus.,* 332 F. Supp. 3d at 1342 ("HHI may not […] rely on Commerce's factual conclusions from prior reviews in the instant review because each review is separate and based on the record developed before the agency in the review.").  In short, it was HEES's burden to build the record, and Commerce reasonably found that HEES failed to do so.  *See Ta Chen Stainless Steel Pipe, Inc. v. United States*, 298 F.3d 1330, 1336 (Fed. Cir. 2002) ("The burden of production [belongs] to the party in possession of the necessary information.") (citation

omitted) (alteration in original).  Here, HEES willfully failed to report all service-related revenue as requested by Commerce, "depriv[ing] Commerce of the ability to analyze [HEES's] sales process, capping methodology, and affiliations."  *See* I&D Mem. at 14.

HEES also argues that in applying adverse facts available, Commerce simply restated its basis for using facts available—HEES's failure to provide information, Pl.'s Rule 56.2 Mot. at 39–40—and thus an adverse inference is not supported, *id*. at 40.  To the contrary, Commerce explained that the use of an adverse inference was warranted because HEES failed to cooperate to the best of its ability in responding to Commerce's requests when, despite multiple requests for service-related revenue and no indication from Commerce that HEES and Hyundai USA were affiliated, HEES did not provide the requested service-related revenue documentation and did not disclose, prior to verification, that such documentation existed.  *See* I&D Mem. at 10–14.  Thus, Commerce did not simply restate its basis for using facts available to support its use of adverse facts available.

As such, the court sustains Commerce's use of facts available with an adverse inference with respect to HEES's reporting of sales-related revenue.

### III.    Reporting of Contested Parts

#### A.  Overview

Commerce also determined that HEES impeded the review by failing to report certain contested parts consistently and accurately, thus preventing Commerce from accurately calculating normal value.  *See* I&D Mem. at 16–19.

In order to determine normal value, Commerce required HEES to provide "a detailed list" and explanation of all merchandise, both in-scope and out-of-scope, included in each home-market sale.  Initial Questionnaire at B1–B2.  In response to Commerce's questionnaires, HEES designated certain contested parts as not within the scope of the order.  *See* Resps. to Remainder of the [FSSQ], Ex. B-2 (Revised 2); Sec. B Questionnaire Resp. (Mar. 11, 2019) ("BQR") at B-7, Ex. B-2, CR 215–31, PR 117–19, CJA Tab 6.

Petitioners[7] commented that certain parts designated by HEES as non-scope merchandise should have been reported as in-scope for determining normal value.  *See* Pet'r's' Cmts. on the Suppl. Secs. B and C Questionnaire Resp. of [HEES] (July 19, 2019) ("Pet'r's' Cmts.") at 10–12, CR 544, PR 239, CJA Tab 18.  Petitioners pointed to the sale of a particular part,[8] noting that although the part was characterized as a component of in-scope merchandise, HEES classified it as out-of-scope and excluded the associated revenue and [[                          ]] from the home market sales file.  *Id*. at 10.

HEES explained that it classified this part as out-of-scope because it was not a transformer part and because it was not attached to or physically part of the LPT, but was instead located remotely, typically 50 to 100 meters from the transformer.  HEES's Rebuttal to Pet'r's Cmts. on HEES's First Sales Suppl. Resp. (Aug. 2, 2019) ("Rebuttal

---

[7] The petitioners that commented on HEES's reporting are Defendant-Intervenors.  *See* Pet'r's' Cmts at 1.

[8] This part was referred to as the "[[        ]]" and consisted of [[                          ]], including a "[[                  ]]."  Pet'r's' Cmts. at 10.

to Pet'r's' Cmts.") at 9–11, CR 575, PR 244, CJA Tab 19.  HEES argued that "the scope

of the order include[d] only LPTs, active transformer parts, and *any other transformer*

*parts* attached to, imported with or invoiced with the active parts of LPTs."  *Id*. at 10–11.

At verification, Commerce identified a possible inconsistency in HEES's reporting

of the contested part(s).[9]  Verification of the Sales Resp. of [HEES] (Oct. 9, 2019)

("Sales Verification Report") at 16, CR 666, PR 294, CJA Tab 27.  HEES addressed the

issue at verification, explaining that parts that governed (i.e., controlled) only in-scope

merchandise were reported as in-scope, while parts that governed both in-scope and

out-of-scope merchandise were reported as out-of-scope.  *See id.*  Thus, HEES

explained, because the "[[                                    ]]" governed only in-scope

merchandise (unlike other contested parts which also governed out-of-scope

merchandise), HEES considered it to be in-scope merchandise.  *See id.*  Commerce

concluded that this explanation was "inconsistent with" HEES's prior reporting that

HEES did "not consider or report [the contested parts] as [in-scope] because the

components are located several meters away and only attached by cables."  *Id.*

For the *Final Results*, Commerce concluded that the contested part(s) should

have been classified as in-scope merchandise.  *See* I&D Mem. at 16.  Commerce noted

that because it learned about this inaccuracy only during verification, it was not able to

---

[9] Specifically, Commerce noted that HEES classified as in-scope a part described as an
"[[                                    ]]" despite this part having similar features to contested
parts that HEES reported as out-of-scope merchandise—it was neither attached to, nor
physically part of the LPT, was located 50 to 100 meters from the LPT, and was
attached by cables.  Sales Verification Report at 16.

gather adequate information about the contested part(s) and, thus, HEES impeded the review by preventing Commerce from accurately calculating normal value.  *See id*. at 16, 19.

### B.  Parties' Contentions

HEES challenges Commerce's decision to rely on AFA on the grounds that HEES incorrectly reported certain contested parts as outside the scope of the order, claiming the decision is unsupported by substantial evidence and contrary to law.  *See* Pl.'s Rule 56.2 Mot. at 27–31.  HEES argues that it reported the contested parts consistent with the scope of the order and consistently throughout this review, that there was no gap in the record, and that Commerce failed to notify HEES of any reporting deficiencies.  *See id*.

The Government contends that Commerce reasonably concluded that it was unable to verify HEES's reporting of the contested part(s) or provide a deficiency notice because the inaccuracy was not apparent until verification.  *See* Def.'s Resp. at 21–23. Defendant-Intervenors contends that HEES did not consistently report the contested part(s).  Def.-Ints.' Resp. at 8–12.

### C.  Analysis

Commerce based its use of facts available on its finding that HEES inaccurately classified the contested part(s), stating that HEES impeded the review with its "shifting explanations" for treating the parts as in- or out-of-scope.  *See* I&D Mem. at 16.  For the following reasons, the court finds that substantial evidence does not support Commerce's reliance on facts available with respect to this issue.

As a baseline matter, Commerce failed to establish that HEES incorrectly reported the contested part(s). While Commerce cursorily notes that "it will treat parts and components as subject or non-subject merchandise based on the language in the scope of the order," it did not directly address HEES's interpretation of the scope of the order and application of the interpretation to HEES's reporting of sales. *Id.* The Government argues that HEES "should have known that [the contested part(s)] needed to be included in the gross unit price" based on the "plain language" of the scope of the order. *See* Def.'s Resp. at 22–23. The court is unable to follow the agency's logic, not only because the relevant scope language has not been interpreted by Commerce, but because Commerce does not clearly identify the particular part(s) that it believes HEES should have included in the gross unit price and explain why it finds the contested part(s) are within the scope of the order. *See* I&D Mem. at 16.

Likewise, substantial evidence does not support Commerce's finding that HEES inconsistently classified the contested part(s). HEES's classification of the part(s) remained unchanged in its questionnaire responses, *compare* BQR, Ex. B-2, *with* Resps. to Remainder of the FSSQ, Ex. B-2 (Revised 2), and its reporting of what may be distinct types of the contested part(s) also appears to have been consistent, *see* Rebuttal to Pet'r's' Cmts. at 9–11.

Defendant-Intervenors argue that, even if HEES's classification of the contested parts remained consistent, its explanations as to why they were classified as in- or out-of-scope were inconsistent. *See* Def.-Int.'s Resp. at 9 (citing I&D Mem. at 18). Although HEES did expand upon its reporting methodology at verification, it is not clear

to the court, from the record, that the additional explanation conflicted with HEES's earlier statements.  In its Rebuttal to Petitioners' Comments, HEES responded to the petitioners' claim that a particular contested part should have been reported as in-scope.  *See* Rebuttal to Pet'r's' Cmts. at 10–12.  HEES explained that this part was not in-scope because it was not a transformer part and was located remotely.  *Id*. at 10–11.

HEES's description at verification—that contested part(s) were being treated as in- or out-of-scope depending on what parts they governed—does not clearly conflict with the explanation provided in the Rebuttal to Petitioners' Comments.  In the Rebuttal to Petitioners' Comments, HEES identified that certain of the contested part(s) were not transformer parts, Rebuttal to Pet'r's' Cmts. at 10–12, and HEES's explanation at verification further clarified how HEES determined whether a part was a transformer part, *see* Sales Verification Report at 16.  In concluding that HEES's explanation was "inaccurate and . . . misleading," I&D Mem. at 18, Commerce ignored HEES's statements that different types of the contested part(s) were necessarily classified differently.

As the court understands the issue, in simpler terms, the distinction HEES draws is similar to the difference between a switch on a lamp and a switch on a circuit breaker.  Both parts are referred to as switches and flipping either switch off would turn off the lamp; nevertheless, the switch on the circuit breaker would not reasonably be considered part of the lamp, as it controls not only the flow of electricity to the lamp, but also controls the flow of electricity throughout the circuit.  Similar to how referring to both parts as "switches," despite their distinct functions, might lead to confusion, neither

Commerce's explanation nor the record is sufficiently clear to indicate whether the

dispute is caused by the use of a generic label being applied to two distinct parts, or

whether the part is one and the same and the dispute is over whether the part is in-

scope depending upon its placement in the LPT/electrical system.

      For these reasons, the court finds that substantial evidence does not support

Commerce's finding that HEES misclassified the contested part(s) and its reliance on

adverse facts available.  On remand, Commerce must reconsider or further explain

whether HEES failed to properly report the contested part(s) and, if so, what the

appropriate consequences of that reporting are.

IV.    **Completeness Failure at Verification**

    A. **Overview**

      In the Initial Questionnaire, Commerce asked HEES to report each U.S. sale of

subject merchandise during the POR.  *See* Initial Questionnaire at A-1.  HEES reported

[[  ]] U.S. sales.  *See* HEES's Revised Home Market and U.S. Sales Databases (Sept.

10, 2019), Ex. C-1 (Revised 2), CR 628, PR 273, CJA Tab 24.  Commerce reconciled

this database to HEES's audited books and records during verification.  *See* Remand

Results at 26.

      At verification, Commerce selected and examined an LPT sale that was not

included in HEES's U.S. sales database to test the completeness of that database (i.e.,

a completeness test).  *See* U.S. Verification of the Sales Resp. of [HEES] (Oct. 9, 2019)

("CEP Sales Verification Report") at 9–10, CR 667, PR 295, CJA Tab 28.  This sale had

been shipped and installed during the POR, but was recorded in Hyundai USA's accounting system outside the POR.  *Id.* at 9.

HEES provided documentation indicating that this sale was made by Hyundai USA on behalf of HPT and was for an Alabama-produced LPT.  *Id.* at 9–10.  The invoice for the sale indicated that the customer was invoiced for customs duties, leading Commerce to question whether the LPT was from Korea.  *Id.*; *see also* Hyundai CEP Sales Verification Exs. (Sept. 6, 2019) ("USSVE"), Ex. VE-8 at 5, CR 625–27, CJA Tab 23.

HEES explained that the LPT was originally planned to be produced in Korea, but that production was transferred to the United States after the initial purchase order, CEP Sales Verification Report at 10, and the inclusion of customs duties on the invoice was a clerical error, I&D Mem. at 7.  Noting that the purchase order required Hyundai USA to notify the customer of certain information[10] and obtain customer approval prior to beginning production, USSVE, Ex. VE-8 at 11, Commerce requested documentation that the customer was provided the notice of production transfer, CEP Sales Verification Report at 10.  HEES could not document such notification.  *See id.*

Commerce requested documentation of the shipment of the [[          ]].  *See id.*  HEES was unable to provide a bill of lading that included the [[          ]], but instead provided a "Confirmation of Shipping" showing that the [[          ]] had been

---

[10] Specifically, the purchase order required Hyundai USA to provide the customer with the "[[                                                                                            ]]."

shipped from HPT to the ultimate customer. *See id.*; USSVE, Ex. VE-8 at 33. Based on these facts, Commerce determined that the application of adverse facts available was warranted. *See* I&D Mem. at 6–8.

Pursuant to the court's Remand Order, Commerce considered two additional documents, a test report and a nameplate document.[11] *See* Remand Results at 10–19. Commerce concluded that the test report was inconclusive as to the manufacturer because the full test report included "a diagram of the nameplate for [the] LPT in question with the name '[[                    ]]' at the top and '[[                              ]]' at the bottom." *Id*. at 24 (internal footnote citation omitted). Furthermore, the test report contained a form with nameplate information identifying "'[[              ]]' as the manufacturer." *Id*. HEES was unable to identify record evidence demonstrating that "[[          ]]" refers to HPT. *Id*. at 24–25. Commerce also concluded that while the test report indicated that the LPT was tested at the Alabama plant, it did not establish that the [[          ]] was produced in the United States because it contained no information indicating the manufacturing location of the [[          ]]. *Id*. at 12. Commerce also found inconclusive the test report's inclusion of a serial number that differed from serial numbers given to LPTs produced in Korea as evidence that the LPT was manufactured in Alabama. *Id*. at 25.

---

[11] The test report shows, *inter alia*, that a particular item was tested and met certain specification requirements, while the nameplate document contains information about the LPT, such as the manufacturer's name, serial numbers, and technical specifications. *See* Confid. Pl.'s Mot. to Suppl. the R., Att. 1 and 2, ECF No. 28-2.

Commerce concluded that HEES failed to demonstrate that it had reported a complete U.S. sales database and, thus, application of adverse facts available was warranted. *See id.* at 19, 28. Commerce cited the following as evidence that the LPT was not produced in Alabama: HEES's inability to document that the production of the LPT was transferred from Korea to the United States; HEES's inability to provide a bill of lading that showed that all parts of the LPT were transferred from the production site in the United States to the final project site; Hyundai USA's accounting records and invoice indicating that the U.S. customer was billed for and paid customs duties; and a commission payment made by Hyundai USA to its Korean parent company associated with the sale of the LPT, listing HEES as the seller of the LPT. *See id.* at 18–19. Commerce explained that, "[t]aken as a whole, the lack of basic supporting documentation and the payment of customs duties by the customer" supported the agency's conclusion that HEES "failed to report [the sale of the LPT] as a U.S. sale" and "establishe[d] [HEES's] failure at verification." *Id.* at 19. Commerce concluded that "[a]ny inference that may be drawn from the testing in Alabama or a nameplate serial number [was] completely overshadowed by these failures." *Id.*

### B. Parties' Contentions

HEES contends that Commerce's application of adverse facts available with respect to the LPT allegedly produced in Korea is unsupported by substantial evidence. Pl.'s Rule 56.2 Mot. at 31–39, 41; Pl.'s Reply at 8–17. HEES argues that the weight of the evidence shows that "a reasonable person could only conclude that the LPT was produced in Alabama." Pl.'s Reply at 17.

The Government and Defendant-Intervenors contend that Commerce's

conclusion that the [[            ]] of the LPT was produced in Korea, and not Alabama,

as well as the use of adverse facts available, is supported by substantial evidence and

is otherwise in accordance with law.  Def.'s Resp. at 14–18; Def.-Ints.' Resp. at 2–8.

### C. Analysis

For the reasons discussed below, the court sustains Commerce's reliance on

adverse facts available with respect to HEES's failure of the completeness test.  In

particular, the court considers Commerce's determination in light of the undisputed fact

that the LPT was originally planned to be manufactured in Korea.  *See* Oral Arg. at

1:31:15–25 (on file with the court); Pl.'s Rule 56.2 Mot. at 16.  Thus, in reviewing

Commerce's determination, the question is whether the only reasonable conclusion

supported by the record, in its entirety, is that the LPT was produced in Alabama.  *See*

*Consolo*, 383 U.S. at 620.

Commerce's determination that the LPT was not produced in Alabama is not, as

HEES contends, "supported by a 'mere scintilla' of evidence."  Pl.'s Rule 56.2 Mot. at

39.  The record shows that the LPT in question was originally contracted to be produced

in Korea.  CEP Sales Verification Report at 10.  At verification, HEES provided an

invoice showing that the customer was billed for customs duties associated with the

LPT.  *See* USSVE, Ex. VE-8 at 5.  While HEES argues that the inclusion of customs

duties on this invoice was a clerical error, *see* Pl.'s Rule 56.2 Mot. at 37, and that this

document does not prove that the customs duties were actually paid, *see* Pl.'s Reply at

12, verification also confirmed that the invoice was paid in full, *see* USSVE, Ex. VE-8 at

5.  The fact that an invoice to the unaffiliated customer, inclusive of a line item for customs duties, was paid in full calls into question the assertion that this customer was aware that production of this LPT had been shifted to the United States and agreed to the shift.

While HEES is not wrong that the evidence relied on by Commerce does not definitively prove that the LPT was manufactured in Korea, likewise, the evidence pointed to by HEES does not definitively prove that the LPT was manufactured in Alabama.  HEES did not provide record evidence that the ultimate customer approved or acknowledged the change in the place of manufacture from Korea to Alabama.[12] *See* CEP Sales Verification Report, Ex. VE-8 at 11; CEP Sales Verification Report at 10.  HEES was also unable to provide a bill of lading for the [[          ]] of the LPT, which might have documented that all parts of the LPT were shipped from Alabama to the customer.  *See* CEP Sales Verification Report at 10.

The court does not find Commerce's weighing of the record evidence to be unreasonable.  HEES cites *Diamond Sawblades Manufacturers' Coalition v. United States*, 42 CIT __, 301 F. Supp. 3d 1326 (2018), to argue that Commerce failed to give adequate weight to material evidence contradicting its conclusion—in particular, the agency's reconciliation of HEES's reported sales and costs.  Pl.'s Reply at 9–10.  Reliance on *Diamond Sawblades* is misplaced.  In *Diamond Sawblades*, the court found

---

[12] HEES argues that the purchase order does not require this notice to be provided in writing.  Pl.'s Rule 56.2 Mot. at 36; Pl.'s Reply at 14–16.  While it is true that written notice was not required, HEES provided no record evidence that notice was provided.

that substantial evidence did not support Commerce's determination because

Commerce relied on a single piece of evidence to support its determination, despite

substantial record evidence supporting a contrary conclusion.  301 F. Supp. 3d at 1349.

Although the court agrees that Commerce's reconciliation of HEES's U.S. sales

database and the inclusion of the serial number in the test report and nameplate

support HEES's position, Commerce weighed this evidence against more than a single

piece of evidence.  Absent definitive evidence of the place of production, all record

evidence was circumstantial, and the court must sustain Commerce's findings when

substantial evidence supports those findings.  *See Consolo*, 383 U.S.at 620.

 The court now turns to whether Commerce's use of an adverse inference was

supported by substantial evidence.  HEES argues that its "alleged failure to respond to

a request for information" was not a failure to act to the best of its ability.  *See* Pl.'s Rule

56.2 Mot. at 41; *see also* Pl.'s Reply at 20.  The Government argues that Commerce's

use of adverse facts available was warranted because HEES was unable to support its

claim that the LPT in question was manufactured in the United States.  Def.'s Resp. at

14–18.  Defendant-Intervenors further argue that HEES's inadequate record keeping

supports Commerce's use of an adverse inference.  *See* Def.-Ints.' Resp. at 2–8.

 The court finds that substantial evidence supports Commerce's decision to apply

an adverse inference.  As discussed above, Commerce "may use an inference that is

adverse to the interests of [a respondent] in selecting from among the facts otherwise

available" when the respondent "fail[s] to cooperate by not acting to the best of its ability

to comply with a request for information."  19 U.S.C. § 1677e(b)(1)(A).  Commerce may

apply an adverse inference in circumstances under which it is reasonable for the

agency "to expect that more forthcoming responses should have been made." *Nippon*

*Steel*, 337 F.3d at 1382.

The court's assessment of whether HEES "put forth its maximum efforts to

investigate and obtain the requested information from its records," *Nippon Steel*, 337

F.3d at 1382–83, necessarily must consider whether HEES could or should have been

able to provide Commerce with the requested information.  Here, HEES should have

been able to document the place of production of the LPT.  *See Nippon Steel*, 337 F.3d

at 1382–84; *Diamond Sawblades Manufacturers' Coal. v. United States*, 43 CIT __, __,

415 F. Supp. 3d 1365, 1372–73 (2019) (noting that an experienced respondent "should

have been aware of the necessity to maintain country of origin records").  HEES, as a

participating respondent in previous proceedings, was certainly aware of the

antidumping order, the importance of reporting sales from Korea to the United States,

and in a case such as this, the importance of documenting any alleged change of

production from Korea to the United States.  It is HEES's burden to create an adequate

record for Commerce to make its determination.  *See QVD Food*, 658 F.3d at 1324.  It

was "reasonable for Commerce to expect that more forthcoming responses should have

been made," *Nippon Steel*, 337 F.3d at 1383, and it is reasonably discernible to the

court that Commerce found that HEES, an experienced respondent, failed to provide

documents that would surely be kept in the ordinary course of business.  *See Hung*

*Vuong Corp. v. United States*, 44 CIT __, __, 483 F. Supp. 2d 1321, 1351 (holding that

substantial evidence "permitted Commerce to apply an adverse inference" based on

experienced respondent's failure to retain documents maintained in the normal course of business).

For the foregoing reasons, the court sustains Commerce's use of adverse facts available with respect to HEES's completeness failure at verification.

## V.    Total Adverse Facts Available

Because the court finds that substantial evidence does not support Commerce's use of facts available with respect to HEES's reporting of the contested part(s), the court does not reach the question of whether substantial evidence supports Commerce's use of total adverse facts available.  Although Commerce stated that HEES's failure to provide the requested service-related revenue documentation warranted the application of total adverse facts available, I&D Mem. at 14, Commerce also stated that it relied on a combination of the failures to provide service-related revenue documentation, the failed completeness test, and inconsistently reported contested parts for home market sales as a basis for applying total adverse facts available, I&D Mem. at 21; Remand Results at 30–31 ("Commerce's decision to apply total AFA . . . was based on three findings, not solely on [HEES's failed completeness test].").  On remand, Commerce must therefore reconsider or further explain its use of total adverse facts available consistent with this decision.

### CONCLUSION AND ORDER

In accordance with the foregoing, it is hereby

**ORDERED** that Commerce's *Final Results*, as amended by the Remand Results, are remanded in part and sustained in part; it is further

**ORDERED** that, on remand, Commerce shall reconsider or further explain its determination to use facts available with respect to HEES's reporting of the contested part(s) in accordance with this opinion; it is further

**ORDERED** that, on remand, Commerce shall reconsider or further explain its determination to rely on total adverse facts available to determine HEES's margin in accordance with this opinion; it is further

**ORDERED** that Commerce's *Final Results*, as amended by the Remand Results, are sustained in all other aspects; it is further

**ORDERED** that Commerce shall file its remand redetermination on or before August 8, 2022; it is further

**ORDERED** that subsequent proceedings shall be governed by USCIT Rule 56.2(h); and it is further

**ORDERED** that any comments or responsive comments must not exceed 4,000 words.

/s/     Mark A. Barnett
Mark A. Barnett, Chief Judge

Dated: May 10, 2022
      New York, New York